# 25-0720-cv

## United States Court of Appeals
### for the
## Second Circuit

---

SJUNDE AP-FONDEN,

*Plaintiff-Appellant,*

MATTHEW SCHAEFFER,

*Plaintiff,*

– v. –

FEDERAL DEPOSIT INSURANCE CORPORATION,
in its capacity as Receiver for Signature Bank,

*Intervenor-Appellee,*

JOSEPH DEPAOLO, FRANK SANTORA, JOSEPH SEIBERT, SCOTT A.
SHAY, VITO SUSCA, STEPHEN WYREMSKI, KPMG LLP, ERIC HOWELL,

*Defendants-Appellees,*

BRIAN ANDREW PERGAMENT, JOHN ROMANO,

*Intervenors-Plaintiffs,*

SIGNATURE BANK, KPMG INTERNATIONAL LIMITED,

*Defendants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

**BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT**

---

SHARAN NIRMUL
RICHARD A. RUSSO
JOSHUA A. MATERESE
NATHANIEL C. SIMON
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

JOHN J. RIZIO-HAMILTON
JEREMY ROBINSON
ALEXANDER MCRAE NOBLE
JOHN J. ESMAY
JONATHAN D'ERRICO
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 554-1400

*Attorneys for Plaintiff-Appellant*

---

 (800) 4-APPEAL • (381076)

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Lead Plaintiff-Appellant Sjunde AP-Fonden, a Swedish public pension fund established under law as a Swedish governmental agency, is not a corporation.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT .........................................................1

QUESTION PRESENTED ......................................................................2

PRELIMINARY STATEMENT .............................................................3

STATEMENT OF THE CASE................................................................9

I.      Summary of the Allegations .........................................................9

II.     Procedural History .....................................................................12

      A.     Commencement of the Action and Appointment of AP7 ...................12

      B.     The FDIC Intervened and Moved to Dismiss the Amended Complaint ..............................................................14

      C.     The District Court Dismissed the Amended Complaint .....................16

SUMMARY OF THE ARGUMENT ....................................................16

ARGUMENT .......................................................................................19

I.      Standard of Review......................................................................19

II.     The District Court Erred by Interpreting the Succession Clause to Extend to Direct Shareholder Fraud Claims Against Signature's Former Officers and Outside Auditor.........................................................19

      A.     The Succession Clause Limits the Shareholder Rights to Which the FDIC Succeeds ..............................................................20

      B.     Courts of Appeal Have Uniformly Limited the Succession Clause to Shareholder Rights Seeking to Remedy a Corporate Harm, Which Mirrors This Court's Test in Analogous Contexts.......26

i

        1.     The Court of Appeals for the Third, Fourth, Seventh, Ninth, Tenth, and Eleventh Circuits Have Each Relied on the Direct-Derivative Test to Determine the Source of Harm ......................................................................27

        2.     The First Circuit's Analysis in *Zucker* Reinforces the Source of the Harm Inquiry ......................................................30

        3.     The FDIC Has Previously Argued that the Source of the Harm Test Controls..................................................................32

        4.     This Court Applied a Source of the Harm Inquiry to the Federal Deposit Insurance Act and Should Extend Its Reasoning to FIRREA's Succession Clause.............................32

    C.     Under Any Appropriate Analytical Framework, the Claims Here Belong to Shareholders Because They Allege Distinctive Injury ......36

    D.     The District Court's Test Premised on Reviewing Whether Any Alleged Facts Refer to the Bank and Its Assets Is Flawed and Is in Direct Conflict with Decisions of Numerous Courts of Appeal ....................................................................................................37

III.   FIRREA's Legislative History and Purpose Refute the District Court's Expansion of the Statute ...............................................................40

    A.     FIRREA's Purpose and History Refute the District Court's Opinion...........................................................................................41

    B.     The District Court's Opinion Raises Constitutional Problems..........45

IV.   The District Court's Erroneous Interpretation Leads to Absurd Results that Contravene FIRREA's Underlying Purpose and Intent ........................48

    A.     FIRREA's Priority Scheme, Which the District Court Relied on, Has No Bearing on These Investor Claims .........................................49

    B.     The District Court's Interpretation Seized Class Action Claims from Investors that the FDIC Cannot Bring and Does Not Even Recognize ..................................................................................55

CONCLUSION ...................................................................................................57

ii

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aaron v. Illinois Nat'l Ins. Co.*,
   2023 WL 7389034 (E.D. La. Nov. 8, 2023) ................................................26, 33

*Adato v. Kagan*,
   599 F.2d 1111 (2d Cir. 1979) ......................................................*passim*

*Amorosa v. AOL Time Warner, Inc.*,
   409 F. App'x 412 (2d Cir. 2011) ................................................7, 23, 55

*Morrone ex rel. Arotech Corp. v. Erlich*,
   2011 WL 1322085 (E.D.N.Y. Mar. 31, 2011) ............................... 23-24

*In re Atl. Fin. Fed. Sec. Litig.*,
   1991 WL 98757 (E.D. Pa. May 29, 1991) ............................ 29-30, 51

*Auburn Hous. Auth. v. Martinez*,
   277 F.3d 138 (2d Cir. 2002) ................................................................25

*Barnes v. Harris*,
   783 F.3d 1185 (10th Cir. 2015) ............................................ 27-28, 31

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
   472 U.S. 299 (1985) .............................................................................43

*In re Beach First National Bancshares, Inc.*,
   702 F.3d 772 (4th Cir. 2012) ..............................................................28

*Brazlin v. W. Sav. & Loan Assn.*,
   1994 WL 374286 (D. Ariz. Jan. 28, 1994) ........................................29

*In re Buttonwood Partners, Ltd.*,
   111 B.R. 57 (Bankr. S.D.N.Y. 1990)..................................................48

*Carter v. HealthPort Techs., LLC*,
   822 F.3d 47 (2d Cir. 2016) ..................................................................19

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reps., Inc.*,
   44 F.3d 61 (2d Cir. 1994) ....................................................................46

iii

*Clark v. Martinez*,
　543 U.S. 371 (2005)........................................................................46

*Cohen v. Beneficial Indus. Loan Corp.*,
　337 U.S. 541 (1949)........................................................................22

*Delta Sav. Bank v. United States*,
　265 F.3d 1017 (9th Cir. 2001) ..................................................48, 56

*Eisenhauer v. Culinary Inst. of Am.*,
　84 F.4th 507 (2d Cir. 2023) .........................................................41

*FDIC v. Jenkins*,
　888 F.2d 1537 (11th Cir. 1989) .....................................42, 43, 50-51

*Goldblatt v. Wells Fargo Advisors, LLC*,
　2011 WL 446896 (D. Conn. Feb. 1, 2011)................................33, 35

*Hayes v. Gross*,
　982 F.2d 104 (3d Cir. 1992) ....................................................*passim*

*Henneberry v. Sumitomo Corp. of Am.*,
　415 F. Supp. 2d 423 (S.D.N.Y. 2006) ..............................................50

*Howard v. Haddad*,
　916 F.2d 167 (4th Cir. 1990) ..................................................*passim*

*Indep. Inv. Protective League v. Time, Inc.*,
　50 N.Y.2d 259 (N.Y. 1980) ....................................................... 22-23

*Kamen v. Kemper Fin. Servs., Inc.*,
　500 U.S. 90 (1991)........................................................................22

*Lacewell v. Office of Comptroller of Currency*,
　999 F.3d 130 (2d Cir. 2021) .............................................................19

*Landy v. FDIC*,
　486 F.2d 139 (3d Cir. 1973) .............................................................21

*Levin v. Miller*,
　763 F.3d 667 (7th Cir. 2014) ...................................................*passim*

iv

*Lubin v. Skow*,
  382 F. App'x 866 (11th Cir. 2010) ....................................................29

*McCarthy v. FDIC*,
  348 F.3d 1075 (9th Cir. 2003) ....................................................20, 21

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.*,
  28 F.3d 376 (3d Cir. 1994), *as amended* (Aug. 29, 1994).................54

*New Rock Asset Partners, L.P. v. Preferred Entity
  Advancements, Inc.*,
  101 F.3d 1492 (3d Cir. 1996) .....................................................41

*O'Melveny & Myers v. FDIC*,
  512 U.S. 79 (1994)................................................................. 4-5, 21

*Pagliara v. Fed. Home Loan Mortg. Corp.*,
  203 F. Supp. 3d 678 (E.D. Va. 2016) ..............................................23

*Pareto v. FDIC*,
  139 F.3d 696 (9th Cir. 1998) ....................................................26, 29

*Patel v. Patel*,
  2010 WL 11549879 (N.D. Ga. Dec. 29, 2010) ...............................29

*Rajamin v. Deutsche Bank Nat. Tr. Co.*,
  757 F.3d 79 (2d Cir. 2014) ........................................................56

*Sacirbey v. Guccione*,
  589 F.3d 52 (2d Cir.2009) ..........................................................23

*SAS Inst., Inc. v. Iancu*,
  584 U.S. 357 (2018)....................................................................22

*In re Smith Barney Transfer Agent Litig.*,
  765 F. Supp. 2d 391 (S.D.N.Y. 2011) ........................................23, 29

*Springfield Hosp., Inc. v. Guzman*,
  28 F.4th 403 (2d Cir. 2022) .........................................................19

*In re SVB Fin. Grp.*,
  650 B.R. 790 ..............................................................................54

*In re Turquoise Hill Resources Ltd. Sec. Litig.*,
  2021 WL 2201388 (S.D.N.Y. June 1, 2021) ................................................. 44-45

*United States v. Gayle*,
  342 F.3d 89 (2d Cir. 2003) .................................................................... 19

*United States v. Miller*,
  145 S. Ct. 839 (2025) ................................................................... *passim*

*Verdi v. FDIC*,
  2024 WL 4252038 (S.D.N.Y. Sept. 20, 2024) ................................. 15, 37-38, 40

*In re WorldCom, Inc. Sec. Litig.*,
  293 B.R. 308 (S.D.N.Y. 2003) .......................................................... 51

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) .......................................... 53-54

*Zucker v. Rodriguez*,
  919 F.3d 649 (1st Cir. 2019)................................................... *passim*

**Statutes**

12 U.S.C. § 1821(d)(2)................................................................. 20

12 U.S.C. § 1821(d)(2)(A)(i) ..................................................*passim*

12 U.S.C. § 1821(d)(11)(A) ..................................................49, 50

15 U.S.C. § 78aa .............................................................................1

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. § 1331 ............................................................................1

28 U.S.C. § 1337............................................................................1

**Other Authorities**

U.S. Const. amend. V...................................................................45

Special Assessment Pursuant to Systemic Risk Determination,
  Final Rule, 88 FED. REG. 83,329 at 83,331 (Nov. 29, 2023)..............52

vi

135 CONG. REC. 18575 (daily ed. Aug. 3, 1989) ....................................42

135 CONG. REC. S3993-01 (daily ed. Apr. 17, 1989) ............................42

H.R. REP. 101-54(I) (1989), *reprinted in* 1989 U.S.C.C.A.N. 86 ..........42

S. 774, 101ST CONG. § 214(o) (1989-1990).................................................42

*Successor*, Black's Law Dictionary (12th ed. 2024) ...............................21

Federal Deposit Insurance Corporation, *Annual Report 2023* (Feb. 22, 2024), available at https://www.fdic.gov/about/financial-reports/reports/2023annualreport/2023-arfinal.pdf ............................................52

## JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of New York had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa. The District Court entered final judgment dismissing the action on March 24, 2025. Appellant filed a timely Notice of Appeal on March 27, 2025. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## QUESTION PRESENTED

Whether the District Court erred in holding that, under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the Federal Deposit Insurance Corporation succeeds to Sjunde AP-Fonden's class action claims for violations of the federal securities laws against Signature Bank's former officers and outside auditor, where: (1) the claims were direct, not derivative; (2) Signature Bank is not a defendant; (3) the claims do not seek recovery from Signature Bank's assets; and (4) no court had ever held that such claims belonged to the Federal Deposit Insurance Corporation?

## PRELIMINARY STATEMENT

The decision below (Block, J.) has created a dramatic and unprecedented expansion of the Succession Clause of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). As a legal and practical matter, the consequences of this expansion are significant. Under the District Court's overbroad reading of the statute, investors in a failed bank will never be able to bring claims for securities fraud to recover their own losses.

As explained below, the District Court's sweeping expansion of FIRREA contradicts the approach of each of the seven circuit courts that have addressed the issue. It also contradicts this Court's own precedent interpreting depositors' rights following a bank failure under FIRREA's predecessor, the Federal Deposit Insurance Act. Although this Court has not yet had the opportunity to rule on the scope of FIRREA's Succession Clause, it should take this opportunity to align with the other circuits by rejecting the District Court's expansion of the statute.

This is a securities fraud class action in which the public pension fund, Sjunde AP Fonden ("AP7"), was appointed as lead plaintiff to represent a class of former investors pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). AP7 alleges that former officers and the auditor of now defunct Signature Bank ("Signature" or the "Bank") violated Section 10(b) of the Exchange Act by making false and misleading statements to investors. AP7 asserts these

claims on behalf of a limited class of former investors who purchased Signature stock at artificially inflated prices between the specific dates of January 21, 2021 through March 12, 2023 (the "Class Period"). It is not disputed here that these claims are direct. The claims seek to recover individualized damages suffered by class members when the value of the shares they owned declined due to revelation of the fraud. AP7 does not assert any derivative claim on behalf of the Bank, does not seek redress for any injury suffered by the Bank, and does not seek to recover from Bank assets.

The Federal Deposit Insurance Corporation ("FDIC") took over as Signature's receiver while the Bank faced a liquidity crisis. Despite neither Signature nor the FDIC being a defendant, the FDIC intervened in this action to move to dismiss, arguing that the FDIC owned the claims asserted by AP7 and the class. The District Court erroneously accepted this argument based on its over-expansive reading of FIRREA's Succession Clause and committed multiple errors in doing so.

The Succession Clause provides that when the FDIC becomes a failed bank's receiver, it "succeed[s] to . . . all rights . . . of the insured depository institution, and of any stockholder . . . of such institution with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A)(i). This language means that "the FDIC as receiver 'steps into the shoes' of the failed [bank] . . . obtaining the rights '*of* the insured depository institution' that existed prior to receivership." *O'Melveny*

4

& *Myers v. FDIC*, 512 U.S. 79, 86 (1994). This provision specifically limits this authority to shareholder rights "with respect to the institution and the assets of the institution," covering only claims that seek redress for injuries to the failed bank that shareholders can typically bring on behalf of the bank.

The circuit courts have developed two approaches to effectuate this meaning, which both focus on the same question: whether the shareholder seeks redress for an injury suffered by the bank. The first and predominate approach—accepted by seven circuits that have addressed the issue—simply asks whether the claims are "direct" or "derivative" in nature because the Succession Clause only gives the FDIC ownership of claims "that investors . . . would pursue *derivatively* on behalf of the failed bank" and not *direct* claims that "do not depend on an injury to the failed bank." *E.g.*, *Levin v. Miller*, 763 F.3d 667, 672 (7th Cir. 2014) (emphasis added). The other approach, articulated by the First Circuit in a case "brought by a former bank holding company to recover its interest in a wholly owned subsidiary bank," involves a two-part test that also looks to the source of the alleged harm, i.e., whether the injury is to the failed bank or a direct one distinct to the individual plaintiff. *Zucker v. Rodriguez*, 919 F.3d 649, 656-57 (1st Cir. 2019)

The harm inquiry accepted by each of the other circuit courts mirrors this Court's approach to interpreting depositors' rights following a bank failure under the Federal Deposit Insurance Act. *See Adato v. Kagan*, 599 F.2d 1111, 1117 (2d

5

Cir. 1979) ("[W]rongdoing by bank officers that adversely affects all depositors creates a liability which is an asset of the bank, and only the bank or its receiver may sue for its recovery," whereas "[i]ndividual depositors may sue in their own right . . . if they have suffered a wrong that is distinctly theirs" and "the FDIC is hardly the proper party to represent them"). And the FDIC endorsed the harm inquiry as its formal agency position for decades after FIRREA's enactment. *See Levin*, 763 F.3d at 671-72 ("Again this [claim] is based on injury that Irwin sustained in its own right, a claim that the FDIC could not pursue as the Banks' successor. Counsel for the FDIC agreed with this proposition at oral argument.") (cleaned up).

Under the proper harm inquiry, the claims here do not belong to the FDIC because they are direct investors' claims that seek recovery for injuries distinct to the individual class members, and do not seek to recover for harm to the Bank. This is universally recognized by courts because direct securities fraud claims allege individualized harms to the stock purchasers who bring them. *See, e.g.*, *Howard v. Haddad*, 916 F.2d 167, 169-70 (4th Cir. 1990). The FDIC has never contested this, and the District Court made no finding otherwise. Indeed, as explained below, Congress deliberately crafted FIRREA to preserve the ability of private plaintiffs to bring direct securities fraud claims.

In holding otherwise, the District Court adopted a test that indiscriminately strips investors of any claims that merely reference a failed bank, regardless of the

6

nature of the claim, the source of the harm asserted, or whether the FDIC can even pursue them. The District Court's error stems from substituting the phrase "with respect to" for "concern," SPA-14, despite Supreme Court guidance that, when interpreting statutes, "with respect to" need not be read expansively because such phrases "inherently depend on their surrounding context." *United States v. Miller*, 145 S. Ct. 839, 853 (2025). And the context here is that FIRREA was "not designed to vaporize claims that otherwise exist after a business failure." *Levin*, 763 F.3d at 671.

In addition to resting on a flawed interpretation of the Succession Clause, this Court should reject the District Court's approach and reasoning because it produces absurd and impracticable results in multiple ways. <u>First</u>, the District Court's test transferred ownership of the claims to the FDIC, but the FDIC has no standing to assert the claims and does not even recognize them. Standing for a Section 10b-5 claim requires the plaintiff to have purchased the security at issue at artificially inflated prices during the class period and suffered losses when the fraud was revealed. *See, e.g.*, *Amorosa v. AOL Time Warner, Inc.*, 409 F. App'x 412, 417 (2d Cir. 2011). The stock purchasers in the class here are the only individuals with injuries that meet the standing requirements of the federal securities laws. The FDIC does not meet these requirements. The FDIC has not pursued, and cannot pursue, these claims, given it lacks standing to bring them under the securities laws. The

7

FDIC also has publicly admitted that its receivership refuses to recognize any class claims, including any securities claims of the class members here.

Second, the outcome puts multiple statutes in conflict. The Exchange Act and PSLRA unambiguously vest these claims only in those who have transacted in the security, and require a lead plaintiff like AP7 to lead the prosecution of these claims. By lodging ownership of the claims with the FDIC, the District Court effectively has subordinated the securities laws to FIRREA, which courts recognize FIRREA was not intended to do. *See, e.g.*, *Hayes v. Gross*, 982 F.2d 104, 110 (3d Cir. 1992) ("We find nothing in the text or legislative history of FIRREA to support this proposition and therefore reject it.").

Third, the District Court reasoned that FIRREA must be interpreted to divest the ***investor*** class of its claims for the purpose of making Signature's former ***depositors*** whole. This is improperly mixing apples and oranges. Signature's former depositors have no interest in the claims at issue here and would not stand to recover from them at all. AP7 and the class do not owe any duty to the depositors that would warrant taking the damages they suffered and using them to pay depositors as the District Court envisioned. And any distribution of investors' damages to pay depositors would represent an improper windfall because the FDIC has publicly admitted that depositors have already been made whole, unlike the class members here whose claims the FDIC refuses to even recognize.

8

Fourth, the District Court's overbroad test holds that investors' claims against KPMG also belong to the FDIC. These claims are not even arguably asserted against the Bank or its employees and deal strictly with KPMG's own fraudulent statements causing harm to investors. These claims do not assert rights "with respect to the institution and the assets of the institution" under any reasonable interpretation of that phrase.

The District Court's ruling should be reversed.

## STATEMENT OF THE CASE

### I. Summary of the Allegations

This case asserts direct claims for violations of the federal securities laws against the former executives of now defunct Signature and its auditor, KPMG. Appellant AP7, on behalf of itself and members of the class of stock purchasers it represents under the PSLRA, alleges that Signature's executives (the "Individual Defendants") and KPMG made material misstatements concerning Signature's liquidity and risk profile which caused class members to purchase Signature stock at artificially inflated prices. These investors suffered losses to the value of their personally held shares when the truth regarding these facts were revealed and Signature's stock price plummeted.

At the start of the alleged Class Period in early 2021, the Individual Defendants were aggressively transforming Signature from a staid, New York-

centric bank into a global, "crypto friendly" operation. A-123-24 (¶¶54-56). As part of this strategic shift, the Bank more than doubled total deposits during 2020 and 2021, as it took in billions of dollars in deposits from cryptocurrency customers. A-127 (¶66). By the end of 2021, deposits from crypto customers had grown to nearly $30 billion (over 25% of the Bank's total deposits), most of the Bank's largest depositors were now crypto companies, and 92% of the Bank's total deposits were uninsured. A-127-29 (¶¶67-69).

During this period, analysts specifically questioned the Individual Defendants as to how the deposit growth, including from crypto customers, affected the Bank's stability and overall liquidity risks. These Defendants assured investors, *inter alia*, that "[w]e haven't had any issues [with] liquidity at all," A-158-59 (¶152), Signature's deposits were "quite stable," A-183 (¶221), and the Bank responsibly managed any risk exposure through "internal limitations on concentrations" and other means, A-185 (¶231). Meanwhile, Signature's outside auditor KPMG issued misleading statements assuring investors of the adequacy of the Bank's internal controls. A-218-19 (¶360). As a result of these representations, Signature's stock price soared to $360 during the Class Period. A-118-19 (¶40).

Defendants knew their representations to investors were false. For years, federal and state banking regulators from the FDIC and the New York State Department of Financial Services (collectively, the "Regulators") had repeatedly

10

warned the Bank's former executives that they had caused Signature to suffer from severe risk control deficiencies. For example, in a June 16, 2020 presentation to the Bank's senior management, the Regulators warned the Individual Defendants that the Bank faced "critical exposure" from its "high level of uninsured deposits," A-134-35 (¶87), and that these Defendants had pervasively failed to manage the Bank's "inadequate liquidity contingency planning, liquidity stress testing, and internal controls." A-137 (¶92). Underlying these conclusions, Regulators specifically found that "management's assumptions [about the stability of deposits] were not well documented and had not been substantiated," A-142-43 (¶109), and "deposit outflow methodology w[as] not fully developed and documented." A-144 (¶115). Regulators concluded that the Individual Defendants repeatedly refused to remediate many of these deficiencies—all while falsely assuring investors of the Bank's stability. A-148-53 (¶¶124-137).

As a result of Defendants' violations of the federal securities laws, Appellant and the putative class were harmed when they purchased Signature stock at prices inflated by Defendants' fraud and lost such value when the fraud was revealed. As alleged in the Complaint, beginning on May 16, 2022, investors began to learn the truth when the Bank's management disclosed substantial deposit outflows of approximately $1.39 billion following the collapse of TerraUSD, a cryptocurrency "stablecoin" pegged to the U.S. dollar. A-153-54 (¶¶138-39). Then, on July 9, 2022,

11

Signature announced its total deposits had shrunk by an additional $5.04 billion. A-155-56 (¶143). On December 6, 2022, the Bank's management stunned investors by announcing that Signature would be "shrink[ing] its deposits tied to cryptocurrencies by $8 billion to $10 billion," disclosing for the first time that the Bank's crypto deposits were so overconcentrated that it was holding deposits of individual crypto clients that each amounted to over 2% of the Bank's *total* deposits. A-161 (¶¶160-61).

Each of these corrective disclosures were followed by significant declines in the price of Signature's stock, resulting in significant harm to AP7 and the class. On March 10, 2023, a liquidity crisis at the Bank occurred, leading to Signature's placement into FDIC receivership on March 12, 2023. A-164-65, 173 (¶¶171, 193).

## II. Procedural History

### A. Commencement of the Action and Appointment of AP7

On March 14, 2023, investor Matthew Schaeffer commenced this class action against Signature and certain former Bank executives, alleging violations of the Exchange Act. A-22-36. Several weeks later, another investor, Pirthi Pal Singh, filed a separate related class action against Signature, the individual defendants in *Schaeffer*, and three additional former Bank executives. A-37-71.

On May 15, 2023, AP7 moved for appointment as lead plaintiff pursuant to the PSLRA and to consolidate the *Schaeffer* and *Singh* actions. A-10 at 14-16. On

June 29, 2023, the FDIC appeared and substituted itself as a party in place of Signature Bank. A-11 at 38. On July 26, 2023, the plaintiffs in *Schaeffer* and *Singh* voluntarily dismissed Signature (and thus the FDIC) as a Defendant. A-75-78.

On July 17, 2023, despite neither Signature nor the FDIC being a party to the actions, the FDIC requested to intervene for the purpose of moving to dismiss the actions prior to the Court's appointment of a lead plaintiff pursuant to the PSLRA. A-72-74.

On August 1, 2023, Magistrate Judge Cho held a hearing on the competing lead plaintiff motions, which was attended by the FDIC. A-12. The FDIC urged the district court to bypass the PSLRA's mandatory lead plaintiff procedures and rule on its motion to dismiss prior to appointing any lead plaintiff in this action. *See* A-12 at 50, 5:4-16. On August 10, 2023, Magistrate Judge Cho denied the FDIC's request that the court decide the motion to dismiss prior to appointing a lead plaintiff. A-79-95. Magistrate Judge Cho duly appointed AP7 as Lead Plaintiff to represent the class of investors in this consolidated action. *Id*. On December 1, 2023, AP7, pursuant to its role as PSLRA-appointed Lead Plaintiff, filed its Consolidated Complaint for Violations of the Federal Securities Laws ("Amended Complaint"), asserting claims on behalf of a discrete class of stock purchasers under Section 10(b) of the Exchange Act against the individual former Bank executives and Signature's

13

auditor, KPMG.  A-99-268.  AP7 did not name Signature nor the FDIC as Receiver as a Defendant.

### B.   The FDIC Intervened and Moved to Dismiss the Amended Complaint

Even though neither Signature nor the FDIC as Receiver were Defendants in the case, the FDIC moved to intervene for the purposes of moving to dismiss, asserting that AP7 lacked standing under FIRREA.  The FDIC argued that (i) the FDIC "owns" shareholders' claims against the Banks' executives under FIRREA's so-called "Succession Clause," (ii) AP7 failed to exhaust FIRREA's mandatory claims process under FIRREA's "Exhaustion Clause," and (iii) the District Court lacked jurisdiction under FIRREA's forum limitation clause.  A-72-74, A-97-98, A-271-302.  Notably, the FDIC did not dispute that AP7's claims were direct claims seeking to recover for losses to the value of investors' personally held shares.

AP7 opposed the FDIC's motion to dismiss because, among other reasons, all courts that have considered this issue have found that neither FIRREA's Succession Clause nor Exhaustion Clause applies to direct shareholder claims brought against defendants other than the bank in receivership, including fraud claims against former bank executives, like the Individual Defendants here.  A-366-399.  Moreover, even though FIRREA's Exhaustion Clause did not apply to AP7's claims, out of an abundance of caution, AP7 exhausted its administrative remedies under FIRREA's claims process by timely filing a claim with the Receiver; therefore, even if FIRREA

14

did apply, at most the District Court should have transferred the case to the Southern District of New York under FIRREA's forum limitation clause. A-362-63, A-402-12.

The parties made further submissions to the Court. First, on September 23, 2024, the FDIC submitted *Verdi v. Federal Deposit Insurance Corp.*, a *pro se* case in the Southern District of New York. A-429-39 (*Verdi v. FDIC*, 2024 WL 4252038 (S.D.N.Y. Sept. 20, 2024)). AP7 responded that, in *Verdi*, the *pro se* plaintiff brought individual state tort claims against several individuals **and** the FDIC as receiver for Signature. A-441 (citing *Verdi*, 2024 WL 4252038, at *2). AP7 noted that the plaintiff in *Verdi* settled his claims against three senior executives of Signature (for insurance proceeds) and then voluntarily dismissed those claims, leaving the bank/FDIC as the **only** named defendant in the action. *Id*. AP7 further responded that Judge Ho's decision to dismiss plaintiff's remaining claims against the bank for lack of standing under the Succession Clause turned on the fact that the *pro se* plaintiff proceeded only against the FDIC as receiver for Signature. *Id*.

Then, on February 13, 2025, the District Court ordered the FDIC to produce evidence of D&O insurance policies that the FDIC argued would be impaired by AP7's claims. A-20. On February 20, 2025, the FDIC produced the D&O policies, including Side A DIC policies which provide insurance coverage exclusively for directors and officers of Signature and not the Bank itself. A-444-651.

The District Court held oral argument on the FDIC's motion to dismiss on March 19, 2025. A-666-94. During the hearing, the FDIC's counsel took the position that "the purpose of a succession clause was to transfer, for Congress to transfer everything possible to the FDIC as receiver, similar to a bankruptcy receiver." A-691.

### C.    The District Court Dismissed the Amended Complaint

On March 21, 2025, the District Court dismissed for a lack of subject matter jurisdiction under Rule 12(b)(1) upon concluding that AP7 and the class lacked standing. SPA-1-17. The District Court held that AP7 and the class lacked standing because, under FIRREA's "Succession Clause," the FDIC succeeded to AP7 and the class claims because the Complaint's allegations related to the bank and its assets. SPA-15-16. The District Court never found the claims to be derivative, as the FDIC never contested that the claims were direct. In ruling to dismiss Appellant's claims under the Succession Clause, the District Court declined to reach any of the other arguments advanced by the FDIC as grounds for dismissal. SPA-17 n.7. AP7 timely filed a notice of appeal. A-695-696.

## SUMMARY OF THE ARGUMENT

In holding that the FDIC owned AP7's and the class's direct claims under the Succession Clause, the District Court committed multiple errors warranting reversal.

First, the District Court misconstrued the scope of FIRREA's Succession Clause. Congress only intended for the FDIC to succeed to shareholder claims that seek to recover on behalf of the failed bank based on injuries to the failed bank and its assets. Consistent with this reading, courts have consistently held that the FDIC only succeeds to shareholder claims that seek to recover for harms suffered by the bank itself. AP7's securities fraud claims, however, are direct claims alleging harm to investors personally and seeking recovery from former officers and KPMG, not from the bank or its assets. As courts in cases such as *Levin* and *Howard* have confirmed, these direct claims fall outside FIRREA's scope. Under the District Court's unbounded and impractical interpretation of "with respect to" in the Succession Clause, however, the entire analysis hinges on the mere fact that the allegations reference a bank and its assets, rather than the nature of the harm. This interpretation effectively vaporizes all shareholder claims that merely reference a failed bank—a result directly contrary to precedent and congressional intent.

Second, the District Court's decision below runs afoul of FIRREA's legislative history and raises constitutional takings concerns that militate against the overbroad reading advanced by the FDIC. Congress rejected proposals to prioritize FDIC claims over direct securities fraud actions by shareholders and explicitly intended to preserve the ability of private investors to hold former bank officers, directors, and auditors accountable for fraud. The District Court ignored this intent,

17

as well as the PSLRA's independent statutory framework empowering investors like AP7, not the FDIC, to prosecute such claims. The District Court's interpretation also raises serious constitutional concerns under the Takings Clause. Stripping investors of their direct claims without just compensation, especially when the FDIC refused to consider them administratively, amounts to an impermissible governmental taking. Courts are required to avoid interpretations that invite such constitutional doubts, just as the Seventh Circuit held in interpreting the Succession Clause to only encompass derivative and not direct claims. *See Levin*, 763 F.3d at 671.

Third, the District Court's interpretation of FIRREA produces absurd results that Congress did not and could not have intended the statute to produce. For example, under the District Court's interpretation of FIRREA's priority scheme, *investors'* direct claims for securities fraud, including against outside auditor KPMG, are treated as assets of the Bank to be first distributed to the Bank's *depositors* who have no connection to these investors' claims—a result that runs directly counter to FIRREA's underlying purposes and Congress's intent to preserve investors' securities fraud claims.

For all these reasons, the District Court's dismissal should be reversed.

## ARGUMENT

### I.  Standard of Review

This Court reviews the District Court's Rule 12(b)(1) dismissal for lack of jurisdiction based on the allegations of the Amended Complaint *de novo*, accepting as true all material factual allegations of the Amended Complaint and drawing all reasonable inferences for the Plaintiff, AP7. *Lacewell v. Office of Comptroller of Currency*, 999 F.3d 130, 140 (2d Cir. 2021). Findings of fact are reviewed for clear error. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016).

### II.  The District Court Erred by Interpreting the Succession Clause to Extend to Direct Shareholder Fraud Claims Against Signature's Former Officers and Outside Auditor

In contested issues of statutory interpretation, this Court "begins with the plain text," *United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003), but "also must consider the context in which the statutory terms are used." *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 418 (2d Cir. 2022).

The Succession Clause does not give the FDIC ownership of every shareholder claim that merely relates in some way to a failed bank. It states that the FDIC, as receiver of a failed bank, "succeed[s] to . . . all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A)(i).

As detailed in the following sections, the claims here do not fall within this

19

language for several reasons. In holding otherwise, the District Court committed multiple errors that misconstrued the statutory text, disregarded federal circuit court authority uniformly holding that the Succession Clause does not encompass investors' direct securities fraud claims, misinterpreted this Court's own precedent, and failed to correctly apply the limited authority, *Zucker*, 919 F.3d at 656, that the District Court believed supported its conclusion, which explicitly carved out securities fraud claims from its holding.

### A. The Succession Clause Limits the Shareholder Rights to Which the FDIC Succeeds

As the Supreme Court instructs, "the words of [the Succession Clause] must be read in [] context and with a view to their place in the overall statutory scheme." *Miller*, 145 S. Ct. at 853 (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)). This "fundamental canon of statutory construction," *id.*, directs courts to interpret the Succession Clause in light of FIRREA's "core purpose[]"—to "ensure that the **assets of a failed institution** are distributed fairly and promptly among those with valid claims against the institution, and to expeditiously wind up the affairs of failed banks." *McCarthy v. FDIC*, 348 F.3d 1075, 1079 (9th Cir. 2003) (emphasis added).

To achieve this purpose, Congress defines the FDIC's "[g]eneral powers" when acting as conservator to be a "successor to" the failed entity. 12 U.S.C. § 1821(d)(2). In this role, Congress enabled the FDIC to "succeed to" the rights of

"stockholder[s] . . . of such institution" so long as the rights are "with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A)(i).

When Congress designated the FDIC as a "successor to" the failed entity, it authorized the FDIC to "'step[] into the shoes' of the failed [bank] . . . obtaining the rights '*of* the insured depository institution' that existed prior to receivership." *O'Melveny & Myers*, 512 U.S. at 86. It did not seek to create new rights or extinguish shareholder claims that never belonged to the bank. The term "succeed to" has specific legal significance that the District Court ignored. *See Successor*, Black's Law Dictionary (12th ed. 2024) ("A corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation.").

FIRREA's precursor, the Federal Deposit Insurance Act, did not grant the FDIC authority to "succeed to" concurrently-held shareholder rights, resulting in shareholders inappropriately retaining derivative rights alongside the FDIC. *See Landy v. FDIC*, 486 F.2d 139, 148 (3d Cir. 1973) ("Congress has given no indication that it intended to preclude derivative suits by the shareholders of a national bank in receivership."). The Succession Clause corrected this deficiency by explicitly stating that the FDIC "succeeds to" certain rights—furthering the design of allowing the FDIC to "promptly" and "fairly" settle the bank's claims. *McCarthy*, 348 F.3d at 1079. But Congress did not intend for the FDIC to extinguish shareholder rights

21

that the FDIC "could not pursue" in its capacity as successor. *See Levin*, 763 F.3d at 671 (holding this is not a "sensible" reading).

Further evidencing Congress' intent is its decision to qualify the shareholder rights to which the FDIC succeeds by adding the phrase "with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A)(i). This wording, presumed to be "deliberate and deserving of judicial respect," *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018), refers specifically to rights that are bestowed commonly to all shareholders by virtue of share ownership—not all conceivable shareholder rights or rights that they possess independent of the institution.

The distinction between derivative and direct claims illustrates the importance of this limitation. By virtue of share ownership, shareholders commonly possess the right to "step into the corporation's shoes and to seek in its right the restitution he could not demand in his own," i.e., to seek compensation for harm done to the company, through a derivative claim. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949). Classic derivative claims, such as claims for breach of fiduciary duty, waste of corporate assets, and the like, "enforce a *corporate* cause of action." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991). Because shareholders only possess the right to enforce a corporate cause of action while actively holding shares of the company, *Indep. Inv. Protective League v. Time, Inc.*, 50 N.Y.2d 259, 263-64 (N.Y. 1980), these rights exist "with respect to" the failed

22

bank and its assets, and the FDIC owns them.

By contrast, direct claims assert an "individual injury [to investors] distinct from the injury to the corporation." *In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d 391, 398 (S.D.N.Y. 2011). These claims, unlike derivative rights, do not derive from the corporation or share ownership itself, but from separate protections provided by federal law. *See Pagliara v. Fed. Home Loan Mortg. Corp.*, 203 F. Supp. 3d 678, 686-87 (E.D. Va. 2016) ("standing to bring a lawsuit to remedy a personal injury is not easily categorized as a right with respect to the corporation."). These federal rights vest at the time of purchase, are not transferable with shares, and are not common to all shareholders. *See Amorosa*, 409 F. App'x at 417 (holding there is no "holder" claim "under federal securities law" because there is a "limitation of standing to purchasers and sellers of securities").[1] This fundamental difference further illustrates why personal transaction rights fall outside the scope of rights to which the FDIC succeeds. *See Morrone ex rel. Arotech Corp. v. Erlich*, 2011 WL 1322085, at *5 (E.D.N.Y. Mar. 31, 2011) ("because the misstatements allegedly 'caus[ed] the Company's common stock to be overvalued and artificially inflated,' . . . . any injury due to these omissions accrued to shareholders individually

---

[1] This interpretation is furthered when considering Congress inserted "shareholders . . . of such institution"—indicating its intent to limit the succeeded to rights to those held by active shareholders. *Sacirbey v. Guccione*, 589 F.3d 52, 66 (2d Cir.2009) ("A basic canon of statutory interpretation . . . is to avoid readings that 'render statutory language surplusage' or 'redundant.'").

23

at the time of purchase.") (quoting *Howard*, 916 F.2d at 170 (brackets in original)).

The rights asserted here are not "with respect to" Signature and its assets. This case involves direct injuries to investors who bought stock at artificially inflated prices due to Defendants' violations of the federal securities laws. AP7 and the Class do not seek recovery for injuries to Signature or its assets, but for distinct personal harms. A-249-50, 259 (¶¶ 452, 481). Each investor's harm is unique to them and depends on "the difference between what [each investor] paid and what the stock was [actually] worth on the day [that investor] paid [for] it." *Howard*, 916 F.2d at 169-70. This is precisely the type of direct claim that courts have consistently held falls outside the scope of the Succession Clause. *See, e.g.*, *id.* (securities fraud claims are direct claims that do not belong to the FDIC); *Hayes*, 982 F.2d at 108 ("an individual stockholder may sue officers and directors based on an injury distinct from the injury to the corporation and the indirect injury to stockholders generally").

The District Court concluded that the FDIC succeeded to the claims because it misinterpreted the Succession Clause. Principally, the District Court's error is seen through misinterpreting the limiting phrase "with respect to" as the more expansive terms "concern" and "relate to." SPA-14-15. Under this analysis, the District Court considered whether the allegations supporting the claims concerned the Bank and its assets, rather than looking to the source of the right asserted by AP7. *Id.* The District Court's interpretation ignores the Supreme Court repeated

24

instruction that "with respect to" need not be read expansively because such phrases "inherently depend on their surrounding context." *Miller*, 145 S. Ct. at 853 (citing *Presley v. Etowah Cnty. Comm'n*, 502 U.S. 491, 506-507, 509 (1992)).

In context, the better reading of the Succession Clause that is most "consonant with the rest of the statute," *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002), is that, under the Succession Clause, the FDIC "succeed[s] to" only the rights possessed by shareholders to sue for injuries suffered by the failed bank or to seek recovery from its assets, because such rights are fundamentally held by shareholders "with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A)(i). This reading aligns with FIRREA's design that the FDIC serve as the sole party pursuing corporate rights as the failed bank's "successor"— without competing with shareholders over the institution's rights. *Miller*, 145 S. Ct. at 853.

As explained below, the District Court's decision also erroneously contradicts decisions from the First, Third, Fourth, Seventh, Ninth, Tenth, and Eleventh Circuits. It even conflicts with this Court's own precedent in similar cases. And it results in an unworkable standard that would effectively eliminate all shareholder rights whenever a bank fails—something Congress never intended and makes no sense.

This Court should reverse the District Court's decision and join other Courts of Appeals in holding that under FIRREA's Succession Clause, the FDIC only

succeeds to shareholder claims that seek recovery on behalf of the failed bank for injuries to the bank itself.

**B.     Courts of Appeal Have Uniformly Limited the Succession Clause to Shareholder Rights Seeking to Remedy a Corporate Harm, Which Mirrors This Court's Test in Analogous Contexts**

Consistent with the above, each U.S. Court of Appeal that has addressed this issue has looked to whether the shareholder's right involves an "injury to the corporation," or a distinct injury to the shareholder. *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998); *see Aaron v. Illinois Nat'l Ins. Co.*, 2023 WL 7389034, at *4 (E.D. La. Nov. 8, 2023) (harmonizing appellate authority that each case "considered where the harm occurred and whether it was distinct from the harm to the bank") (citing *Zucker*, 919 F.3d at 656). As discussed below, the majority of these Courts of Appeal have simply analyzed whether the asserted right is derivative or direct to determine whether the Succession Clause applies, known as the "direct-derivative test." The First Circuit has not embraced the direct-derivative test, but nonetheless, through its test, analyzed whether the true harm asserted by the shareholder involved generalized harm to the failed bank, or distinct injury to the failed bank's shareholders. Each Court of Appeal's inquiry mirrors this Court's approach in analogous contexts. And each compels the conclusion that the claims here belong to the individual investors represented by AP7, not the FDIC.

26

1.   **The Court of Appeals for the Third, Fourth, Seventh, Ninth, Tenth, and Eleventh Circuits Have Each Relied on the Direct-Derivative Test to Determine the Source of Harm**

The Court of Appeals for the Third, Fourth, Seventh, Ninth, Tenth, and Eleventh Circuits have consistently held that, under FIRREA's Succession Clause, courts must determine whether the claimed injury is distinct to the shareholder (i.e., direct) or merely derivative of harm to the bank (i.e., derivative). This approach properly focuses on the source of the harm as the determinative factor.

The Seventh Circuit's analysis in *Levin* provides authoritative guidance. Writing for the court, Judge Easterbrook explained that "Section 1821(d)(2)(A)(i) transfers to the FDIC only stockholders' claims 'with respect to . . . the assets of the institution'—in other words, those that investors (but for § 1821(d)(2)(A)(i)) would pursue derivatively on behalf of the failed bank." 763 F.3d at 672 (ellipsis in original).  The court expressly rejected the FDIC's attempt to claim it owned "every investor's claims of every description," holding instead that the statute serves to "allocat[e] claims between the FDIC and the failed bank's shareholders." *Id.* Applying these principles, the court held that the FDIC did not succeed to the shareholders' direct claims because they "d[id] not depend on an injury to the failed bank." *Id.*

Both the Tenth and Fourth Circuits have applied this same analytical framework.  In *Barnes v. Harris*, 783 F.3d 1185 (10th Cir. 2015), the Tenth Circuit

27

held that the FDIC succeeds to rights only if they "are based on harm derivative of injuries to the Bank," as these "qualify as claims of a shareholder 'with respect to the [bank] and the assets of the [bank].'" *Id.* at 1193 (citing 12 U.S.C. § 1821(d)(2)(A)(i))(brackets in original). Similarly, in *In re Beach First National Bancshares, Inc.*, 702 F.3d 772 (4th Cir. 2012), the Fourth Circuit determined that claims belonged to the FDIC precisely because the trustee "ha[d] not pled a harm or an act that occurred at the [parent company] level that did not simultaneously and primarily occur at the Bank (subsidiary) level." *Id.* at 778.

This source-of-the-harm approach has direct application to securities fraud claims, which courts unanimously hold do not belong to the FDIC. The Third Circuit, in *Hayes*, considered whether a failed bank's receiver succeeded to a shareholder's securities fraud claim involving misrepresentations by the bank's officers and directors. 982 F.2d at 106-08. The court held that the receiver did not succeed to claims where the shareholder alleged a "direct injury from fraud" and sought "to recover the difference between the allegedly inflated price he paid for his stock and the price he would have paid had defendants made accurate statements." *Id.* at 108. Similarly, in *Howard*, the Fourth Circuit reversed the dismissal of securities fraud claims, finding that a stockholder's action did not "seek[] damages arising from an injury *to* the corporation," but rather sought to recover "the difference between what he paid and what the stock was worth on the day he paid

28

[for] it." 916 F.2d at 169-70. These cases are directly on point—securities fraud claims are direct and do not belong to FDIC.

Other circuits have consistently applied the source of the injury framework. *See Lubin v. Skow*, 382 F. App'x 866, 873 (11th Cir. 2010) (dismissing claims only because "the Complaint fails to plead sufficient facts connecting any act or omission by the defendants with a harm to the Holding Company that is distinct from the harm the Holding Company suffered when its investment in the Bank soured"); *Pareto*, 139 F.3d at 699 (holding that claims transferred to the FDIC where shareholder "did not allege injury to a right he possessed as an individual, separate and distinct from the injury to the value of the bank's stock").

Courts within the Circuit and across the country are in accord. *See Smith Barney*, 765 F. Supp. 2d at 399 ("If those misrepresentations induced Plaintiffs' investment, they can be said to have suffered a direct injury."); *Patel v. Patel*, 2010 WL 11549879, at *2 (N.D. Ga. Dec. 29, 2010) (holding the FDIC did not succeed to shareholder claims "under the federal Securities Exchange Act of 1934 . . . arising out of the plaintiffs' purchases of [the failed bank's] stock . . . at artificially inflated prices"); *Brazlin v. W. Sav. & Loan Assn.*, 1994 WL 374286, at *7 (D. Ariz. Jan. 28, 1994) ("the [p]laintiffs who purchased their notes on the open market and not from Western have standing to assert a direct claim based upon securities fraud."); *In re Atl. Fin. Fed. Sec. Litig.*, 1991 WL 98757, at *2 (E.D. Pa. May 29, 1991) (noting

29

"distinction between derivative suits brought by a shareholder on behalf of the corporation, and lawsuits brought by *stock purchasers* who were allegedly fraudulently induced to *purchase* stock by the officers and directors.").

The uniformity of these decisions demonstrates that courts have consistently interpreted FIRREA's Succession Clause to transfer to the FDIC only those claims seeking recovery for injuries to the failed bank itself, not distinct injuries suffered by shareholders in their capacity as securities purchasers. The District Court's decision directly contradicts all these longstanding precedents, particularly *Hayes* and *Howard*, which expressly recognized shareholders' rights to pursue direct securities fraud claims against officers and directors of failed banks.

### 2. The First Circuit's Analysis in *Zucker* Reinforces the Source of the Harm Inquiry

The Court of Appeals for First Circuit in *Zucker* employed an analysis of the Succession Clause that is entirely consistent with the direct-derivative analysis applied by sister Circuits, and results in the same conclusions. 919 F.3d at 656-57 (applying a two-part test based on the statutory text). Although *Zucker* adopts a different analytical framework, it ultimately supports the proposition that securities fraud claims such as those at issue here remain with shareholders.

In *Zucker*, a bank holding company's bankruptcy administrator sued former directors and officers for allegedly causing the failure of its wholly owned subsidiary bank. *Id.* at 650-51. The court affirmed dismissal of these claims, holding they

belonged to the FDIC because the alleged harm derived from "malfeasance by [the holding company's] directors [that] depressed the Bank's assets." *Id.* at 656. This was not surprising since the bank holding company's estate was suing to recover for the depressed value of the subsidiary bank. *Id.* Significantly, the First Circuit explicitly circumscribed its holding, stating that it "is a limited one" that "applies only to claims . . . brought by a former bank holding company to recover its interest in a wholly owned subsidiary bank." *Id.* And the *Zucker* court expressly distinguished its holding from "securities fraud suits," precisely the category of claims presently before this Court. *Id.* at 660.

The *Zucker* court's focus on whether the claims sought recovery for "depress[ing] the Bank's assets" fundamentally aligns with the source-of-harm inquiry employed by other Circuits. *Id.* at 656. Though rejecting the conclusive distinction between direct and derivative claims, the First Circuit examined precisely where the alleged injury occurred—at the bank level—and whether the harm flowed upward to the holding company only derivatively. The court determined that the harm was the "depress[ion] [of] the Bank's assets," meaning the source of the harm was injury to the bank itself. *Id.* at 656. This analysis mirrors the approach in cases like *Levin* and *Barnes*, where the courts examined whether the alleged harm was derivative of injuries to the bank. Accordingly, *Zucker* does not undermine but rather reinforces the proposition that courts must examine the source of the alleged

31

harm to determine whether the FDIC succeeds to shareholder claims under FIRREA. Where, as here, the alleged harm flows directly to investors' personal property rather than to the bank's assets as in *Zucker*, the claims properly remain with the shareholders.

### 3. The FDIC Has Previously Argued that the Source of the Harm Test Controls

The reasonableness of interpreting FIRREA's Succession Clause as one where Congress solely intended for the FDIC to succeed to corporate harms is reinforced because the FDIC formally endorsed this reading *for decades* following FIRREA's enactment. For example, in *Pareto*, the FDIC argued: "in order for a group of stockholders to state a viable individual claim, some injury must be alleged that is not shared by all stockholders." *Pareto v. FDIC*, 1997 WL 33546994, at *6 (9th Cir. Sept. 25, 1997). And, in 2013, the FDIC "agreed with [the] proposition at oral argument" that it did not succeed to a claim "based on injury that Irwin sustained in its own right" and that "the FDIC could not pursue as the Banks' successor." *Levin*, 763 F.3d at 671-72. The FDIC's historical position reinforces that the source of the harm is the key inquiry under the Succession Clause.

### 4. This Court Applied a Source of the Harm Inquiry to the Federal Deposit Insurance Act and Should Extend Its Reasoning to FIRREA's Succession Clause

The analyses described above comport with this Court's precedent in analyzing the Federal Deposit Insurance Act, which controlled FDIC receiverships

32

before FIRREA's enactment. *See Adato*, 599 F.2d at 1117. In *Adato*, this Court held that the pre-FIRREA succession clause divested private plaintiffs of claims for derivative harms only, and not direct harms. *Id.* (holding that "[i]ndividual depositors may sue in their own right . . . *if they have suffered a wrong that is distinctly theirs and not common to all*" and the FDIC is hardly the proper party to represent them); *see also Goldblatt v. Wells Fargo Advisors, LLC*, 2011 WL 446896, at *3 (D. Conn. Feb. 1, 2011) (holding that *Adato*'s analysis controlled whether similar succession clause in Federal Credit Union Act applied to depositor claims). The District Court relied upon this relevant precedent yet misconstrued it in concluding the claims here belonged to the FDIC. SPA-15.

In *Adato*, this Court addressed a similar question of which injuries depositors of a failed bank may sue for in their own right, as distinguished from those for which "only the bank or its receiver may sue for its recovery." 599 F.2d at 1117. Significantly, in addressing this question, this Court looked to the same touchstone that all of the above-cited circuit authorities, including *Zucker*, have looked to— namely, the source of the alleged harm, i.e., whether the injury is a derivative one based on harm to the entity or a direct one distinct to the individual plaintiffs. *Aaron*, 2023 WL 7389034, at *4 (harmonizing appellate authority that each case "considered where the harm occurred and whether it was distinct from the harm to the bank"). As explained below, this Court's analysis in *Adato* strongly supports

33

AP7's position that the claims here do not belong to the FDIC because they allege harms distinct to a limited class of securities purchasers during a defined period of time, not to the bank or common to all shareholders.

In *Adato*, a group of depositors who placed their funds in a commercial bank before it failed and entered receivership brought claims against the bank's former directors and officers under the federal securities and banking laws. 599 F.2d at 1114-16. The district court dismissed these claims for lack of standing based on the "general rule" that the alleged injury occurred to all depositors, for which "only the bank or its receiver may sue for its recovery." *Id.* at 1117. This Court reversed, holding, as an "exception to the general rule," that "[i]ndividual depositors may sue in their own right . . . if they have suffered a wrong that is distinctly theirs and not common to all." *Id.* In so holding, this Court recognized that the FDIC, which had initiated parallel litigation to seek recovery on behalf of the depositors, was "hardly the proper party to represent [the specific plaintiffs] in this proceeding," because they alleged injuries that were "not common to those of other depositors whose interests are represented by the FDIC." *Id.* This Court emphasized that there was "no reason why this exception to the general rule should not apply to [the federal banking laws]." *Id.*

Here, contrary to the District Court's analysis, *Adato* strongly supports that the claims here do not belong to the FDIC. In this case, it is undisputed that the

claims do not seek to recover on behalf of all shareholders, but rather only on behalf of a specific class of individual stock purchasers for a defined time period for the distinct injuries they suffered based on the decline in the value of the shares those investors purchased in reliance on the fraud. Those injuries are not "common to all" shareholders, and thus are injuries for which "[i]ndividual [shareholders] may sue in their own right." *Id.* at 1117.

The District Court mistakenly analogized the claims here to those in *Goldblatt*, 2011 WL 446896, at *3, which dealt with a succession clause in the Federal Credit Union Act much like the Succession Clause at issue here. There, following a credit union's failure, depositors whose losses exceeded federal insurance limits attempted to sue the credit union's directors and officers despite parallel litigation brought by the credit union's receiver on behalf of the depositors. Critically, the court held that *Adato*'s harm-inquiry controlled application of the succession clause. The court found that the receivership owned the claims because "both insured and uninsured losses *are considered derivative* of the claims belonging to the institution *because the injury was sustained primarily by that institution*." *Id.* at *3. Here, as noted above, the allegations are universally recognized as presenting direct harms to investors and not harms to the bank. Under the approach in *Goldblatt*, the claims here are not stripped from the investors and do not belong to the FDIC.

35

The District Court plainly erred in failing to properly credit the facts of AP7's direct claims alleging distinct, personal injury to a limited class of stock purchasers.

## C. Under Any Appropriate Analytical Framework, the Claims Here Belong to Shareholders Because They Allege Distinctive Injury

Whether it be the direct-derivative test employed by the Third, Fourth, Seventh, Ninth, Tenth, and Eleventh Circuits, the First Circuit's analysis in *Zucker*, or this Court's own precedent in *Adato*, each framework is centrally fixated on the source of the alleged harm. Accordingly, the Succession Clause does not apply because AP7 does not seek to recover for injuries sustained by Signature or its assets. Instead, AP7 alleges that it and a limited class of private investors purchased Signature stock at artificially high prices due to Defendants' misrepresentations between January 21, 2021 and March 12, 2023, and suffered damage due to the precipitous decline in the price of their personally-held stock when the truth was revealed. A-249-50, 259 (¶¶ 452, 481).

The claims at issue represent quintessential direct injuries to the shareholders themselves—they are not derivative of harm to the bank and they do not stem from depletion of the bank's assets as in *Zucker*. They allege distinctive harm to a specific class of stock purchasers rather than injury "common to all." *Adato*, 599 F.2d at 1117. The alleged fraud directly injured the investors who purchased securities at artificially inflated prices during a certain time period, making these claims precisely the type that remain with shareholders under every analytical framework employed

36

by the Courts of Appeals that have considered this issue. *Hayes*, 982 F.2d at 108; *Howard*, 916 F.2d at 169-70.

Accordingly, this Court should hold that the Succession Clause does not apply to AP7's and the putative investor class's claims, as they belong to the individual investors represented by AP7 and are not succeeded to by the FDIC.

### D. The District Court's Test Premised on Reviewing Whether Any Alleged Facts Refer to the Bank and Its Assets Is Flawed and Is in Direct Conflict with Decisions of Numerous Courts of Appeal

In contrast to the straightforward source of the harm test, the District Court applied an essentially limitless test that looks to whether the shareholder's claims involve allegations that "concern" or "relate to" the bank and its assets. SPA 14-15. The District Court's flawed analysis found that allegations "concern Signature's failure after it made alleged misrepresentations about its health (*including* about its assets)" and thus that the Succession Clause applies. SPA 14 (emphasis added). There are several problems with this test.

<u>First</u>, as detailed above, the District Court's ruling rests on a flawed interpretation of the Succession Clause. *See* Argument §II.A. Namely, the District Court's interpretation of the phrase "with respect to" to mean "concerning" ignored well settled Supreme Court precedent that "with respect to" need not be read expansively. *Miller*, 145 S. Ct. at 853; *see Verdi*, 2024 WL 4252038, at *4 (interpreting "with respect to" according to its "ordinary meaning" as defined in

standard dictionaries). This interpretation did not consider how the meaning of "phrases that govern conceptual relationships . . . inherently depend on their surrounding context," *Miller*, 145 S. Ct. at 853, nor did it appropriately analyze FIRREA's surrounding context. *See* Argument §§II.A, IV.A.

Second, FIRREA's surrounding context is "not designed to vaporize claims that otherwise exist after a business failure." *Levin*, 763 F.3d at 671. Yet the District Court's test would do exactly that. If a court is to look at whether a shareholder's asserted right "concerns" a bank and its assets for claims related to events ***that precipitated a bank's collapse***, it is difficult to fathom any rights of shareholders that fall outside the reach of the Succession Clause.

At oral argument, the District Court acknowledged the prospect that the FDIC's reading would effectively extinguish all shareholder rights following a bank's collapse, asking the FDIC to provide "an example of a direct claim that would survive FIRREA." A-691. The FDIC responded that the claim would need to have "nothing to do with the assets of the bank"—and contrived the hypothetical of "a securities fraud claim with respect to misrepresentations concerning the management of the bank [because] the CEO was unhealthy." *Id.*

While this hypothetical appears completely fictional and unrealistic, the District Court credited it in its opinion. *See* SPA-11. But the District Court's acceptance of this hypothetical in one place is undermined by its own reasoning later

38

in the opinion. When applying its test later in the opinion, the District Court concluded that the "misstatements still relate to Signature and its assets" because Defendants "invoked [] misstatements to justify evading risk management measures, endangering Signature and its assets—including those of depositors attracted to Signature by those same misstatements." SPA-15. But under this logic, the FDIC's hypothetical about misstatements about an officer's health would also fall within the Clause because, by operating with an officer unfit for the role, the officer would have "endanger[ed] [the failed bank] and its assets." *Id*.

The FDIC's hypothetical demonstrates that direct claims surviving under the District Court's test is mere legal fiction—which is notable as the FDIC concedes that certain direct claims should survive. A-691. The legal fiction is seen through the FDIC's ability to rely on circular logic that a shareholder's claim "concerns" the bank and its assets because the shareholders would not have suffered harm but-for harm that occurred to the bank and its assets.[2] Even if courts faced with these arguments are able to construct some meaningful limits to the "concern" test, their

---

[2] To illustrate this point, Appellant respectfully refers to the FDIC's March 25, 2025 brief, submitted days after the District Court's order, in the bankruptcy proceedings of Silicon Valley Bank, *In re: SVB Financial Group*, No. 23-10367 (S.D.N.Y. Bankr.). There, the FDIC argued that certain claims fell within the Succession Clause because: "Absent harm to SVB and its assets, the Cayman accountholders would not have any alleged damages." This brief is docketed in the bankruptcy proceedings at Doc. 1741.

applications will suffer from wildly inconsistent results given the ambiguity in determining whether a claim "concerns" the bank's assets, as demonstrated by the ambiguous outcome of the officer-health hypothetical.

Third, the Court's general reliance on *Verdi* as authoritative guidance on the appropriate standard was misplaced. In *Verdi*, the *pro se* plaintiff dismissed all claims against all individual defendants, leaving his claims against the Bank (with the FDIC substituted as the named defendant) as the only claims in the action. *Verdi*, 2024 WL 4252038, at *1 n.1. As Judge Ho acknowledged, the plaintiff asserted his remaining claims "for the acts of the Individual Defendants and its employees" under "the doctrine of *respondeat superior*"—and, as a result, Judge Ho concluded "the[] claims necessarily concern Signature's assets" because any recovery would be sought from the bank's assets. *Id.* at *6, n.58. Here, by contrast, and discussed further in Section IV below, the claims are asserted against only the Individual Defendants and KPMG, and seek no recovery from the Bank or the FDIC or the Bank's assets.

## III. FIRREA's Legislative History and Purpose Refute the District Court's Expansion of the Statute

As shown above, the language of FIRREA does not authorize or require the claims here to be transferred to the FDIC. This alone warrants reversal of the District Court's contrary decision. Even assuming the relevant statutory language is ambiguous, the result would be the same after examining the legislative history of

40

the statute. "Where . . . resolution of a question of federal law turns on a statute and the intention of Congress, [courts] look first to the statutory language and then to the legislative history if the statutory language is unclear." *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 522 n.80 (2d Cir. 2023) (quoting *Blum v. Stenson*, 465 U.S. 886, 896, (1984)) (ellipsis in original).

FIRREA's legislative history underscores that Congress did not intend to give the FDIC ownership of direct securities fraud claims by former investors against the failed institution's former directors and officers or its auditor. The District Court erred by failing to consider critical evidence that Congress crafted FIRREA to ensure private investors could continue to pursue such claims against failed banks' officers, directors, and auditors—precisely what AP7 sought to do here.

## A. FIRREA's Purpose and History Refute the District Court's Opinion

Courts customarily look to FIRREA's purpose and history to resolve questions about its application. *See, e.g.*, *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1498 (3d Cir. 1996). The District Court recognized the importance of these interpretive tools to the question presented—but applied them incorrectly. SPA-12-13.

For example, in considering FIRREA's purpose and history in its analysis of the securities fraud claims at issue, the District Court ignored the piece of FIRREA's legislative history ***most relevant to securities fraud claims***. In enacting FIRREA,

41

Congress sought to address a "widespread pattern of fraud" by officers, directors, and accountants of banking institutions causing the savings and loan crisis in the 1980s.[3]  Congress recognized that private plaintiffs bringing *securities fraud* lawsuits would play a critical role in achieving FIRREA's goals.  Congress expressly rejected a proposal to give the FDIC priority over competing claims asserted by shareholders of the failed bank in suits against officers and directors.  *See* S. 774, 101ST CONG. § 214(o) (1989-1990): Financial Institutions Reform, Recovery and Enforcement Act of 1989.  In "overwhelmingly" rejecting this amendment, FIRREA's drafters determined that giving the FDIC such a priority "would represent fundamentally bad policy."  135 Cong. Rec. at 18575 (daily ed. Aug. 3, 1989) (statement of Rep. Staggers) (explaining that giving FDIC priority would frustrate the purpose of FIRREA because "*private plaintiffs would simply no longer bring fraud suits against bank officers and others guilty of wrongdoing*").

Congress' express rejection of a proposal to give the FDIC *priority* over private plaintiffs to pursue direct claims demonstrates that it did not intend for FIRREA to go even further by completely *stripping* private plaintiffs of their direct claims in favor of the FDIC—which is the incorrect result the District Court reached

---

[3] *See* 135 CONG. REC. S3993-01, S3994 (daily ed. Apr. 17, 1989) (statement of Sen. Riegle) (FIRREA was enacted to address a "widespread pattern of fraud and illegal conduct" precipitating savings and loan crisis); H.R. REP. 101-54(I), at 301 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 97 (noting accountants' "major role in masking the insolvency of many failed thrifts" and failing to properly "report fraud").

here. *See FDIC v. Jenkins*, 888 F.2d 1537, 1546 (11th Cir. 1989) ("Of course, it would be convenient to the FDIC to have an arsenal of priorities, presumptions and defenses to maximize recovery to the insurance fund, but this does not require that courts must grant all of these tools to the FDIC."); *see also Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) ("[P]rivate actions provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'") (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)). The District Court's analysis cannot be squared with FIRREA's legislative history.

Multiple other circuits have pointed to this legislative history in rejecting the FDIC's attempts to advance overbroad interpretations of FIRREA at the expense of private claimants. *See, e.g.*, *Jenkins*, 888 F.2d at 1538 n.1 (reversing district court order giving FDIC priority over shareholder suit against officers, directors, and auditor of failed bank based on FIRREA's "highly persuasive" legislative history that "clearly refutes FDIC's argument that it was the intent of Congress to grant the priority"); *Howard*, 916 F.2d at 170 (adopting the reasoning of *Jenkins* in holding that the FDIC does not succeed to direct securities fraud claims). Because the District Court's analysis contradicts this clear legislative history, which has been credited by multiple federal circuits, the District Court's interpretation was flawed.

43

The First Circuit's ruling in *Zucker*, which the District Court relied on heavily, confirms the relevance of the FIRREA legislative history compelling the conclusion that the FDIC should not own the claims here. Critically, the First Circuit did not find the legislative history supportive of the holding company's claims *because* its claims "[were] not one[s] alleging fraud or one[s] to enforce the securities laws." 919 F. 3d at 660. This strongly suggests that—when faced with such claims, as here—the First Circuit would have found that Congress intended to preserve the right of a private investor to bring these claims. The District Court incorrectly disregarded this reality in purporting to consider FIRREA's history.

Indeed, as the Third Circuit noted in holding that the receiver of a failed bank does ***not*** succeed to shareholders' direct claims for securities fraud, the FDIC's "argument is, in essence, a claim that Congress, in enacting FIRREA, impliedly amended the Exchange Act so as to subordinate the latter to the former. We find nothing in the text or legislative history of FIRREA to support this proposition and therefore reject it." *Hayes*, 982 F.2d at 106, 110 ("Because [plaintiff] alleges direct injury . . . under the securities laws, we will reverse the dismissal").

As the court noted in *Hayes*, Congress did not intend FIRREA to trump the federal securities laws. This is underscored by Congress's enactment of the PSLRA, pursuant to which AP7 was appointed as Lead Plaintiff to bring direct securities law claims on behalf of former investors in Signature. As courts have uniformly

44

recognized, Congress enacted the PSLRA to "empower investors so that they may exercise primary control over private securities litigation." *In re Turquoise Hill Resources Ltd. Sec. Litig.*, 2021 WL 2201388, at *5 (S.D.N.Y. June 1, 2021). Holding that AP7's claims belong to the FDIC effectively subordinates the PSLRA to FIRREA, which Congress did not intend to do. *Hayes*, 982 F.2d at 110. The District Court did not consider any of these important congressional concerns or goals in reaching its decision, which deprived investors of their claims and usurped AP7's role as the PSLRA-appointed representative of the Class. This error similarly supports reversal of the District Court's decision.

In sum, FIRREA's purpose and history support that Congress did not intend FDIC to gain ownership of direct securities fraud claims of the type brought by AP7 here.

**B.    The District Court's Opinion Raises Constitutional Problems**

The District Court's erroneous interpretation of the Succession Clause raises serious constitutional issues under the Takings Clause of the Fifth Amendment, which prohibits the federal government from seizing private property "for public use, without just compensation." U.S. Const. amend. V.

Under the District Court's incorrect interpretation, the Succession Clause deprives investors of their right to bring any direct claims even remotely concerning a failed bank, including direct claims against defendants indisputably outside the

FDIC's receivership, such as KPMG. SPA-13. The District Court's erroneous interpretation raises serious questions as to whether (i) the Succession Clause amounts to an unlawful seizure under the Fifth Amendment, (ii) plaintiffs received "just compensation" for their direct claims, and (iii) FIRREA authorized the FDIC to use any proceeds flowing from plaintiffs' direct claims to pay private creditors, rather than for public use.

To avoid these and other constitutional infirmities, courts have correctly rejected the District Court's interpretation of the Succession Clause. For instance, in *Levin,* the Seventh Circuit refused to "transfer[] to the FDIC every investor's claims of every description" specifically because that "would pose the question [of] whether [plaintiff] and similarly situated stockholders would be entitled to compensation for a taking." 763 F.3d at 672. Indeed, the Supreme Court has directed that, when "choosing between competing plausible interpretations of a statutory text," a court must presume that "Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005); *cf. CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reps., Inc.*, 44 F.3d 61, 74 (2d Cir. 1994) (refusing interpretation of federal statute and related precedent that "would raise very substantial problems under the Takings Clause of the Constitution").

46

Rather than heed this well-established canon of statutory interpretation, the District Court held that there cannot be an unlawful seizure under the Takings Clause for "claims that have yet to be adjudicated." SPA-13 (quoting *Verdi*, 2024 WL 4252038, at *3). At the outset, the District Court relies on a non-binding concurrence in *Levin* to claim that "interpreting the Succession Clause to cover some direct claims 'would surely withstand any challenge'" under Takings Clause. *See* SPA-13 (quoting *Levin*, 763 F.3d at 674 (Hamilton, J., concurring)). But under the District Court makes no effort to reckon with the Seventh Circuit's actual holding in that case, which rejects the District Court's interpretation of the Succession Clause, including on the constitutional grounds raised here. *See Levin*, 763 F.3d at 672 ("Any other reading of § 1821(d)(2)(A)(i) would pose the question whether . . . stockholders would be entitled to compensation for a taking; our reading of the statute (which is also the FDIC's) avoids the need to tackle that question.").

Moreover, the District Court's ruling ignores that Appellant's claims ***have*** been adjudicated by the FDIC's administrative process. On July 17, 2023, AP7 filed an administrative claim on behalf of the putative class. A-363. In response, the FDIC ***rejected*** these claims, explaining that "the Receiver does not accept class claims for review."[4] *Id.*; *see also* A-313 (the FDIC's own claim notification form

---

[4] For these reasons, and those discussed in AP7's Opposition to the FDIC's motion to dismiss (A-366-99), AP7 properly exhausted the FDIC's administrative process on behalf of itself and the putative class to any extent necessary.

states that "[i]f you do not have a claim *against the Failed Institution*, please disregard this notice"). It was not only erroneous, but absurd for the District Court to strip claims from investors and give them to the FDIC that *the agency itself refuses to recognize*. The District Court's interpretation also provides for the government's seizure (and erasure) of Appellant's class claims absent compensation—an unconstitutional result.

## IV. The District Court's Erroneous Interpretation Leads to Absurd Results that Contravene FIRREA's Underlying Purpose and Intent

As courts interpreting FIRREA have repeatedly recognized, courts should not adopt interpretations of FIRREA "if the result would otherwise 'be absurd or impracticable.'" *See Delta Sav. Bank v. United States*, 265 F.3d 1017, 1023 (9th Cir. 2001) (rejecting interpretation of FIRREA's Succession Clause that would give the FDIC ownership of shareholder claims that would be "absurd or impracticable" for the FDIC to prosecute) (quoting *Pareto*, 139 F.3d at 700). Thus, courts should not embrace interpretations of FIRREA that, "by applying the FIRREA standards mechanically," produce results that "would be directly contrary to FIRREA's underlying policy goals." *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 60 (Bankr. S.D.N.Y. 1990).

Here, the District Court's flawed interpretation of the Succession Clause produces impracticable and absurd results showing its interpretation was erroneous and warrants reversal.

### A. FIRREA's Priority Scheme, Which the District Court Relied on, Has No Bearing on These Investor Claims

The District Court grounded its analysis of the Succession Clause in its mistaken view that FIRREA's "priority scheme" in Section 1821(d)(11)(A)(v) applied to the claims here and supported divesting AP7 and the class of these claims. This was error, as the priority scheme has no relationship to the claims here.

Section 1821(d)(11)(A) governs the order in which the FDIC distributes payments from the "amounts realized from the liquidation or other resolution of any insured depository institution by [the FDIC]," in which the FDIC distributes payments to satisfy "any deposit liability" above others. 12 U.S.C. § 1821(d)(11)(A).

In the District Court's view, the FDIC must have succeeded to the claims here because holding otherwise would "circumvent FIRREA's priority scheme for satisfying Signature's outstanding obligations," and "disrupt Congress's rational and reasoned decision to compensate depositors over those lower in the priority scheme." SPA-12, 17. The District Court reasoned that, if AP7 and the class were permitted to retain their claims, they would "usurp claims that the FDIC could recover from," and "thus enable direct claims to be paid from the very assets the FDIC has to satisfy the failed bank's obligations." SPA-13. This analysis was riddled with several errors about the role and operation of the priority scheme.

First, the priority scheme is, by its plain terms, inapplicable to the claims here.[5]  The priority scheme, by its plain terms, applies only to amounts realized from the FDIC's liquidation *of the failed bank's assets*.  *See* 12 U.S.C. § 1821(d)(11)(A) (governing distribution of "amounts realized from the liquidation or other resolution *of any insured depository institution* by [the FDIC]").  This scheme has no bearing where, as here, the claims seek to recover from the Individual Defendants and KPMG, *not* the bank or its assets.[6]  This fact, overlooked by the District Court, underscores that the FDIC does not own investors' claims.  There is no risk that AP7's claims would be "paid from the very assets the FDIC has to satisfy the failed bank's obligations," as the District Court wrongly concluded.  SPA-13.

This distinction between claims against the bank and claims against third parties is reinforced by FIRREA's parallels to bankruptcy law—as the FDIC acknowledged during oral argument.  *See* A-691 (comparing FDIC's role "to a bankruptcy receiver").  The Bankruptcy Code "approves of the position that such shareholders may proceed in suits against third parties on an equal status with

---

[5] In fact, FIRREA's priority scheme supports that the Succession Clause applies to derivative and not direct claims.  The structural consistency is evident because, in derivative cases, the "damages are awarded ***to the corporation*** rather than directly to the derivative plaintiff."  *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 439 (S.D.N.Y. 2006).

[6] As discussed below, the District Court's finding that the existence of D&O policies here supports its finding that the FDIC owns the claims was erroneous because, under settled law, the policies at issue are not assets of the bank.

general creditors," noting that Section 510(b) of the Bankruptcy Code applies only to "claims against the debtor or an affiliate of a debtor," not third parties. *Jenkins*, 888 F.2d at 1545; *see also Atl. Fin. Fed.*, 1991 WL 98757, at *2 (fraud "is not bargained for when someone chooses to purchase stock, and should not be included in the calculus of priority among creditors to a corporation."); *cf. In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 313 (S.D.N.Y. 2003) ("Once WorldCom filed for bankruptcy, the automatic stay provisions of the bankruptcy laws took effect" but the securities litigation "proceed[ed] against certain former WorldCom executive officers [and] underwriters," among other parties).

This reasoning applies, where AP7 seeks to recover from the Individual Defendants and KPMG—third parties—not from Signature Bank or its assets. Just as the Bankruptcy Code does not prohibit shareholders from proceeding against third parties, FIRREA's priority scheme should not be misinterpreted to give the FDIC ownership of investors' direct claims against third parties that are not derivative of the bank's rights.

Second, the District Court was sorely mistaken in its rationale that the FDIC must gain ownership of the claims here in order to make depositors whole. The depositors have no legal relationship to the investors represented by AP7, and those investors owe the depositors no duty whatsoever. The claims at issue here do not seek to take anything from depositors, nor could they. The District Court ignored

51

that depositors and investors are situated completely differently.  For example, unlike investors, depositors' monetary losses are guaranteed recovery through the FDIC's Deposit Insurance Fund.  Indeed, the District Court overlooked that *the FDIC already ensured depositors were made whole*.  A-173 (¶193),[7] showing the District Court's fear that preserving the investors' claims would come at the expense of depositors was misplaced.

The District Court also erred in reasoning that the FDIC should own the claims because the FDIC could potentially seek recovery from the same source of assets "and then distribute proceeds pursuant to the priority scheme."  SPA-13.  Courts have consistently rejected this same reasoning, holding that "the mere fact that [private plaintiffs] and the FDIC are pursuing the same source of assets does not transform" the plaintiffs' claims into ones that the FDIC succeeded to under FIRREA.  *See, e.g.*, *Howard*, 916 F.2d at 170.  These courts rightly hold that this reasoning would effectively give the FDIC the inappropriate priority over private claimants that Congress explicitly rejected as described above.  *See, e.g.*, *Hayes*, 982

---

[7] In its 2023 annual report, the FDIC confirmed that all of Signature's deposits, including uninsured deposits, were protected and transferred from Signature to FDIC-operated bridge banks for the protection of depositors.  *See* Federal Deposit Insurance Corporation, *Annual Report 2023* (Feb. 22, 2024), available at https://www.fdic.gov/about/financial-reports/reports/2023annualreport/2023-arfinal.pdf. Further, the FDIC publicly reported in November 2023 that all uninsured depositors had been made whole.  *See* Federal Deposit Insurance Corporation, *Special Assessment Pursuant to Systemic Risk Determination*, Final Rule, 88 FED. REG. 83,329 at 83,331 (Nov. 29, 2023).

F.2d at 109 ("If both plaintiff and the [receiver] prove entitled to judgment, there will be no inequity in requiring defendants to satisfy both judgments.").

Relatedly, the District Court erred finding that the existence of director and officer ("D&O") insurance policies here supports its finding that the FDIC owns the claims. SPA-14. The District Court reasoned that the FDIC owns the claims here because, "[d]amages recovered, at least against the Officers, will be paid from Signature's [D&O] policies[.]" *Id.* This finding did not support the District Court's holding that the FDIC owned all the claims here for several reasons.

To start, the claims against KPMG do not implicate these D&O policies whatsoever. Any recovery on the claims against KPMG will come from KPMG, and the FDIC has never argued otherwise.

Next, as to the Individual Defendants, the mere fact that the FDIC may bring claims against these same parties that could implicate the D&O policies does not suffice to bring the claims here within the scope of the Succession Clause, as several courts have held in light of FIRREA's legislative history rejecting an FDIC priority over private plaintiffs. *See* Argument §III.A. This line of reasoning overlooks that the Individual Defendants face personal liability under the federal securities law, and that it does not follow that the FDIC would succeed to any claim where a party seeks recovery from the assets of the failed bank's directors and officers. *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 325 (S.D.N.Y. 2005) (noting "the

53

settlement amount included [monetary contributions] paid personally by the settling [d]irector [d]efendants.").

Nevertheless, even crediting the District Court's flawed logic about the relevance of the Individual Defendants' ability to use insurance proceeds to satisfy a settlement or judgment, the District Court wrongly held the D&O policies implicated here are an asset of Signature's estate. SPA-14-15. The policies here include multiple Side A D&O policies, *see* A-444-651, which "do not provide any insurance coverage to the [failed bank] itself" and "provide protection exclusively for the directors and officers," and thus, "are not property of [a failed bank's] estate." *In re SVB Fin. Grp.*, 650 B.R. 790, 793 n.1, 799 n.3 (Bankr. S.D.N.Y. 2023).

The District Court disregarded this applicable case law from the bankruptcy context based solely on inapposite authority from the Third Circuit. *See* SPA-14-15 (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.*, 28 F.3d 376, 384-85 (3d Cir. 1994), *as amended* (Aug. 29, 1994)). But even *National Union* acknowledged that "assets" is commonly understood as pertaining to "estate that is applicable or subject to the payment of his or her or its debts." *Nat'l Union*, 28 F.3d at 384 (citing Black's Law Dictionary 117 (6th ed. 1990)). That *National Union* concluded policies that provided coverage ***to the bank holding company*** for damages sustained ***by the subsidiary bank*** due to employee misconduct—in the context of a disparate provision of FIRREA—is entirely distinguishable from the

54

D&O policies at issue here which provide exclusive coverage **to Signature's directors and officers personally**.

### B. The District Court's Interpretation Seized Class Action Claims from Investors that the FDIC Cannot Bring and Does Not Even Recognize

The District Court's interpretation was also erroneous because it produces a nonsensical result that the FDIC has ownership of claims that (i) the FDIC lacks standing to bring, and (ii) the FDIC does not even recognize as valid.

As explained above in Argument Section II.A, only securities purchasers who suffered losses to their personally held shares in reliance on the Individual Defendants' and KPMG's fraud have standing to pursue the securities fraud claims asserted here. These rights vested at the time of purchase, they are not transferable with the shares; they exist only in shareholders who purchased during the defined Class Period, and are not possessed by all shareholders. *See Amorosa*, 409 F. App'x at 417 (there is no "holder" claim "under federal securities law" because there is a "limitation of standing to purchasers and sellers of securities").

The FDIC cannot "succeed to" these claims because it did not buy stock during the Class Period (nor did the Bank), and thus lacks standing to bring the claims that the District Court has stripped from investors comprising the class here. *Levin*, 763 F.3d at 671-72. In other words, under the District Court's interpretation, there are **no** class members who have standing to pursue these securities fraud claims

55

under the PSLRA. But the Supreme Court's and Second Circuit's prudential standing limits, the FDIC cannot bring direct shareholder claims because the Agency "cannot rest [its] claim to relief on the legal rights or interests of third parties." *Rajamin v. Deutsche Bank Nat. Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

No reasonable interpretation of FIRREA could countenance these absurd results as courts have recognized in rejecting overbroad interpretations of the Succession Clause as the FDIC has advanced here. *Levin*, 763 F.3d at 671 ("[FIRREA] is not designed to vaporize claims that otherwise exist after a business failure. Yet if [the claim] is dismissed . . . no one will be able to pursue it. It would not be sensible to read [the Succession Clause] that way."); *Delta Savings Bank*, 265 F.3d at 1023-24 (FDIC does not gain ownership of shareholder claims that would be "impracticable" for the FDIC to prosecute).

Moreover, it was absurd for the District Court to strip the class action claims from investors and give them to the FDIC here because the FDIC refuses to even recognize the existence of these claims. As explained above, the FDIC has publicly stated that no class action claims will be accepted by the receivership. *See* Statement of the Case §II.A. The District Court's interpretation producing this absurd result is erroneous, as FIRREA cannot reasonably be interpreted to strip claims from

56

investors and transfer them to an agency that refuses to even recognize, let alone accept them.

## CONCLUSION

The District Court's grant of FDIC's motion to dismiss should be reversed.

Dated: May 23, 2025

Respectfully submitted,

By: */s/ Sharan Nirmul*
Sharan Nirmul
Richard A. Russo
Joshua A. Materese
Nathaniel C. Simon
**KESSLER TOPAZ MELTZER
& CHECK, LLP**
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
rrusso@ktmc.com
jmaterese@ktmc.com
nsimon@ktmc.com

John J. Rizio-Hamilton
Jeremy Robinson
John J. Esmay
Alexander McRae Noble
Jonathan D'Errico
**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnr@blbglaw.com
jeremy@blbglaw.com
john.esmay@blbglaw.com

57

alexander.noble@blbglaw.com
jonathan.derrico@blbglaw.com

*Attorneys for Plaintiff-Appellant*
*Sjunde AP-Fonden*

## <u>STATEMENT OF COMPLIANCE</u>

This brief complies with the Second Circuit Local Rule 32.1(a)(4) which requires that the principal brief contain no more than 14,000 words because it contains 13,343 words, exclusive of the sections that do not count towards the limitation pursuant to Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirement of Federal Rule of Appellate Procedure 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2021 in Times New Roman 14-point font.


*/s/ Sharan Nirmul*
Sharan Nirmul

# SPECIAL APPENDIX

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Memorandum and Order of the Honorable Frederic
Block, dated March 21, 2025 ................................. SPA-1

Judgment, entered on March 24, 2025, Appealed
from ........................................................ SPA-18

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SJUNDE AP-FONDEN, Individually
and on behalf of all other similarly
situated,

             Plaintiff,

  -against-

JOSEPH DEPAOLO, ERIC HOWELL,
FRANK SANTORA, JOSEPH
SEIBERT, SCOTT A. SHAY, VITO
SUSCA, STEPHEN WYREMSKI, and
KPMG LLP,

             Defendants,

and FEDERAL DEPOSIT
INSURANCE CORPORATION, In its
capacity as Receiver for Signature
Bank,

             Intervenor.

---

**MEMORANDUM AND ORDER**
Case No. 23-CV-1921

*Appearances:*
*For the Lead Plaintiff:*
JOHN RIZIO-HAMILTON
JEREMY P. ROBINSON
JOHN J. ESMAY
ALEXANDER MCRAE NOBLE
JONATHAN G. D'ERRICO
Bernstein Litowitz Berger & Grossmann LLP
1251 Avenue of the Americas
New York, NY 10020

SHARAN NIRMUL
RICHARD A. RUSSO, JR. (*PRO HAC VICE*)

*For the Intervenor FDIC:*
RYAN A. KANE
ADAM M. BIALEK
MAXWELL G. DILLAN
NICOLE C. RENDE
Wollmuth Maher & Deutsch LLP
500 Fifth Ave, 12th Floor
New York, NY 10110

*For the Defendant Eric Howell:*
PETER L. SIMMONS
HARRISON D. POLANS

SPA-2

JOSHUA A. MATERESE (*PRO HAC VICE*)
NATHANIEL C. SIMON (*PRO HAC VICE*)
Kessler Topaz Meltzer Check, LLP
280 King of Prussia Road
Radnor, PA 19087

Fried, Frank, Harris, Shriver &
Jacobson LLP
One New York Plaza
New York, NY 10004

*For the Defendant Joseph DePaolo:*
MICHAEL DOLUISIO
STUART T. STEINBERG
Dechert LLP
Circa Centre, 29 Arch Street
Philadelphia, PA 19104

*For the Defendant Joseph Seibert:*
JONATHAN HARRIS
JOSEPH GALLAGHER
Harris St. Laurent & Wechsler LLP
40 Wall Street, 53rd Floor
New York, NY 10005

*For the Defendant KPMG:*
RICHARD T. MAROONEY
KEVIN J. O'BRIEN
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036

LISA BUGNI
King & Spalding LLP
50 California Street, Suite 3300
San Francisco, CA 94111

*For the Defendant Scott A. Shay:*
ALAN VINEGRAD
JONATHAN M. SPERLING
ABIGAIL KERTZMAN
GIOVANNI SCARCELLA
Covington & Burling LLP
620 Eighth Avenue

New York, NY 10018

*For the Defendant Stephen Wyremski:*
ANAND SITHIAN
DANIEL L. ZELENKO
MARA LIEBER
Crowell & Moring LLP
375 Ninth Avenue
New York, NY 10001

*For the Defendant Vito Susca:*
CHARLES T. SPADA
DANIEL E. REYNOLDS
Lankler Siffert & Wohl LLP
1185 Avenue of the Americas
New York, NY 10036

*For the Defendant Frank Santora:*
DAVID B. MASSEY
EMILY B. COOPER
Perkins Coie LLP
1155 Avenue of the Americas,
22nd Floor
New York, NY 10036

**BLOCK, Senior District Judge:**

Lead Plaintiff Sjunde AP-fonden ("AP7" or "Plaintiff") brings this securities fraud class action asserting claims under Section 10(b) of the Securities Exchange Act and Rule 10b-5(b) against KPMG, which was Signature Bank's ("Signature") auditor from 2001 to 2023, and seven former directors, senior executives, and officers (the "Officers") of Signature (collectively, "Defendants"). The consolidated complaint alleges that Defendants made misstatements about

3

Signature's health that attracted depositors and investors, inflating Signature's common stock and ultimately resulting in Signature's collapse and receivership.

After it had intervened, the Federal Deposit Insurance Corporation (the "FDIC"), the appointed receiver for Signature, moved to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). Defendants also filed individual motions to dismiss under 12(b)(6). The Court held oral argument on March 19, 2025. For the following reasons, the FDIC's motion is GRANTED and the case is dismissed.

## I.    Background

Magistrate Judge James Cho recounted the procedural background in his August 10, 2023, Memorandum and Order consolidating the case[1] and appointing Sjunde AP-fonden[2] as Lead Plaintiff. *See Schaeffer v. Depaolo*, No. 23-CV-1921, 2023 WL 5153481, at *1–2 (E.D.N.Y. Aug. 10, 2023). The following facts are from the amended complaint. *See* Am. Compl., ECF No. 70.

---

[1] Matthew Schaeffer originally brought this case individually and on behalf of all others similarly situated. *Schaeffer v. Depaolo*, No. 23-CV-1921, 2023 WL 5153481, at *1 (E.D.N.Y. Aug. 10, 2023). Pirthi Pal Singh brought a similar but separate class action a few weeks later. *Id.* (citing *Singh v. Signature Bank, et al.*, No. 23-CV-2501 (E.D.N.Y. Mar. 31, 2023)). Magistrate Judge Cho consolidated these two cases and appointed AP7, also known as Sjunde AP-fonden, as Lead Plaintiff.

[2] "Lead Plaintiff AP7 is a Swedish public pension fund, established under law as a Swedish governmental agency, with approximately $100 billion in assets under management." Am. Compl. at ¶ 30, ECF No. 70.

SPA-5

The case "arises out of the string of bank failures in March 2023 and, in particular, the collapse of Signature Bank." *Schaeffer*, 2023 WL 5153481 at *1. Throughout the start of March 2023, Signature reassured the public that it did not face the same problems that plagued other failing crypto-friendly banks. Am. Compl. at ¶ 169. But on March 10, 2023, depositors withdrew over 20% of Signature's total deposits. *Id*. at ¶ 171. Regulators intervened to keep Signature afloat but "this proved impossible because, as [Signature's] management knew, [Signature's] risk and liquidity management systems were either non-existent or woefully deficient." *Id*. at ¶ 173. "On March 12, 2023, the New York Department of Financial Services ('DFS') took possession of Signature Bank, and trading in the bank's shares was halted—essentially rendering those shares valueless." *Schaeffer*, 2023 WL 5153481 at *1. DFS immediately appointed the FDIC as receiver. Am. Compl. at ¶ 22. "When trading resumed on March 28, 2023, the stock was trading under a dollar, and closed at $0.13. This amounted to a 99.81% drop and erased billions of dollars in shareholder value." *Id*. at ¶ 25.

Plaintiff alleges that shareholders acquired Signature common stock between January 21, 2021, and March 12, 2023, in reliance on Defendants' misstatements about Signature's health.[3] Specifically, Plaintiff alleges that the Officers made

---

[3] Plaintiff detailed these alleged misstatements by the Officers in its omnibus memorandum of law opposing this motion to dismiss. *See* Pl.'s Omnibus Mem. at 31–32, ECF No. 125-77.

public misrepresentations about Signature's liquidity and risk management that encouraged uninsured deposits of digital assets and inflated the stock's price. Plaintiff also alleges the Officers lied to and ignored warnings by regulators to implement adequate liquidity risk management. And, Plaintiff alleges, KPMG either intentionally misrepresented or recklessly disregarded Signature's financial position in producing audits that incorrectly assured its health.

## II.    Legal Standards

"The question of standing encompasses both [Article III] constitutional and prudential considerations." *Lerman v. Bd. Of Elections in City of New York*, 232 F.3d 135, 143 (2d Cir. 2000). While Article III limits courts to resolving active cases and controversies, "the prudential standing rule [additionally] bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Rajamin v. Deutsche Bank Nat'l Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014) (cleaned up). Both constitutional and prudential standing, in this circuit, implicate federal jurisdiction, which courts must ensure "is not extended beyond its proper limits." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 90 (2d Cir. 2000) (citing *Thompson v. Cnty. of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994)); *see In re Sofer*, 613 F. App'x 92, 92 (2d Cir. 2015) (summary order) ("Prudential

---

Plaintiff also provided a chart detailing the Officers' and KPMG's alleged misstatements. *See* ECF No. 125-79.

SPA-7

standing remains a jurisdictional requirement in our Circuit." (citing *Thompson*, 15 F.3d at 248)). As such, prudential standing is a threshold issue. *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 48 (2d Cir. 2014).

"In reviewing a 12(b)(1) motion to dismiss, the court 'must accept as true all material factual allegations in the complaint, but the court is not to draw inferences from the complaint favorable to [the party asserting jurisdiction].'" *Tiraco v. New York State Bd. of Elections*, 963 F. Supp. 2d 184, 190 (E.D.N.Y. 2013) (quoting *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004)). "Where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Tandon v. Captain's Cove Marina of Bridgeport, Inc*., 752 F.3d 239, 243 (2d Cir. 2014) (cleaned up). "In that case, the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (cleaned up). "However, the plaintiffs are entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016).

## III. Discussion

The FDIC asserts that Plaintiff does not have standing because, among other reasons, the FDIC owns Plaintiff's claims pursuant to the succession provision (the

"Succession Clause") of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"). *See* 12 U.S.C. § 1821(d)(2)(A). The Court agrees.

Under the Succession Clause, the FDIC, as conservator or receiver of a bank, "succeed[s] to . . . all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A). Thus, only the FDIC can bring claims that it succeeded to pursuant to the Succession Clause. *See Pareto v. F.D.I.C.*, 139 F.3d 696, 700 (9th Cir. 1998) (explaining that application of Succession Clause transfers to FDIC "a shareholder's right, power, or privilege to demand corporate action or to sue directors or others when action is not forthcoming").

There exists a circuit split over how to apply the Succession Clause. The split concerns whether to apply the Clause according to its plain text or by differentiating between direct and derivative claims. In a recent decision, Judge Dale E. Ho of the Southern District of New York explained the bases for the split and did not find Second Circuit authority resolving it. *Verdi v. Fed. Deposit Ins. Corp.*, No. 24-CV-791, 2024 WL 4252038, at *3 (S.D.N.Y. Sept. 20, 2024). The plaintiff in *Verdi* brought claims against the FDIC, in its capacity as receiver for Signature, alleging "that Signature and its leadership made false or misleading

8

statements . . . immediately prior to Signature's collapse" which "induced him to purchase additional shares[.]" *Id.* at *1. Soon after, following Signature's collapse, "his investments cratered in value." *Id.*

For guidance on how to resolve the split, Judge Ho surveyed "authority from outside this Circuit." *Id.* According to Judge Ho, "the Fourth, Seventh, and Eleventh Circuits have held that the Succession Clause applies only to derivative claims, and not to direct claims." *Id.* (citing cases). The Ninth and Tenth Circuits have taken a softer stance in also holding that the Succession Clause applies to shareholders' derivative claims, without foreclosing its possible application to direct claims. *See Pareto*, 1319 F.3d at 700; *Barnes v. Harris*, 783 F.3d 1185, 1193 (10th Cir. 2015). However, the First Circuit recently held that the Succession Clause does not distinguish between direct and derivative claims. *See Zucker v. Rodriguez*, 919 F.3d 649, 656–58 (1st Cir. 2019). Instead, the First Circuit explained that the Succession Clause only covers claims that fall within the text of § 1821(d)(2)(A)—claims with respect to the institution and its assets.[4] *See id*.

---

[4] Judge Ho cites various district court decisions that endorse and adopt *Zucker*'s interpretation of the Succession Clause. *See Am. W. Bank Members v. Utah*, No. 16-CV-326, 2023 WL 4108352, at *6 (D. Utah June 21, 2023), *aff'd*, No. 23-4091, 2024 WL 3812451 (10th Cir. Aug. 14, 2024) ("The court finds the reasoning of the First Circuit in *Zucker* with respect to the scope of FIRREA's succession clause persuasive."); *Aaron v. Ill. Nat'l Ins. Co.*, No. 19-CV-10341, 2023 WL 7389034, at *4 (E.D. La. Nov. 8, 2023) ("The text strongly suggests that the FDIC should succeed to claims that are in name against the Holding Company, but are actually aimed at the assets of the bank.").

AP7, like the plaintiff in *Verdi*, argues that the FDIC did not succeed to its claims because the Succession Clause only extinguishes "a shareholder's derivative claims brought on behalf of a corporation (and therefore does not implicate direct claims brought by shareholders against the corporation)." *Verdi*, 2024 WL 4252038 at *3. The Court, like Judge Ho, disagrees. In resolving the circuit split, Judge Ho, agreeing with the First Circuit's decision in *Zucker*, did not base his decision on whether to prescind between direct or derivative claims. *Id.* at *6 (citing 919 F.3d at 658). He held "that the text of the Succession Clause does not explicitly require categorizing claims as derivative or direct[.]" *Id*. He noted, however, that "at the very least, [it] does not explicitly foreclose the possibility that at least some direct claims are covered by the Clause." *Id.* Rather than reading some extratextual distinction into the statute, Judge Ho applied its plain text.

The Court agrees with Judge Ho's thoughtful and thorough analysis of the Succession Clause and adopts his holding regarding its scope. The Succession Clause's applicability does not hinge on some distinction between direct and derivative claims, but on the statutory text in § 1821(d)(2)(A). Thus, the Succession Clause covers claims that satisfy "the two conditions set forth in its text—that is, the claim asserts a 'right of a shareholder' and that right is 'with respect to the institution and the assets of the institution.'" *Id.* (quoting *Am. W. Bank Members*, 2023 WL 4108352 at *5–6).

10

The direct-derivative extratextual test and the "with respect to" statutory test largely overlap but have some gaps. The Succession Clause does not necessarily cover direct claims under the former, but some direct claims might be "with respect to the institution" and its assets under the latter. Take, for example, a case where a bank's officer, ahead of its inevitable collapse, privately misrepresents its solvency to induce some shareholders to buy preferred shares. The harm here is direct because it only affected the discrete shareholders targeted by the private misrepresentations. But that direct claim would still be "with respect to" the bank and its assets because the misrepresentations intertwine with the bank's financial condition and the state of its assets. By contrast, some direct claims are not "with respect to" the bank and its assets. Consider a case brought by shareholders against an officer who induced investment by privately misrepresenting another officer's health. *See* Oral Arg. Tr. at 26:07–15. There, the officer did not misrepresent the bank's deteriorating financial condition or its assets. And some direct cases clearly fall outside the Succession Clause, like one involving a personal dispute between a shareholder and an officer.

At oral argument, Plaintiff asserted that Judge Ho misinterpreted *Zucker* and that the proper test must focus on whether the harm to Plaintiff was distinct from harm to Signature and its assets. Oral Arg. Tr. at 13:05–17:12. Under such inquiry, Plaintiff insists, plaintiffs could bring claims that allege a harm distinct from one

11

suffered by Signature and its assets. But that mischaracterizes *Zucker*. The *Zucker* court merely meant that the direct-derivative test, which emphasizes harm, and the statutory test can overlap. *See* 919 F.3d at 658 (explaining that cases applying direct-derivative test "are consistent with" court's holding under statutory test). The Court has already acknowledged such. And while a harm inquiry does not itself contradict *Zucker*, giving it dispositive weight does. *Cf. Aaron*, 2023 WL 7389034 at *4 ("While *Zucker* rejects an express distinction between direct and derivative claims, it does not reject a 'source of the harm' inquiry."). That is because the statutory test applies wherever the at-issue claims are "with respect to the institution and" its assets. *See* 12 U.S.C. § 1821(d)(2)(A). Deeming this harm inquiry dispositive would effectively reincarnate the direct-derivative interpretation of the Succession Clause. Thus, the Court remains persuaded that Judge Ho properly interpreted *Zucker*.

FIRREA's purpose and structure counsel this outcome. "[T]he direct/derivative dichotomy could allow those who run the banks into the ground to take for themselves some of the modest sums available to reimburse the FDIC for a portion of the socialized losses they inflicted." *Levin v. Miller*, 763 F.3d 667, 674 (7th Cir. 2014) (cleaned up) (Hamilton, J., concurring). This dichotomy could also circumvent FIRREA's priority scheme for satisfying Signature's outstanding obligations. *See Zucker*, 919 F.3d at 658. The priority scheme provides that

12

"amounts realized" from liquidating a failed bank "shall be distributed" first to cover the FDIC's administrative expenses, then to "any deposit liability of the institution," next to "any other general or senior liability," then to subordinate obligations, and finally to shareholders or members. 12 U.S.C. § 1821(d)(11)(A). Erroneously reading in a direct-derivative distinction would usurp claims that the FDIC could recover from and then distribute proceeds pursuant to the priority scheme. It would thus enable direct claims to be paid from the very assets the FDIC has to satisfy the failed bank's obligations.

Lastly, Plaintiff cautions that interpreting the Succession Clause to cover some direct claims could effectuate an unlawful seizure under the Takings Clause of the Fifth Amendment. That is not so. "As the First Circuit noted [in *Zucker*], the Takings Clause requires compensation 'only for deprivations of vested property rights,' which do 'not vest until a final, unreviewable judgment has been obtained'—which is obviously not the case with respect to any claims that have yet to be adjudicated." *Verdi*, 2024 WL 4252038 at *3 (quoting *Zucker*, 919 F.3d at 659); *see Levin*, 763 F.3d at 674 (Hamilton, J., concurring) (explaining that interpreting Succession Clause to cover some direct claims "would surely withstand any challenge" under Takings Clause).

Plaintiff chiefly alleges that shareholders purchased Signature common stock in reliance on Defendants' misrepresentations. "In particular, Plaintiff's

13

theory of damages for [its] investments both before and after the alleged misrepresentations depend on the drop in value of [its] shares of Signature stock. Therefore, any claims Plaintiff may have against Signature are rights in [its] capacity as 'a stockholder.'" *Id.* at *6. These claims are also "with respect to the institution and the assets of the institution," 12 U.S.C. § 1821(d)(2)(A), because, as Judge Ho correctly observed, "they concern Signature's failure after it made alleged misrepresentations about its health (including about its assets)," *Verdi*, 2024 WL 4252038 at *6.

Plaintiff responds in its filings and at oral argument that the Court cannot cleanly adopt Judge Ho's reasoning since its claims are not against Signature but against its former officers and auditor, KPMG. *See* Oral Arg. Tr. at 9:05–10:09. As such, Plaintiff argues that its suit "does not seek to recover from the assets of Signature Bank." *Id.* at 9:22–25. But Signature's absence does not remove these claims from the Succession Clause's scope. Damages recovered, at least against the Officers, will be paid from Signature's director and officer insurance policies ("D&O insurance"), assets of the bank.[5] *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.*, 28 F.3d 376, 384–85 (3d Cir. 1994), *as amended*

---

[5] The Court cannot overstate the importance of ascertaining its jurisdiction. It undermines judicial economy to waste court and party resources processing a case destined for dismissal. To that end, the Court requested and considered a copy of the D&O insurance. *See* ECF No. 141. No party objected. Plaintiff could have requested supplemental briefing on whether it was proper for the Court to consider the D&O insurance. Still, Plaintiff submitted supplemental authority relevant to the D&O insurance and acknowledged the Court's request in its filing.

14

(Aug. 29, 1994) (concluding that D&O insurance is an "asset" of bank regardless of whether bank "will ultimately be entitled to collect under the insurance policies").[6]

Nonetheless, Defendants' misstatements still relate to Signature and its assets. The Officers acted on behalf of Signature and KPMG made public assurances about Signature. Importantly, Defendants allegedly invoked these misstatements to justify evading risk management measures, endangering Signature and its assets—including those of depositors attracted to Signature by those same misstatements. *See Golldblatt v. Wells Fargo Advisors, LLC*, No. 3:10-CV-924, 2011 WL 446896, at *3 (D. Conn. Feb. 1, 2011) (applying similar succession clause in Federal Credit Union Act to depositors' claims because alleged harm impacted all depositors, "'creat[ing] a liability which is an asset of the bank, and [which] only the bank or its receiver may sue for its recovery'" (quoting *Adato v. Kagan*, 599 F.2d 1111, 1117 (2d Cir. 1979)). And the ultimate

---

[6] AP7 submitted as supplemental authority *In re SVB Financial Group*, 650 B.R. 790 (Bankr. S.D.N.Y. 2023) to argue that D&O policies that only cover the Officers, and not Signature ("Side A DIC policy"), are not Signature's assets. ECF No. 143. This bankruptcy case lifted a stay to allow officers to access proceeds from Side A DIC policies to cover their ongoing litigation costs. But in this context, the policy itself is an asset even if its "owner and named insured will ultimately be found not to be entitled to a particular recovery under the policy." *Nat'l Union Fire Ins. Co.*, 28 F.3d at 384. Even so, some of the D&O policies here also insure both Signature and the Officers, including the primary policy. *See* ECF No. 141 at 3–4, 9. Thus, recovery against the Officers would first exhaust the D&O policies before reaching the Side A DIC policies. *See Zucker*, 919 F.3d at 656 (applying Succession Clause where Plaintiff sought "to recover from assets, like insurance, that the FDIC also seeks in its own action related to the Bank's failure.").

15

harm to shareholders stemmed from a harm to Signature and its assets—unforeseen mass withdrawals and the lack of risk management measures. *See Zucker*, 919 F.3d at 656 (holding that claims "relate to" assets where they depend on "proving that malfeasance by [holding company's] directors depressed the Bank's assets").

Plaintiff's claims are thus "with respect to" Signature and its assets, and the FDIC succeeded to Plaintiff's claims. "Because the FDIC succeeded to Plaintiff's claims, Plaintiff lacks standing to assert them." *Verdi*, 2024 WL 4252038 at *6. "'The so-called third-party standing bar . . . prevents litigants from asserting the rights or legal interests of others simply to obtain relief from injury to themselves.'" *Id.* (quoting *N.Y. State Citizens' Coal for Child. v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019)). That bar applies here to deprive Plaintiff of standing to assert the succeeded-to claims.

## IV.   Practical Considerations

AP7 and other shareholders are not without recourse. The FDIC will distribute "amounts realized from the liquidation or other resolution of" Signature to satisfy any outstanding obligations to shareholders. 12 U.S.C. § 1821(d)(11). And the FDIC can pursue this case, adding spoils to the payout pot.

To be sure, this decision is not victimless. The many pension funds that invested in Signature stock have unexpectedly lost capital necessary to provide retirees with a dignified retirement. That is especially problematic as shareholders

16

SPA-17

are last to be compensated under FIRREA's priority scheme. *Id.* at §

1821(d)(11)(A)(v). But the Court will not—and cannot—disrupt Congress's

rational and reasoned decision to compensate depositors over those lower in the

priority scheme. *See Zucker*, 919 F.3d at 661 ("The long history of extensive

federal involvement in the savings and loan industry reveals that the protection of

depositors and the stability of thrift institutions are paramount among

congressional concerns.").

## V.     Conclusion

Accordingly, the FDIC's motion is GRANTED and the case is dismissed.[7]

**SO ORDERED.**

  /S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
March 21, 2025

_____

[7] Given this disposition, the Court does not address Plaintiff's exhaustion and merits arguments. And the Court does not consider Plaintiff's belated unclean hands argument, first raised in its response to supplemental briefing. *See Azeez v. City of New York*, No. 16-CV-342, 2018 WL 4017580, at *6 (E.D.N.Y. Aug. 22, 2018), *aff'd*, 790 F. App'x 270 (2d Cir. 2019) ("Ordinarily, any issues not addressed in an opposition brief are deemed abandoned by the party opposing the motion."). Regardless, state law defenses assertable against a bank cannot be asserted against the FDIC because it also acts "on behalf of the depositors and creditors." *F.D.I.C. v. Abel*, No. 92-CV-9175, 1996 WL 520906, at *2 (S.D.N.Y. Sept. 12, 1996).

17

SPA-18

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
SJUNDE AP-FONDEN, individually and on
behalf of all others similarly situated,

                Plaintiff,

            - against -

JOSEPH DEPAOLO, ERIC HOWELL, FRANK
SANTORA, JOSPEH SEIBERT, SCOTT A. SHAY,
VITO SUSCA, STEPHEN WYREMSKI, and
KPMG LLP,

                Defendants,

and FEDERAL DEPOSIT INSURANCE
CORPORATION, in its capacity as Receiver for
Signature Bank,

                Intervenor.
-----------------------------------------------------------X

                      **JUDGMENT**
                      CV 23-1921 (FB) (JRC)

      A Memorandum and Order of Honorable Frederic Block, United States District Judge,

having been filed on March 21, 2025, granting Intervenor Federal Deposit Insurance

Corporation's ("FDIC") motion to dismiss, and dismissing this case, it is

      **ORDERED AND ADJUDGED** that Plaintiff Sjunde AP-Fonden take nothing of

Defendants Jospeh DePaolo, Eric Howell, Frank Santora, Joseph Seibert, Scott A. Shay, Vito

Susca, Stephen Wyremski, and KPMG LLP; that Intervenor FDIC's motion to dismiss is

granted; and that this is dismissed.

Dated: March 24, 2025
       Brooklyn, New York

                          BRENNA B. MAHONEY
                          CLERK OF COURT

               BY:   /S/ JAMES J. TORITTO
                          DEPUTY CLERK