# 25-0720-cv

## In the United States Court of Appeals for the Second Circuit

SJUNDE AP-FONDEN,

*Plaintiff-Appellant,*

MATTHEW SCHAEFFER,

*Plaintiff,*

— v. —

FEDERAL DEPOSIT INSURANCE CORPORATION,
IN ITS CAPACITY AS RECEIVER FOR SIGNATURE BANK,

*Intervenor-Appellee,*

JOSEPH DEPAOLO, FRANK SANTORA, JOSEPH SEIBERT,
SCOTT A. SHAY, VITO SUSCA, STEPHEN WYREMSKI,
KPMG LLP, ERIC HOWELL,

*Defendants-Appellees,*

BRIAN ANDREW PERGAMENT, JOHN ROMANO,

*Intervenors-Plaintiffs,*

SIGNATURE BANK, KPMG INTERNATIONAL LIMITED,

*Defendants.*

On Appeal From The United States District Court
For The Eastern District Of New York

## ANSWERING BRIEF FOR INTERVENOR-APPELLEE FDIC

| | |
|---|---|
| DOMINIC A. ARNI | Federal Deposit Insurance |
| Acting Asst. General Counsel | Corporation |
| J. SCOTT WATSON | 3501 Fairfax Drive |
| Senior Counsel | Arlington, VA 22226 |
| JOSEPH BROOKS | Tel: (703) 562-2054 |
| Counsel | |

*Counsel for Intervenor-Appellee*

## FED. R. APP. P. 26.1 DISCLOSURE STATEMENT

Intervenor-Appellee Federal Deposit Insurance Corporation, as Receiver for Signature Bank (the FDIC) is not required to provide a disclosure statement under Fed. R. App. P. 26.1 because the FDIC is a federal agency established under 12 U.S.C. § 1811.

# TABLE OF CONTENTS

FED. R. APP. P. 26.1 DISCLOSURE STATEMENT..............................i

TABLE OF CONTENTS...................................................ii

TABLE OF AUTHORITIES................................................v

PRELIMINARY STATEMENT..............................................1

JURISDICTIONAL STATEMENT...........................................5

COUNTERSTATEMENT OF THE ISSUES.....................................6

STATEMENT OF THE CASE..............................................7

    I.    Relevant Statutory And Regulatory Background.................7

    II.    Relevant Allegations Of AP7's Complaint.....................8

    III.    Relevant Procedural History.................................13

    IV.    Rulings Presented For Review................................17

SUMMARY OF ARGUMENT................................................17

ARGUMENT..........................................................20

    I.    Standards Of Review.........................................20

    II.    The District Court Correctly Held That AP7 Lacks Prudential Standing To Litigate The Claims Alleged In Its Complaint.................................................20

        A.    The District Court Correctly Adopted And Applied The Two-Step Test For Applying The Succession Clause Articulated By The First Circuit In *Zucker v. Rodriguez*.......................................21

1. *Zucker* Correctly Interpreted The Succession Clause..21

2. The District Court Correctly Applied *Zucker's* Two-Step Statutory Test.......................................26

B. The District Court Correctly Declined To Apply The Direct-Derivative Test Because It Contravenes Controlling Precedent On Statutory Interpretation........30

C. *Zucker* Does Not Reinforce The "Source Of Harm" Inquiry...............................................................40

D. AP7's Resort To Legislative History Is Unavailing.........42

E. AP7's Constitutional-Avoidance Argument Lacks Merit...................................................................44

F. AP7's Absurd-Results Argument Lacks Merit...............46

1. The District Court Did Not Ground Its Analysis Of The Succession Clause On FIRREA's Priority Scheme................................................................46

2. The FDIC Can Bring, And It Does Recognize, The Claims At Issue Here......................................48

G. Other Arguments AP7 Makes Also Lack Merit.............49

III. Alternatively, The District Court Lacked Subject-Matter Jurisdiction Because The Administrative Claims Process Was Not Exhausted Before This Action Was Commenced.....53

A. FIRREA Strips Courts Of Jurisdiction Over Claims That Are Filed When The Administrative Claims Process Has Not Been Exhausted..............................54

B. The District Court Never Had Jurisdiction Because This Action Was Commenced Before The Administrative

Claims Process Was Exhausted……………………………..58

C.  AP7's Arguments That The Exhaustion Requirement
Either Does Not Apply Or Was Satisfied Lack Merit…….59

1.  AP7's Claims Are Subject To FIRREA's Exhaustion
Requirement…………………………………………………60

2.  AP7's Belated Administrative Claims Did Not
Exhaust FIRREA's Administrative Claims Process…..62

3.  AP7 Could Not Exhaust The FIRREA Claims
Process On Behalf Of Putative Class Members………..64

CONCLUSION………………………………………………………..68

RULE 32(g) CERTIFICATE OF COMPLIANCE………………….70

CERTIFICATE OF SERVICE………………………………………..71

iv

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Aaron v. Illinois Nat'l Ins. Co.*,
  2023 WL 7389034 (E.D. La. Nov. 8, 2023)................................38, 39

*Aber-Shukofsky v. JPMorgan Chase & Co.*,
  755 F. Supp. 2d 441 (E.D.N.Y. 2010)...........................................61

*Adato v. Kagan*,
  599 F.2d 1111 (2d Cir. 1979)................................................49, 50

*America West Bank Members v. Utah*,
  2023 WL 4108352 (D. Utah June 21, 2023), *aff'd*,
  2024 WL 3812451 (10th Cir. Aug. 14, 2024).............33, 34, 39, 46, 48

*Barnes v. Harris*,
  783 F.3d 1185 (10th Cir. 2015)....................................32, 40, 41, 49

*Barnhart v. Sigmon Coal Co.*,
  534 U.S. 438 (2002).......................................................23, 44, 46

*BedRoc Ltd., LLC v. United States*,
  541 U.S. 176 (2004).......................................................2, 20, 21

*Benson v. JPMorgan Chase Bank, N.A.*,
  673 F.3d 1207 (9th Cir. 2012)...................................................61

*Bowers v. Whitman*,
  671 F.3d 905 (9th Cir. 2012)....................................................45

*Brandow v. FDIC*,
  2008 WL 5378348 (N.D. Ohio Dec. 22, 2008)................................65

*Carlyle Towers Condominium Ass'n, Inc. v. FDIC*,
  170 F.3d 301 (2d Cir. 1999)..............................................55, 63, 64

*Case Fin., Inc. v. Alden,*
　2009 WL 2581873 (Del. Ch. Aug. 31, 2009)……………………………..22

*Cassese v. Washington Mut., Inc.,*
　711 F. Supp. 2d 261 (E.D.N.Y. 2010),
　*appeal dismissed sub nom. Bloom v. FDIC,*
　738 F.3d 58 (2d Cir. 2013)………………………………………..64, 65

*Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.,*
　993 F.2d 269 (1st Cir. 1998)………………………………………45

*EPA v. EME Homer City Generation, L.P.,*
　572 U.S. 489 (2014)………………………………………………23

*Galper v. JP Morgan Chase Bank, N.A.,*
　802 F.3d 437 (2d Cir. 2015)……………………………………18, 28

*Hayes v. Gross,*
　982 F.2d 104 (3d Cir. 1992)………………………………………...32

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A.,*
　747 F.3d 44 (2d Cir. 2014)………………………………………5

*Holman v. Downey Sav. & Loan Ass'n,*
　2010WL 11597286 (C.D. Cal. Apr. 21, 2010)………………………64, 65

*Hunter v. McMahon,*
　75 F.4th 62 (2d Cir. 2023)………………………………………58

*In re Alphabet, Inc. Sec. Litig.,*
　1 F.4th 687 (9th Cir. 2021)………………………………………61

*In re Tronox Inc.,*
　855 F.3d 84 (2d Cir. 2017)………………………………………54

*Jennings v. Rodriguez,*
　583 U.S. 281 (2018)…………………………………………...3, 18, 27

*Kusen v. Herbert,*
  2025 WL 1635863 (N.D. Cal. June 9, 2025)...............59, 64, 66, 67, 68

*Lamar, Archer & Cofrin, LLP v. Appling,*
  584 U.S. 709 (2018)......................................................27, 28

*Landgraf v. USI Film Prods.,*
  511 U.S. 244 (1994).........................................................45

*Levin v. Miller,*
  763 F.3d 667 (7th Cir. 2014)..............................................32, 33

*Lubin v. Skow,*
  382 F. App'x 866 (11th Cir. 2010).............................................32

*Lutter v. JNESO,*
  86 F.4th 111 (3d Cir. 2023)...................................................59

*Michels v. RTC,*
  1994 WL 242162 (D. Minn. Apr. 13, 1994)......................................65

*Mollon v. Torrance,*
  22 U.S. (9 Wheat.) 537 (1824).................................................58

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.,*
  118 A.3d 175 (Del. 2015).....................................................22

*National Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.,*
  28 F.3d 376 (3d Cir. 1994).....................................................37

*Nielsen v. Preap,*
  586 U.S. 392 (2019)..........................................................45

*Pareto v. FDIC,*
  139 F.3d 696 (9th Cir. 1998)............................................1, 31, 32

*Rajamin v. Deutsche Bank Nat'l Trust Co.,*
  757 F.3d 79 (2d Cir. 2014)...............................................20, 53

*Resolution Trust Corp. v. Elman,*
    949 F.2d 624 (2d Cir. 1991)..........................................................64

*Rosa v. RTC,*
    938 F.2d 383 (3d Cir. 1991)..........................................................59

*Rundgren v. Washington Mut. Bank, FA,*
    760 F.3d 1056 (9th Cir. 2014)........................................................55

*Sahni v. American Diversified Partners,*
    83 F.3d 1054 (9th Cir. 1996).........................................................54

*Scott v. Fischer,*
    616 F.3d 100 (2d Cir. 2010)..........................................................54

*Seaway Bank & Trust Co. v. J&A Series I, LLC,*
    962 F.3d 926 (7th Cir. 2020).........................................................61

*Sowell v. American Cyanamid Co.,*
    888 F.2d 802 (11th Cir. 1989)........................................................45

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,*
    250 F.3d 87 (2d Cir. 2001)...........................................................61

*Taylor v. ANB Bancshares, Inc.,*
    682 F. Supp. 2d 970 (W.D. Ark. 2009)................................................65

*Tenet v. Doe,*
    544 U.S. 1 (2005).....................................................................5

*United States v. DiCristina,*
    726 F.3d 92 (2d Cir. 2013)................................................21, 27, 48

*United States v. Harris,*
    838 F.3d 98 (2d Cir. 2016)...........................................................20

*United States v. Miller,*
    604 U.S. ---, 145 S. Ct. 839 (2025)..................................................27

*United States v. Zheng,*
   113 F.4th 280 (2d Cir. 2024)…………………………………………43

*Verdi v. FDIC,*
   2024 WL 4252038 (S.D.N.Y. Sept. 20, 2024)…..21, 35, 36, 38, 39, 46-48

*Verdi v. FDIC,*
   2023 WL 6388225 (C.D. Cal. Sept. 28, 2023)…………………………..61

*Vieira v. Anderson (In re Beach First Nat'l Bancdhares, Inc.),*
   702 F.3d 772 (4th Cir. 2012)…………………………………………..32, 40

*Zucker v. Rodriguez,*
   919 F.3d 649 (1st Cir. 2019)…….2-4, 17-19, 21-26, 28-35, 37-49, 52, 53

*Zu[c]ker v. Rodriguez,*
   2017 WL 2345683 (D.P.R. May 30, 2017), *aff'd,*
   919 F.3d 649 (1st Cir. 2019)……………………………………………..22

## UNITED STATES CONSTITUTION

U.S. Const. amend. V (Takings Clause)………………………………19, 45

## FEDERAL STATUTES

12 U.S.C. § 1813(c)(2)………………………………………………...7

12 U.S.C. § 1821(c)(1)………………………………………………...7

12 U.S.C. § 1821(d)……………………………………………………56

12 U.S.C. § 1821(d)(2)(A)……………………………………….*passim*

12 U.S.C. § 1821(d)(2)(A)(i)………………………………………1, 3, 32

12 U.S.C. § 1821(d)(3)…………………………………………………56

12 U.S.C. § 1821(d)(3)(B)(i)…………………………………………...56

ix

12 U.S.C. § 1821(d)(3)(C)(i)……………………………………………56

12 U.S.C. § 1821(d)(5)(A)……………………………………………63

12 U.S.C. § 1821(d)(5)(A)(i)…………………………………………56

12 U.S.C. § 1821(d)(5)(B)……………………………………………56

12 U.S.C. § 1821(d)(6)(A)…………………………………………57, 63

12 U.S.C. § 1821(d)(11)(A)………………………………………7, 25, 52

12 U.S.C. § 1821(d)(11)(A)(v)………………………………………25

12 U.S.C. § 1821(d)(13)(D)………………………………………5, 55

12 U.S.C. § 1821(d)(13)(D)(ii)……………………………………6, 60, 61

12 U.S.C. § 1821(g)…………………………………………………52

15 U.S.C. § 78u-4(a)(1)………………………………………………65

28 U.S.C. § 1291……………………………………………………5

28 U.S.C. § 2107(b)…………………………………………………5

Financial Institutions Reform, Recovery, and Enforcement Act of 1989,
   Pub. L. 101-73, 103 Stat. 183………………………………………*passim*

## OTHER AUTHORITIES

H.R.Rep. No. 54(I), 101st Cong., 1st Sess 2 (1989), *reprinted in*
   1989 U.S.C.C.A.N. 86………………………………………………54

S. 774, 101st Cong. § 214(o) (1989)……………………………………42, 43

## PRELIMINARY STATEMENT

"When Congress enacted FIRREA,[1] it put in place a tessellated scheme which was designed to provide an orderly method" for resolving failed banks.[2] To that end, FIRREA includes a provision (the Succession Clause) that assigns to the FDIC as receiver "*all rights, titles, powers, and privileges* of the insured depository institution*, and *of any stockholder*, member, accountholder, depositor, officer, or director of such institution *with respect to the institution and the assets of the institution.*"[3] Thus, "Congress has transferred everything it could to the FDIC[.]"[4] As a result, "*all* of the accouterments of ownership were gathered into the hands of a single entity so that it would be in a position to develop a consistent approach to dealing with the [failed bank's] various problems."[5]

This case arises from the fourth largest bank failure in United States history. On March 12, 2023, the New York Department of Financial Services closed Signature Bank of New York (Signature or the Bank)

---

[1] Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183.

[2] *Pareto v. FDIC*, 139 F.3d 696, 701 (9th Cir. 1998) (footnote added).

[3] 12 U.S.C. § 1821(d)(2)(A)(i) (emphasis added).

[4] *Pareto*, 139 F.3d at 700.

[5] *Id.* at 701 (emphasis added).

and appointed the FDIC as the Bank's receiver.[6] Plaintiff-Appellant Sjunde AP-Fonden (AP7) is the lead plaintiff in this action, which asserts securities-fraud claims on behalf of a putative class of Signature stockholders who allegedly relied on misstatements by the Bank's executives and auditor—made on behalf of the Bank—and were subsequently damaged by a decline in the price of their stock. The main issue presented by this appeal is whether the Succession Clause assigned those claims to the FDIC. The district court correctly held that it did.

AP7 concedes, as it must, that the claims-ownership issue is an "issue of statutory interpretation[.]"[7] "Thus, [this Court's] inquiry begins with the statutory text, and ends there as well if the text is unambiguous."[8] Adhering to this cardinal rule of statutory construction, in *Zucker v. Rodriguez* the First Circuit interpreted the Succession Clause as requiring a two-step analysis that tracks the plain language of the statute.[9] The first step considers whether a claim asserts a "right of a stockholder" of the bank, and the second step considers whether the rights

---

[6] A-118 (¶ 40).

[7] AP7 Br. 19.

[8] *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004).

[9] 919 F.3d 649, 656-57 (1st Cir. 2019).

being asserted are "with respect to the [bank] and the assets of the [bank]."[10] The district court here adopted and applied this analysis.[11]

AP7 argues that the district court "principally erred" by interpreting the phrase "with respect to" in the Succession Clause to mean "concern" and "relate to."[12] This argument has no purchase. Simply stated, it cannot successfully be disputed that "[t]he phrase 'with respect to' means . . . 'concerning,' or 'relat[ing] to.'"[13] Moreover, in *Zucker* the First Circuit interpreted the phrase "with respect to" *as it is used in the Succession Clause* to mean "relate to or concern."[14] Because AP7 does not dispute that its claims "relate to" or "concern" Signature and its assets (nor could it reasonably do so), that should be the end of the matter.

Rather than rely on the plain text of section 1821(d)(2)(A)(i), AP7—without identifying any ambiguity in the statute (there is none)—urges this Court to apply an extratextual direct-derivative test that some cir-

---

[10] *Id.*

[11] SPA-10-16.

[12] AP7 Br. 24; *see also id.* at 7, 17 (same).

[13] *Jennings v. Rodriguez*, 583 U.S. 281, 320 (2018) (Justice THOMAS, joined by Justice GORSUCH, concurring in part and concurring in the judgment) (quoting three standard dictionaries).

[14] *Zucker*, 919 F.3d at 656.

cuits used before *Zucker* was decided.[15] But as the First Circuit explained while rejecting that test in *Zucker*, "the most basic problem for [AP7's] interpretation is that the direct-derivative distinction appears nowhere in the language of § 1821(d)(2)(A)."[16]

AP7 also argues that *Zucker's* two-step test and the direct-derivative test are consistent and always lead to the same result because, AP7 says, they both focus on the source of the harm.[17] But as the district court correctly concluded, AP7 "mischaracterizes *Zucker*" because *Zucker* simply noted that the two tests can *overlap* in *some* instances and "[d]eeming th[e] harm inquiry dispositive would effectively reincarnate the direct-derivative interpretation of the Succession Clause."[18]

Finally, as we show *infra* at 42-44 and 46-49, AP7's resort to legislative history and absurd-results arguments is unavailing.

Although the district court did not reach the issue, the parties also briefed below whether the district court lacked subject-matter jurisdiction because AP7 failed to exhaust FIRREA's administrative claims pro-

---

[15] AP7 Br. 5, 17, 27-30.

[16] *Zucker*, 919 F.3d at 657.

[17] AP7 Br. 30; *see also id.* at 26, 30-32 (same).

[18] SPA-12.

cess.[19] As we show *infra* at 53-68, AP7's failure to exhaust the claims process precludes jurisdiction here and provides an alternative ground for affirmance.

## JURISDICTIONAL STATEMENT

1. As discussed *infra* at 53-68, the district court lacked jurisdiction because: (1) 12 U.S.C. § 1821(d)(13)(D) provides that "no court shall have jurisdiction over . . . any claim relating to any act or omission of [Signature]" unless and until the plaintiff has fully exhausted the FDIC's administrative claims process; (2) AP7's claims relate to acts or omissions of Signature; and (3) neither AP7 nor any other named plaintiff exhausted the administrative claims process before this action was commenced. Nevertheless, because "prudential standing . . . represents the sort of 'threshold question' [the Supreme Court] ha[s] recognized may be resolved before addressing jurisdiction[,]"[20] the district court properly dismissed this action on the ground that AP7 lacks prudential standing.

2. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2107(b). The district court's judgment finally disposing of all parties' claims was

---

[19] *See* A-277-79, 280-82, 286-93, 374-75, 386-97, 418-23.

[20] *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005); *accord Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A.*, 747 F.3d 44, 48 (2d Cir. 2014).

entered on March 24, 2025,[21] and AP7 filed its notice of appeal less than sixty days later on March 27, 2025.[22]

## COUNTERSTATEMENT OF THE ISSUES

1. The Succession Clause provides that, as Signature's receiver, the FDIC "succeed[ed] to . . . all rights, titles, powers, and privileges of [Signature], and of any stockholder . . . of [Signature] with respect to [Signature] and the assets of [Signature]." AP7's claims are grounded on misstatements about the Bank and its assets made on behalf of the Bank by its former executives and auditor, and they depend on proof of mismanagement of the Bank and resulting harm to the Bank and its assets. Did the FDIC succeed to the claims alleged by AP7 in this action?

2. FIRREA provides that "no court shall have jurisdiction over . . . any claim relating to any act or omission of [Signature]" unless the claimant has first fully exhausted the administrative claims process. 12 U.S.C. § 1821(d)(13)(D)(ii). Neither AP7 nor any other named plaintiff exhausted the administrative claims process before this action was commenced. Did the district court lack jurisdiction over this action?

---

[21] SPA-18.

[22] A-695.

6

## STATEMENT OF THE CASE

## I. Relevant Statutory And Regulatory Background.

In response to the savings and loan crisis of the 1980s, Congress enacted FIRREA. Among other things, the statute provides a framework for resolving failed banks. Under FIRREA, when an FDIC-insured bank becomes insolvent, the FDIC may be appointed as the bank's receiver.[23]

The statute further provides that, as receiver, the FDIC "shall . . . succeed to . . . all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder . . . of such institution with respect to the institution and the assets of the institution."[24]

FIRREA also requires that all amounts realized by the FDIC as receiver from its resolution of a failed bank "shall be distributed to pay claims" of the bank's creditors in the "order of priority" set forth in the statute.[25] Under this congressionally mandated order of priority, no amount can be paid to satisfy claims of a failed bank's stockholders until after all other creditors' claims have been satisfied.[26]

---

[23] *See* 12 U.S.C. §§ 1813(c)(2) and 1821(c)(1).

[24] 12 U.S.C. § 1821(d)(2)(A).

[25] 12 U.S.C. § 1821(d)(11)(A).

[26] *Id.*

## II. Relevant Allegations Of AP7's Complaint.

Signature was a New York state-chartered commercial bank that was co-founded in 2001 by Defendants-Appellees Joseph DePaolo and Scott A. Shay, along with non-party John Tamberlane.[27] On March 12, 2023, the New York Department of Financial Services (the NYDFS) closed the Bank and appointed the FDIC as its receiver.[28]

DePaolo, Shay, and the remaining individual Defendants-Appellees are former directors and/or senior executives of Signature.[29] Defendant-Appellee KPMG LLP is a Delaware limited liability partnership headquartered in New York, New York and was the auditor of Signature's financial statements from 2001 until the Bank closed.[30]

Plaintiff-Appellant AP7 is a Swedish public pension fund.[31] AP7 purchased Signature common stock between January 21, 2021, and March 12, 2023 (the Class Period).[32] Specifically, AP7 purchased: 18,000 shares

---

[27] A-118 (¶ 40).

[28] *Id.*

[29] A-116-118 (¶¶ 31-38).

[30] A-118 (¶ 39).

[31] A-116 (¶ 30).

[32] A-106.

8

in October 2021 at prices between $299.45 and $309.99 per share; 51,941 shares in November 2021 at a price of $302.30 per share; 2,242 shares in February 2022 at a price of $344.89 per share; and 4,309 shares in December 2022 at a price of $122.73 per share.[33]

On Friday, March 10, 2023, Signature received more than 1,600 deposit withdrawal requests.[34] This run on the Bank prompted the FDIC to assess the situation.[35] By the following Sunday afternoon, both the FDIC and the NYDFS concluded Signature could not continue to operate in a safe and sound manner if it opened on the following Monday.[36]

When the FDIC was appointed as receiver on Monday, March 13, 2023, the Bank ceased to exist as an independent entity and *all* investors in Signature "were wiped out."[37] Nasdaq halted trading in the Bank's stock on that same day, with a closing price of $70.00 per share.[38] When trading resumed on March 28, 2023, the stock closed at $0.13.[39]

---

[33] A-268.

[34] A-114 (¶ 22).

[35] *Id.*

[36] *Id.*

[37] A-115 (¶ 24).

[38] *Id.*

[39] *Id.* at ¶ 25.

9

AP7's complaint establishes that its claims depend on proving misconduct at, and/or mismanagement of, *the Bank* by the individual Defendants and related misconduct by KPMG in its role as *the Bank's* auditor. AP7 alleges that Defendants ignored "critical problems and deficiencies in the Bank's risk profile and liquidity risk management controls," "massively expanded the Bank's liquidity risks by taking on billions of dollars in uninsured and volatile deposits from the cryptocurrency industry," and that "Defendants failed to implement the essential controls to analyze, model and mitigate these risks."[40] And AP7's damages allegations rely on the resulting decline in the value of Signature's assets and a corresponding decline in the price of its stock, "amount[ing] to a 99.81% drop [that] erased billions of dollars in shareholder value."[41]

In support of these general allegations, AP7's complaint provides a laundry list of specific examples of Defendants' alleged mismanagement and misconduct. For example, AP7 alleges that Defendants:

- "[C]ompletely failed to implement an adequate liquidity risk management framework at the Bank;"[42]

---

[40] A-107 (¶ 2).

[41] A-115 (¶¶ 24-25).

[42] A-112 (¶ 13).

10

- Failed to implement a "well-documented and thoroughly tested liquidity contingency plan," resulting in a "lack of preparedness for an unanticipated liquidity event;"[43]

- Allowed "the significant liquidity contingency planning deficiencies identified originally during the 2019 examination cycle [to] remain[ ] outstanding and unresolved;"[44]

- Permitted the Bank to experience "tremendous deposit growth more than doubling the Bank's size" that "relied largely on uninsured deposits to fuel deposit growth," resulting in "rapid and uncontrolled growth [that] quickly outpaced its already-deficient risk infrastructure;"[45]

- Allowed Signature to hold over $97 billion in uninsured deposits—roughly 92% of the Bank's deposits—even though "the Bank had no systems or controls in place to identify and mitigate the risks that these uninsured deposits posed to the Bank's liquidity and financial condition;"[46]

- Allowed Signature to increase its deposit concentration in a small number of large depositors, resulting in "just **_four_** depositors compris[ing] **_14%_** of [the Bank's] total assets;"[47]

- Turned Signature into a "crypto friendly" "deposit machine" while most "'[b]ig banks [we]re avoiding crypto currencies' because digital assets 'remain[ed] unpredictable, defined by wild price swings;'"[48]

- "[S]ignificantly increased [Signature's] exposure to its new

---

[43] A-115 (¶ 23).

[44] A-113 (¶ 17).

[45] A-125-26 (¶¶ 63-64).

[46] A-127 (¶ 66).

[47] *Id.* at ¶ 67 (bold italic print in original).

[48] A-123, 125 (¶¶ 56, 61) (internal quotation marks omitted).

11

Fund Banking capital call lines of credit," which "created additional risks, including concerns over the Bank's ability to pledge these loans as collateral at the Federal Reserve discount window;"[49]

- "[S]hockingly did not have in place a sufficient plan [for the Bank] to address, much less the ability to withstand, numerous liquidity stress events, including . . . depositors pulling their money out of the Bank;"[50] and

- "[P]ursu[ed] . . . untrammeled and irresponsible [deposit] growth . . . [that] allowed them to line their pockets with millions of dollars of bonus payments."[51]

Summing up these allegations, AP7 alleges that "[Signature] management's lack of a well-documented and thoroughly tested liquidity contingency plan and its lack of preparedness for an unanticipated liquidity event . . . *were the root cause of the [B]ank's failure.*"[52]

AP7 also alleges that the individual Defendants included material misstatements about Signature and its assets in public statements they made on behalf of Signature.[53] And it alleges that KPMG recklessly audited the Bank's financial statements it prepared on behalf of Signature

---

[49] A-130 (¶¶ 73-74).

[50] A-133 (¶ 84).

[51] A-148 (¶ 123).

[52] A-115 (¶ 23) (bold italic print in original) (bracket and ellipsis added).

[53] *See, e.g.*, A-107 (¶ 2), A-108 (¶ 5), A-127 (¶ 66), A-178-217.

and issued misleading unqualified opinions on Signature's financial statements that resulted in KPMG making material misstatements about the Bank and its assets while acting on behalf of the Bank.[54]

Finally, AP7 alleges that it and other members of the putative class who purchased or otherwise acquired Signature common stock during the Class Period suffered damages due to the "subsequent significant decline in the value of the Company's common stock[.]"[55] And AP7 repeats this allegation several times in its opening brief, confirming that it seeks to recover "damages suffered by the class members when the value of the shares they owned declined[.]"[56]

## III. Relevant Procedural History.

On March 12, 2023, the NYDFS closed Signature and appointed the FDIC as the Bank's receiver.[57] On that same day, the FDIC accepted the appointment.[58]

---

[54] *See* A-217-231.

[55] A-250 (¶ 453).

[56] AP7 Br. 4; *see also id.* at 12 (alleged damages resulted from "significant declines in the price of Signature's stock"), 36 (class members suffered damage due to the "decline in the price of their personally-held stock").

[57] A-303 (¶ 3).

[58] A-309.

Two days later—on March 14, 2023—Plaintiff Matthew Schaeffer, individually and on behalf of all others similarly situated, commenced this action against Signature and individual Defendants-Appellees De-Paolo, Wyremski, and Howell alleging violations of the Securities Exchange Act of 1934 (Exchange Act), as amended by the Private Securities Litigation Reform Act of 1995 (PSLRA).[59] Schaeffer did not file an administrative claim with the FDIC prior to commencing this action.[60]

On March 31, 2023, Perthi Pal Singh, individually and on behalf of all others similarly situated, brought a separate action (the *Singh* action) against Signature Bank, the three individual Defendants-Appellees in the *Schaeffer* action, and three additional individual Defendants.[61] Singh did not file an administrative claim with the FDIC prior to commencing the *Singh* action.[62]

On June 29, 2023, the FDIC filed notices substituting itself as a party for Signature in both the *Schaeffer* action and the *Singh* action.[63]

---

[59] A-22-36.

[60] A-305 (¶ 9).

[61] A-37-71.

[62] A-305 (¶ 9).

[63] *Schaeffer* action Dkt. 38; *Singh* action Dkt. 13.

On July 17, 2023, the FDIC filed pre-motion conference letters requesting leave to move to dismiss in both the *Schaeffer* action and the *Singh* action.[64] The letters asserted that each of the actions should be dismissed based on three alternative threshold grounds: (1) the district court lacked jurisdiction because Schaeffer and Singh failed to exhaust the FDIC's administrative claims process before filing suit; (2) the district court lacked jurisdiction because, even had the plaintiffs properly exhausted the claims process, the claims could only be brought in an action filed in the district court for the Southern District of New York or the District of Columbia; and (3) the plaintiffs lacked standing because the claims they asserted belong to the FDIC as receiver for Signature.[65]

Also on July 17, 2023, counsel for AP7 filed with the FDIC an individual administrative claim on behalf of AP7 and a second administrative claim purportedly on behalf of a putative class of investors.[66]

One week later—on July 25, 2023—Singh voluntarily dismissed Signature from the *Singh* action.[67] The very next day, Schaeffer voluntarily

---

[64] A-72-74; *Singh* action Dkt. 17.

[65] A-72, 73-74; *Singh* action Dkt. 17 at 1, 2-3.

[66] A-305 (¶ 9).

[67] A-75-76.

15

dismissed Signature from the *Schaeffer* action.[68]

On August 10, 2023, the district court consolidated the *Schaeffer* and *Singh* actions and appointed AP7 as the lead plaintiff.[69]

On August 28, 2023, the FDIC notified AP7 that the administrative claim it had filed on behalf of a putative class of investors could not be accepted because, as it had previously informed AP7, "[b]y law the Receiver does not accept class claims for review" and "EACH individual or entity must file a separate claim with the receiver."[70] The FDIC also notified AP7 that its individual administrative claim was still pending.[71]

On December 1, 2023, AP7 filed the operative Corrected Consolidated Complaint for Violation of the Federal Securities Laws (Complaint).[72]

On December 5, 2023, the district court granted the FDIC's motion to intervene and set a briefing schedule for the FDIC's motion to dismiss.[73]

---

[68] A-77-78.

[69] A-79-95.

[70] A-363.

[71] *Id.*

[72] A-99-268.

[73] A-269-70. The FDIC filed and served its letter regarding service of its motion to intervene and also served that motion on September 1, 2023. A-97; *Schaeffer* action Dkt. 54. AP7's assertion that the FDIC requested leave to amend on July 17, 2023, AP7 Br. 13, is incorrect.

On January 16, 2024, the administrative claims process for AP7's individual administrative claim was exhausted.[74]

On March 21, 2025, the district court granted the FDIC's motion to dismiss the Complaint based on AP7's lack of prudential standing and entered a judgment against AP7.[75]

## IV. Rulings Presented For Review.

The district court held that AP7 lacks prudential standing because the FDIC succeeded to all claims at issue under the Succession Clause.[76]

## SUMMARY OF ARGUMENT

1. In *Zucker v. Rodriguez*, the First Circuit analyzed the plain language of section 1821(d)(2)(A) and held that it unambiguously does *not* distinguish between direct and derivative claims. Rather, the court held, the operative language unambiguously assigns to the FDIC as receiver *all* claims of a failed bank's stockholders that: (1) assert "rights . . . of [a] stockholder . . . of [the bank];" and (2) are "with respect to the [bank] and the assets of the [bank]."[77] The district court here correctly adopted

---

[74] A-391.

[75] SPA-1-17, 18.

[76] SPA-7-16.

[77] *Zucker*, 919 F.3d at 657 (quoting section 1821(d)(2)(A)).

17

*Zucker's* analysis and correctly applied that analysis to AP7's Complaint.[78] Thus, the court correctly held that, "[b]ecause the FDIC succeeded to [AP7's] claims, [AP7] lacks standing to assert them."[79]

AP7 argues that, while applying *Zucker's* two-step test, the district court "principally erred" by interpreting the phrase "with respect to" to mean "concern" or "relate to."[80] But not only is this the meaning of "with respect to" that is found in standard dictionaries and generally used by courts,[81] it is also the definition the First Circuit used in *Zucker*.[82] Moreover, this Court has interpreted "with respect to" the same way in a context that it determined required the phrase to be "construed narrowly."[83] Because AP7 does not dispute that its claims "concern" or "relate to" Signature and its assets (nor could it reasonably do so), nothing further need be considered and the district court's judgment should be affirmed.

---

[78] SPA-10-16.

[79] *Id.* at 16.

[80] AP7 Br. 7, 24.

[81] *E.g., Jennings*, 138 S. Ct. at 856 (Justice THOMAS, with whom Justice GORSUCH joins, concurring in part and concurring in the judgment).

[82] *Zucker*, 919 F.3d at 656.

[83] *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 445-446 (2d Cir. 2015).

Nevertheless, AP7 urges this Court to apply a test that "simply analyze[s] whether the asserted right is derivative or direct[.]"[84] But as the *Zucker* court explained, "the most basic problem for [that] interpretation is that the direct-derivative distinction appears nowhere in the language of § 1821(d)(2)(A)," and a test based on that distinction therefore contravenes Supreme Court precedent on statutory interpretation.[85]

AP7 also rehashes absurd-results and unconstitutional-taking arguments that were flatly rejected in *Zucker*, and they should fare no better here. In particular, AP7's primary absurd-results argument is grounded on a basic misunderstanding of the Succession Clause's text. Contrary to AP7's argument, the Succession Clause does not "vaporize" claims, but instead assigns to the FDIC *all* rights necessary to pursue them. And AP7's unconstitutional-takings argument fails because the Takings Clause protects only vested property rights, and rights in a cause of action do not vest until a final, unreviewable judgment is obtained.

2. Alternatively, the undisputed facts establish that neither AP7 nor either of the original plaintiffs exhausted the administrative claims pro-

---

[84] AP7 Br. 26.

[85] *Zucker*, 919 F.3d at 657.

19

cess before this consolidated action was commenced. It necessarily follows that the district court lacked subject-matter jurisdiction.

## ARGUMENT

### I. Standards Of Review.

This Court reviews *de novo* the district court's prudential standing and statutory construction rulings.[86]

### II. The District Court Correctly Held That AP7 Lacks Prudential Standing To Litigate The Claims Alleged In Its Complaint.

The parties agree that this appeal presents a "contested issue[ ] of statutory interpretation."[87] And as the Supreme Court has instructed, "[t]he preeminent canon of statutory interpretation requires [courts] to presume that [the] legislature says in a statute what it means and means in a statute what it says there."[88] Accordingly, "[w]hen interpreting a statute, [courts] must begin with the language employed by Congress and the assumption that the ordinary meaning of that language

---

[86] *See Rajamin v. Deutsche Bank Nat'l Trust Co.*, 757 F.3d 79, 84, 86 (2d Cir. 2014) (*de novo* review of district court's application of prudential standing); *United States v. Harris*, 838 F.3d 98, 103-04 (2d Cir. 2016) (*de novo* review of district court's statutory construction).

[87] AP7 Br. 19.

[88] *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (internal quotation marks omitted).

accurately expresses the legislative purpose."[89] What is more, "[w]here the statute's language is plain, the sole function of the courts is to enforce it according to its terms."[90] "Thus, [this Court's] inquiry begins with the statutory text, and ends there as well if the text is unambiguous."[91]

### A. The District Court Correctly Adopted and Applied the Two-Step Test for Applying the Succession Clause Articulated by the First Circuit in *Zucker v. Rodriguez.*

In analyzing how to apply the Succession Clause, the district court adopted the Southern District of New York's holding in *Verdi v. FDIC*.[92] *Verdi*, in turn, had adopted the analysis of the First Circuit in *Zucker*.[93] The district court here correctly adopted and applied that analysis.

### 1. *Zucker* correctly interpreted the Succession Clause.

*Zucker* involved claims brought by the plan administrator for the Chapter 11 estate of the former holding company and sole stockholder of a failed bank for which the FDIC had been appointed receiver.[94] The

---

[89] *United States v. DiCristina*, 726 F.3d 92, 96 (2d Cir. 2013) (internal quotation marks omitted).

[90] *Id.* (internal quotation marks omitted).

[91] *BedRoc Ltd.*, 541 U.S. at 183.

[92] 2024 WL 4252038 (S.D.N.Y. Sept. 20, 2024); *see* SPA-10.

[93] *See Verdi*, 2024 WL 4252038, at *3-*6; *see also* SPA-10.

[94] *See Zucker*, 919 F.3d at 650.

defendants were six of *the holding company's* former directors and officers and *their insurer.*[95] "The [a]dministrator's complaint alleged that negligence and breach of fiduciary duties *owed to the [h]olding [c]ompany* caused the [b]ank's failure and *the [h]olding [c]ompany's* resultant loss of its investment in the [b]ank."[96] The FDIC intervened to protect its interests as the bank's receiver and argued that the claims asserted in *Zucker* belonged to the FDIC and not the administrator.

In response, the administrator in *Zucker* argued that the claims at issue were direct claims rather than derivative claims, and that they therefore belonged to the administrator under FIRREA's Succession Clause. Specifically, the administrator argued that section 1821(d)(2)(A)

---

[95] *Id.*

[96] *Id.* (emphases added). These allegations were significant because controlling precedent supported the plaintiff's argument that its claims were direct claims under the governing state law. *See NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 179 n.11 (Del. 2015) (citing with approval *Case Fin., Inc. v. Alden,* 2009 WL 2581873, at *7 (Del. Ch. Aug. 21, 2009), and describing that case as "holding that the plaintiff [parent] corporation could maintain a direct claim for breach of fiduciary duty against a former director, despite the fact that the alleged damages derived from the diminution in value of the plaintiff's shares of its wholly-owned subsidiary[,] . . . because [the former director] owed this duty to the [plaintiff parent corporation] directly"). *See also Zu[c]ker v. Rodriguez*, 2017 WL 2345683, at *4 and n.5 (D.P.R. May 30, 2017) (noting that Delaware law was the controlling state law in *Zucker*).

22

limits bank stockholders' claims that are assumed by the FDIC under the Succession Clause to "claims that shareholders may assert derivatively under state law on behalf of the institution in receivership."[97] But the First Circuit rejected that reading of the statute because "[t]here is no support in the text of § 1821(d)(2)(A) for such a judicial gloss."[98] The court explained: "The most basic problem for the [a]dministrator's interpretation is that the direct-derivative distinction appears nowhere in the language of § 1821(d)(2)(A)."[99] Moreover, the court continued, "[c]ourts must avoid reading into statutes concepts or exceptions absent from the text, so we cannot assume, without a textual basis, that Congress intended to place such a limitation on the FDIC's power."[100]

The First Circuit then interpreted the text of section 1821(d)(2)(A) and held that, "[w]hen the FDIC succeeded to 'all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder . . . of such institution with respect to the institution and the as-

---

[97] *Id.* at 656.

[98] *Id.*

[99] *Id.* at 657.

[100] *Id.* (citing *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002), and *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 508 (2014) (rejecting interpretation that would add an "unwritten exception")).

23

sets of the institution,' it succeeded to the [a]dministrator's claims."[101] The court "reach[ed] that conclusion by applying [section 1821(d)(2)(A)'s] terms to the claims step-by-step."[102]

*First*, the *Zucker* court determined that the claims at issue "depend-[ed] entirely on the [h]olding [c]ompany's position as a [b]ank stockholder . . . because they necessarily required the administrator to prove that, but for the malfeasance of the [h]olding [c]ompany [d]irectors, the assets of the [b]ank would have been much greater, . . . [and that] would have inured to the benefit of the . . . stockholder.'"[103]

*Second*, the *Zucker* court determined that the claims at issue were "with respect to . . . the assets of the institution" because the fact "[t]hat the claims depend[ed] on the [stockholder's] proving that malfeasance by [the] directors depressed the [b]ank's assets mean[t] that the claims *relate[d] to* or *concern[ed]* the assets of the [b]ank."[104]

After completing this straightforward analysis, the First Circuit held

---

[101] *Id.* at 656 (quoting 12 U.S.C. § 1821(d)(2)(A)).

[102] *Id.*

[103] *Id.*

[104] *Id.* (emphasis added).

that "the FDIC as receiver succeeded to those claims 'by operation of law' under § 1821(d)(2)(A)."[105] And as the passage quoted in the preceding paragraph establishes, a critical element of the court's analysis was its interpretation of the phrase "with respect to" in the statutory text as meaning "relate to or concern."[106]

Buttressing its interpretation of the scope of section 1821(d)(2)(A), the First Circuit also noted "that Congress confirmed, in a related provision [12 U.S.C. § 1821(d)(11)(A)], that the FDIC should own actions like the [h]olding [c]ompany's."[107] The court explained: "The provision lays out FIRREA's priority scheme for the payment of certain claims" and "provides that claims of shareholders . . . cannot be satisfied until after all other claims, by depositors and others."[108] The First Circuit therefore concluded that "[t]he [a]dministrator's interpretation, were it applied [t]here, would allow [a bank stockholder] to turn this priority scheme on its head."[109]

---

[105] *Id.* at 657.

[106] *Id.* at 656-57.

[107] *Id.* at 658.

[108] *Id.* (citing 12 U.S.C. § 1821(d)(11)(A)(v)).

[109] *Id.*

25

The *Zucker* court then summed up its statutory-interpretation analysis: "In the end, there is *no ambiguity* in Congress's choice not to limit the claims to which the FDIC succeeds to derivative claims. Our conclusion that § 1821(d)(2)(A) covers the [a]dministrator's claims is consistent with *the plain meanings of the words Congress chose*."[110] The court also observed that, "compared to the [a]dministrator's narrowing construction, [the court's] reading [of the statute] better reflects § 1821 (d)(2)(A)'s breadth."[111]

### 2. The district court correctly applied *Zucker's* two-step statutory test.

AP7 does not contend that *Zucker* was wrongly decided. Instead, AP7 argues that the district court—while applying *Zucker's* two-step test—"misinterpreted the Succession Clause."[112] Specifically, AP7 argues that the district court "principally erred" by interpreting the phrase "with respect to" as meaning "concern" and "relate to."[113] This argument fails for several reasons.

---

[110] *Id.* (emphases added).

[111] *Id.*

[112] *Id.* at 24.

[113] *Id.*; *see also id.* at 7, 17 (same).

*First*, as noted *supra* at 20-21, when interpreting statutes courts "must begin with the language employed by Congress and the assumption that *the ordinary meaning* of that language accurately expresses the legislative purpose."[114] And it is well-settled that "[t]he phrase 'with respect to' means 'referring to,' '*concerning*' or '*relat[ing] to*.'"[115]

*Second*, AP7 argues that the phrase "'with respect to' need not be read expansively" because of the statutory context of FIRREA.[116] As support for this argument, AP7 relies on the Supreme Court's decision in *United States v. Miller*.[117] But *Miller* actually undercuts AP7's argument and strongly supports the district court's interpretation.

As the Supreme Court explained in *Miller*, "[u]se of the word 'respecting' in a legal context generally has a broadening effect."[118] What is

---

[114] *DiCristina*, 726 F.3d at 96 (emphasis added).

[115] *Jennings v. Rodriguez*, 583 U.S. 281, 320 (2018) (Justice THOMAS, joined by Justice GORSUCH, concurring in part and concurring in the judgment) (quoting Oxford American Dictionary and Language Guide 853 (1999 ed.), Webster's New Universal Unabridged Dictionary 1640 (2003 ed.), and American Heritage Dictionary 1485 (4th ed. 2000)) (emphases added).

[116] AP7 Br. 24-25.

[117] *Id.* at 25 (citing *United States v. Miller*, 604 U.S. ---, ---, 145 S. Ct. 839, 853 (2025)).

[118] *Miller*, 145 S.Ct. at 852 (quoting *Lamar, Archer & Cofrin, LLP v.*

27

more, the Court referenced its expansive interpretation of that term in a prior case to "[g]iv[e] breadth to [the] discrete statutory term 'financial condition'" in the Bankruptcy Code.[119] Similarly here, "with respect to" gives breadth to the discrete statutory term "assets of the institution" in FIRREA. Moreover, while the Supreme Court did reject an expansive reading of the phrase "with respect to" in *Miller*, it did so only because it was applying the "general rule . . . that waivers of sovereign immunity are to be read *narrowly*."[120] But that rule does not apply here.

*Third*, even when interpreting the phrase "with respect to" in the context of a statutory preemption provision that this Court said required that the phrase be "construe[d] . . . narrowly," this Court held that the phrase meant "concerns."[121]

Finally, while AP7 argues that *Zucker* supports its interpretation of the Succession Clause,[122] it inexplicably ignores that *Zucker* held the phrase "with respect to" in the Succession Clause should be interpreted

---

*Appling*, 584 U.S. 709, 717 (2018)).

[119] *Id.*

[120] *Id.* at 853 (emphasis in original).

[121] *Galper*, 802 F.3d at 445-46.

[122] *See* AP7 Br. 26, 30-32.

expansively to "reflect[ ] § 1821(d)(2)(A)'s breadth[,]"[123] and it interpret-
ed the phrase to mean "relate to or concern."[124]

AP7 does not argue that its claims do not "relate to" or "concern" Sig-
nature or its assets. Nor could it reasonably do so, given the allegations
of its Complaint. As the district court cogently explained, AP7's claims
are "with respect to the institution and the assets of the institution be-
cause . . . they concern Signature's failure after it made alleged mis-
representations about its health (including its assets)."[125] What is more,
"[t]he Officers act[ing] on behalf of Signature and KPMG made public
assurances about Signature. Importantly, Defendants allegedly invoked
these misstatements to justify evading risk management measures, en-
dangering Signature and its assets—including those of depositors at-
tracted to Signature by those same misstatements."[126]

Moreover, as the district court further explained, "the ultimate harm
to shareholders stemmed from a harm to Signature and its assets—
unforeseen mass withdrawals and the lack of risk management meas-

---

[123] *Zucker*, 919 F.3d at 658.

[124] *Id.* at 656.

[125] SPA-14 (internal citation and quotation marks omitted).

[126] SPA-15.

ures."[127] And as the district court concluded, its holding here aligns with the First Circuit's holding in *Zucker* that "claims 'relate[d] to' assets where they depend[ed] on 'proving that malfeasance by [the holding company's] directors depressed the [b]ank's assets."[128]

Because it is not disputed that AP7's claims "concern" or "relate to" the Bank and its assets, the district court's judgment should be affirmed.

## B. The District Court Correctly Declined to Apply the Direct-Derivative Test Because it Contravenes Controlling Precedent on Statutory Interpretation.

Although AP7 begins its argument by conceding that this appeal presents a "contested issue[ ] of statutory interpretation" and that this Court must therefore "begin [its analysis] with the plain text" of the Succession Clause,[129] it never engages with the text of the Clause. AP7 agrees with the FDIC that "the important piece of th[e] analysis" is "[w]hat does *with respect to* the assets of the corporation mean[,]" and it admits that "there's no language in the statute that says direct or derivative."[130] But despite these concessions, AP7 argues at length that

---

[127] SPA-16.

[128] *Id.* (quoting *Zucker*, 919 F.3d at 656).

[129] AP7 Br. 19.

[130] A-680 (lines 3-4 and 15-16) (emphasis added).

30

this Court should follow the pre-*Zucker* decisions of some other circuits that "simply analyzed whether the asserted [stockholder's] right [wa]s derivative or direct."[131] Those decisions cannot help AP7, however, because—in all but one of them—the courts did not analyze the text of the Succession Clause. And in the one case that did engage with the operative statutory language, the court provided no meaningful analysis.

First, in its pre-*Zucker* decision in *Pareto v. FDIC*, the Ninth Circuit held that section 1821(d)(2)(A) "vests all rights and powers of a stockholder of the bank to bring a derivative action in the FDIC."[132] But the court did *not* hold that section 1821(d)(2)(A) *excludes* direct claims. What is more, although it did not engage with the textual phrase "with respect to," the Ninth Circuit did broadly conclude that the Succession Clause should be interpreted to "assure the expeditious and orderly protection of all who are interested in the bank by placing the pursuit of its rights, protection of its assets, and payment of its liabilities firmly in the hands of a single, congressionally designated agency."[133]

---

[131] AP7 Br. 26.

[132] 139 F.3d 696, 700 (9th Cir. 1998).

[133] *Id.*

31

In other pre-*Zucker* decisions AP7 relies on, the Third, Fourth, Tenth, and Eleventh Circuits applied the direct-derivative test. But like the Ninth Circuit in *Pareto*, they did so perfunctorily without analyzing the text of section 1821(d)(2)(A).[134] The only circuit other than the First Circuit to engage with the phrase "with respect to" in the statutory text was the Seventh Circuit in its pre-*Zucker* decision in *Levin v. Miller*.[135]

In *Levin*, the Seventh Circuit's entire analysis of the text of the Succession Clause was set out in a single, conclusory sentence: "Section 1821(d)(2)(A)(i) transfers to the FDIC only stockholder's claims 'with respect to . . . the assets of the institution'—in other words, those that investors (but for §1821(d)(2)(A)(i)) would pursue derivatively on behalf of the failed bank."[136] But that was no analysis at all.

In his concurrence in *Levin*, Judge Hamilton countered that "[i]t is not obvious . . . that the language must be interpreted so narrowly[.]"[137]

---

[134] *See Hayes v. Gross*, 982 F.2d 104 (3d Cir. 1992); *Vieira v. Anderson (In re Beach First Nat'l Bancshares, Inc.)*, 702 F.3d 772 (4th Cir. 2012); *Barnes v. Harris*, 783 F.3d 1185 (10th Cir. 2015); *Lubin v. Skow*, 382 F. App'x 866 (11th Cir. 2010).

[135] 763 F.3d 667 (7th Cir. 2014).

[136] *Id.* at 672 (ellipsis in original).

[137] *Id.* at 673 (HAMILTON, Circuit Judge, concurring).

32

As he explained, if the text of section 1821(d)(2)(A) "was meant to refer only to derivative claims, it's a broad and roundabout way of expressing that narrower idea."[138] Judge Hamilton instead concluded that the Succession Clause "could be interpreted, for sound policy reasons, more broadly to include a stockholder's *direct* claims that are based on harms resulting from dealings with the assets of the failed institution[.]"[139] And he suggested that the FDIC should urge courts to accept that alternative interpretation.[140] As the First Circuit confirmed in its decision, that is exactly what the FDIC did in *Zucker*.[141]

As of this date, there are no post-*Zucker* circuit-court decisions interpreting or applying section 1821(d)(2)(A). However, four post-*Zucker* district-court decisions have applied the Succession Clause. And in three of them, the courts employed the two-step analysis articulated in *Zucker*.

In *America West Bank Members v. Utah*,[142] the District of Utah found

---

[138] *Id.*

[139] *Id.* (emphasis in original).

[140] *Id.* at 674.

[141] *See Zucker*, 919 F.3d at 658 ("[Its] litigation position, the FDIC says, largely encompasses the reasoning of Judge Hamilton's concurring opinion in *Levin*.").

[142] 2023 WL 4108352 (D. Utah June 21, 2023), *aff'd on other grounds,*

33

"the reasoning of the First Circuit in *Zucker* with respect to the [S]uccession [C]lause persuasive."[143] As the court explained, "[t]here is nothing in the plain language of Section 1821(d)(2)(A) that limits the scope of the statute's succession language to derivative claims exclusively. Accordingly, the court [applied] the two-step analysis set forth in *Zucker* to determine whether [the plaintiff's] claims were assumed by the FDIC pursuant to FIRREA's [S]uccession [C]lause."[144]

The *America West Bank* court then held that the plaintiff holding company's due process claim against a state banking official alleging an improper seizure of its wholly-owned bank had been assigned to the FDIC as receiver. The court explained: "[T]he rights asserted by [the plaintiff] [we]re rights 'with respect to the' [b]ank" because "without showing an injury to the [b]ank resulting from the purportedly unlawful seizure, [the plaintiff] ha[d] no claim."[145]

Similarly here, without showing an injury to Signature resulting from mismanagement of the Bank by the Defendants, AP7 has no claim.

---

2024 WL 3812451 (10th Cir. Aug. 14, 2024).

[143] *Id.* at *6.

[144] *Id.*

[145] *Id.* at *7.

In *Verdi v. FDIC*,[146] the Southern District of New York held that the FDIC succeeded to a stockholder's claims arising from the failure of Signature that were substantially similar to the claims AP7 asserts here. The court "h[eld] that the text of the Succession Clause does not explicitly require categorizing claims as derivative or direct, and at the very least, does not explicitly foreclose the possibility that at least some direct claims are covered by the Clause."[147] It then used *Zucker's* two-step test while applying the Succession Clause.[148]

The *Verdi* court first held the claims asserted rights of "a stockholder" because the plaintiff's theory of damages from the "misrepresentations depend[ed] on the drop in value of his shares of Signature stock."[149] So too here. The court then held the claims were "with respect to the institution and the assets of the institution because they concern[ed] Signature's failure after it made alleged misrepresentations about its health (including about its assets[.]"[150] Again, so too here.

---

[146] 2024 WL 4252038 (S.D.N.Y. Sept. 20, 2024).

[147] *Id.* at *6.

[148] *Id.*

[149] *Id.*

[150] *Id.* (internal punctuation omitted).

AP7 contends that *Verdi* should not be followed for two reasons. Neither one is valid. *First*, AP7 argues that the court in *Verdi* improperly interpreted the phrase "with respect to" based on its "'ordinary meaning' as defined in standard dictionaries," *i.e.*, "regarding" or "concerning."[151] But as demonstrated *supra* at 26-30, that argument has no purchase.

*Second*, AP7 points out that the plaintiff in *Verdi* brought claims against Signature (with the FDIC substituted as a named defendant) and subsequently dismissed all claims against all individual defendants, and it argues that *Verdi* is inapposite because the FDIC as receiver for Signature is not a party here.[152] This argument fails for several reasons.

AP7 contends *Verdi* held that, because Signature was a party, "'the[ ] claims [there] necessarily concern[ed] Signature's assets' because any recovery would be sought from the bank's assets."[153] But AP7 omits that *Verdi* also held that the claims there were "with respect to the institution and its assets because they concern[ed] Signature's failure after it made alleged misrepresentations about its health (including about its

---

[151] AP7 Br. 37-38; *see Verdi*, 2024 WL 4252038, at *4.

[152] AP7 Br. 40.

[153] *Id.* (quoting *Verdi*, 2024 WL 4252038, at *6, n.58).

36

assets[,]"[154] and the district court here relied on this specific part of *Verdi's* holding.[155] The district court here also held, moreover, that "Signature's absence does not remove the[ ] claims from the Succession Clause's scope [because] [d]amages, at least against the Officers, will be paid from Signature's director and officer insurance policies [which are] assets of the bank."[156] And in further support of its "with respect to" holding, the district court here noted that "the ultimate harm to shareholders stemmed from a harm to Signature and its assets—unforeseen mass withdrawals and lack of risk management measures."[157]

It is also noteworthy that both original complaints in this consolidated action named Signature as a defendant and the plaintiffs voluntarily dismissed Signature shortly after the FDIC substituted itself as a party in place of Signature. For the reasons discussed above, AP7 cannot avoid FIRREA's Succession Clause through such a transparent ploy.

---

[154] *Verdi*, 2024 WL 4252038, at *6.

[155] *See* SPA-14.

[156] *Id.* (citing *National Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.*, 28 F.3d 376, 384-85 (3d Cir. 1994)). *See also Zucker*, 919 F.3d at 657 (holding claims there were "with respect to an asset of the [b]ank" for the additional reason that "the coverage under the [D&O] insurance policy [wa]s an asset").

[157] SPA-15-16.

37

Following *Verdi*, in this case the Eastern District of New York also adopted *Zucker's* two-step test. The court ruled that "[t]he Succession Clause's applicability does not hinge on some distinction between direct and derivative claims, but on the statutory text in § 1821(d)(2)(A)."[158]

Finally, in *Aaron v. Illinois Nat'l Ins. Co.*,[159] the Eastern District of Louisiana addressed whether the FDIC succeeded to six claims that arose from a bank failure. Rather than choose between the two-step statutory test and the direct-derivative test, however, the court attempted to harmonize them. The *Aaron* court first acknowledged that *Zucker* rejected the direct-derivative distinction and that the First Circuit's holding rested on its finding that the "claims relat[ed] to or concern[ed] the assets of the [b]ank."[160] But despite that acknowledgement, the court also concluded that *Zucker* supports a "source of the harm" test.[161]

The *Aaron* court then held the FDIC succeeded to four of the claims—including three claims that, like AP7's claims, were based on "the [b]ank's insolvency, which made the [b]ank an unprofitable investment

---

[158] SPA-10.

[159] 2023 WL 7389034 (E.D. La. Nov. 8, 2023).

[160] *Id.* at *4 (quoting *Zucker*, 919 F.3d at 656).

[161] *Id.*

38

for [the shareholders,]" and "corporate actions [by the bank] that diminished the overall value of [the bank]."[162] *Aaron* also held the FDIC did not succeed to two other claims for the seemingly irrelevant reasons that one was a breach of contract claim and the other was a negligence claim.[163] Thus, while embracing both the two-step statutory test and the direct-derivative test, the *Aaron* court's decision is not fully consistent with either test. And because the Complaint in this case does not include a breach of contract or negligence claim, *Aaron* does not help AP7.

If Congress had wanted the FDIC's succession to shareholder claims to turn on whether they are direct or derivative, it easily could have said just that. But it indisputably did not. Controlling precedent therefore requires courts to interpret the text of the Succession Clause and, absent an ambiguity, apply its plain terms. *Zucker* held the Clause is not ambiguous, and AP7 does not say that it is. Consequently, the district court here (along with the courts in *Zucker*, *America West Bank*, and *Verdi*) properly applied the two-step statutory test, and it therefore correctly held the claims at issue belong to the FDIC.

---

[162] *Id.* at *5 (first bracket added).

[163] *Id.* at *6.

## C.  *Zucker* does not Reinforce the "Source of Harm" Inquiry.

As noted above, AP7 does not challenge any aspect of the First Circuit's decision in *Zucker*. To the contrary, it argues that "*Zucker* employed an analysis of the Succession Clause that is entirely consistent with the direct-derivative analysis . . . and results in the same conclusions."[164] But as the district court correctly determined, AP7 "mischaracterizes *Zucker*."[165]

It is true that the First Circuit noted in *Zucker* that the *outcomes* in two cases AP7 relies on that used the direct-derivative test—*Barnes v. Harris* and *Viera v. Anderson*—were consistent with the *outcome* in *Zucker*.[166] But as the district court correctly explained, "[t]he *Zucker* court merely meant that the direct-derivative test, which emphasizes harm, and the statutory test can overlap."[167] What is more, as the district court further explained, "while a harm inquiry does not itself contradict *Zucker*, giving it dispositive weight does . . . because the statutory test

---

[164] AP7 Br. 30.

[165] SPA-11-12.

[166] *See Zucker*, 919 F.3d at 658.

[167] SPA-12 (citing *Zucker*, 919 F.3d at 658).

applies wherever the at-issue claims are 'with respect to the institution and' its assets."[168] And as the district court rightly concluded, "[d]eeming th[e] harm inquiry dispositive would effectively reincarnate the direct-derivative interpretation of the Succession Clause."[169]

Moreover, AP7's assertion that the outcome in *Zucker* would have been the same if the First Circuit had applied the direct-derivative test is not correct. As AP7 has explained, when applying that test courts "simply ask[ ] whether claims are 'direct' or 'derivative.'"[170] And the claims in *Zucker* were direct claims under the governing state law.[171]

In any event, AP7 is simply wrong when it argues that the First Circuit in *Zucker* applied the same analysis that courts have used while applying the direct-derivative test. Indeed, the *Zucker* court could not have been clearer in stating that it *did not* apply that analysis: "In the

---

[168] *Id.* (quoting 12 U.S.C. § 1821(d)(2)(A)) (internal citation omitted).

[169] *Id.*

[170] AP7 Br. 5.

[171] *Supra* at 22 n.96. The possibility that application of the direct-derivative test could result in different outcomes based on which state's law governs is not unique to *Zucker*. For example, the Tenth Circuit noted in *Barnes v. Harris* that the claims at issue there, although derivative under the governing Utah state law, would have been direct claims under New York state law. *Barnes*, 783 F.3d at 1194-95.

41

end, there is no ambiguity in Congress's choice *not* to limit the claims to which the FDIC succeeds to derivative claims."[172] And as AP7 admits, the "touchstone" of the "source of the alleged harm [inquiry is] whether the injury [is] a derivative one . . . or a direct one[.]"[173] In other words, the "source of harm" inquiry is just another way of describing the direct-derivative test—a test that *Zucker* resoundingly rejected.

### D. AP7's Resort to Legislative History is Unavailing.

Unable to find support for its interpretation of the Succession Clause in the text of section 1821(d)(2)(A), AP7 resorts to legislative history.[174] But while doing so, it simply rehashes arguments the First Circuit rejected in *Zucker*. This Court should also reject these arguments.

The plaintiff in *Zucker* argued that the Succession Clause could not be read to cover his claims based on the same rejected amendment to FIRREA that AP7 relies on here.[175] But the First Circuit held that argument failed at the threshold because the text of section 1821(d)(2)(A) is

---

[172] *Zucker*, 919 F.3d at 658.

[173] AP7 Br. 33.

[174] *See* AP7 Br. 40-45.

[175] *Compare Zucker*, 919 F.3d at 660 (plaintiff-appellant relied on S. 774, 101st Cong. § 214(o) (1989)), *with* AP7 Br. 41-42 (same).

42

unambiguous and legislative history therefore could not be consulted.[176] This Court's controlling precedent requires the same result here: "Only when the terms are ambiguous or unclear do[es] [this Court] consider legislative history and other tools of statutory interpretation."[177]

The *Zucker* court also held that "the rejected amendment [was] irrelevant in any event."[178] As AP7 does here,[179] the plaintiff in *Zucker* argued that "the conference committee's rejection of the proposed amendment's priority language mean[t] that Congress could not have intended to give the FDIC ownership of claims like his."[180] But as the First Circuit explained, "[i]nferences of this sort are notoriously unreliable and are to be avoided by courts" because "[t]he fact that Congress rejected a provision about one thing tells us little about what Congress intended in enacting a provision about something else."[181]

Finally, as AP7 does here,[182] the plaintiff in *Zucker* argued that "a

---

[176] *Zucker*, 919 F.3d at 660.

[177] *United States v. Zheng*, 113 F.4th 280, 293 (2d Cir. 2024).

[178] *Zucker*, 919 F.3d at 660.

[179] AP7 Br. 42-43.

[180] *Zucker*, 919 F.3d at 660.

[181] *Id.*

[182] AP7 Br. 42.

floor statement by a member of the conference committee [Rep. Staggers] demonstrate[d] that the amendment was rejected for relevant reasons."[183] But the First Circuit also rejected that argument, explaining that "[c]ourts do not attribute to Congress as a whole the views expressed in individual legislator's floor statements."[184] This comports with the Supreme Court's admonition in *Barnhart v. Sigmon Coal Co.* that "[f]loor statements from [legislators] cannot amend the clear and unambiguous language of a statute."[185] As the Supreme Court explained, there is "no reason to give greater weight to the views of [legislators expressed in floor statements] than to the collective votes of both Houses, which are memorialized in the unambiguous statutory text."[186]

### E. AP7's Constitutional-Avoidance Argument Lacks Merit.

AP7 also attempts to sidestep the unambiguous text of the Succession Clause by invoking the canon of constitutional avoidance.[187] But once again, the First Circuit rejected the same argument in *Zucker*. While

---

[183] *Zucker*, 919 F.3d at 660.

[184] *Id.*

[185] 534 U.S. 438, 457 (2002).

[186] *Id.*

[187] *See* AP7 Br. 45-48.

relying on Supreme Court precedent holding that "[t]he canon [of constitutional avoidance] 'has no application' absent 'ambiguity[,]'" the court held applying that canon "[wa]s not an option."[188] So too here.

What is more, the First Circuit further held in *Zucker* that "[t]here is no constitutional problem in any event."[189] As the court explained, "[t]he Takings Clause requires the government to provide 'just compensation' before taking private property for 'public use,' but only for deprivations of *vested* property rights."[190] "And," as the court further explained, "for purposes of the Takings Clause, '[i]t is well established that a party's property right in a cause of action does not vest until a final, unreviewable judgment has been obtained.'"[191]

---

[188] *Zucker*, 919 F.3d at 659 (quoting *Nielsen v. Preap*, 586 U.S. 392, 419 (2019)).

[189] *Id.*

[190] *Id.* (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994)) (emphasis added).

[191] *Id.* (quoting *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 993 F.2d 269, 273 n.11 (1st Cir. 1993) (internal quotation marks omitted); *see also Bowers v. Whitman*, 671 F.3d 905, 914 (9th Cir. 2012) ("an accrued cause of action is not a vested property interest for Takings Clause purposes until it results in a 'final unreviewable judgment'"); *Sowell v. American Cyanamid Co.*, 888 F.2d 802, 805 (11th Cir. 1989) ("a legal claim affords no definite or enforceable property right until reduced to final judgment").

### F.    AP7's Absurd-Results Argument Lacks Merit.

In another attempt to evade section 1821(d)(2)(A)'s unambiguous text, AP7 contends the decision below leads to absurd results.[192] But again, AP7's argument fails at the threshold. The Supreme Court has instructed that it "rarely invokes [an absurd-results] test to override unambiguous legislation."[193] And AP7 does not suggest any unusual circumstance warranting application of such a test here. AP7 also fails to show the district court's (and the *Zucker*, *America West Bank*, and *Verdi* courts') interpretation of the Succession Clause leads to absurd results.

### 1.   The district court did not ground its analysis of the Succession Clause on FIRREA's priority scheme.

AP7's argument that the district court's interpretation of the Succession Clause leads to absurd results is built on the premise that "[t]he [d]istrict [c]ourt grounded its analysis of the Succession Clause in its . . . view that FIRREA's 'priority scheme' . . . applied to the claims here[.]"[194] But AP7's premise is false. As the district court plainly stated, it "agree[d] with Judge Ho's thoughtful and thorough analysis of the

---

[192] *See* AP7 Br. 48-57.

[193] *Barnhart*, 534 U.S. at 459.

[194] AP7 Br. 49.

Succession Clause [in *Verdi*] and adopt[ed] his holding regarding its scope."[195] And as Judge Ho plainly stated in *Verdi*, "th[at] [c]ourt base[d] its interpretation on *the clarity of the Succession Clause's text alone*."[196]

Moreover, the district court plainly stated the basis on which it grounded its analysis of the Succession Clause: "The Succession Clause's applicability does not hinge on some distinction between direct and de-rivative claims, but on *the statutory text in § 1821(d)(2)(A).* Thus, the Succession Clause covers claims that satisfy *the two conditions set forth in its text*—that is, the claim asserts a 'right of a shareholder' and that right is 'with respect to the institution and the assets of the institution.'"[197]

It is true that the district court briefly discussed the priority scheme after it adopted *Verdi's* and *Zucker's* interpretation of the Succession Clause.[198] But in doing so, the district court was simply applying "[t]he 'whole act' rule of statutory construction [that] exhorts us to read a sec-tion of a statute not in isolation from the context of the whole [a]ct but

---

[195] SPA-10.

[196] *Verdi*, 2024 WL 4252038, at *5 (emphasis added).

[197] SPA-10 (emphases added) (internal quotation mark omitted).

[198] *Id.* at 12-13.

47

to look to the provisions of the whole law, and to its object and policy."[199] And importantly, the district court's determination that the interpretation of the Succession Clause it adopted was consistent with FIRREA's priority scheme mirrors the conclusion the First Circuit reached on this point in *Zucker*.[200] Nevertheless, "[w]here the statute's language is 'plain, the sole function of the courts is to enforce it according to its terms.'"[201] And that is precisely what the district court (and the *Zucker*, *America West Bank*, and *Verdi* courts) did.

### 2. The FDIC can bring, and it does recognize, the claims at issue here.

AP7 argues that the FDIC cannot bring and does not recognize the putative class members' securities-fraud claims that are at issue in this case. AP7 is wrong.

*First*, AP7's argument that the FDIC lacks standing to bring these claims because it did not itself purchase stock during the Class Period is based on a fundamental misunderstanding of the text of the Succession Clause. "What [AP7's] argument misses is that § 1821(d)(2)(A) itself con-

---

[199] *DiCristina*, 726 F.3d at 96.

[200] *See Zucker*, 919 F.3d at 658.

[201] *DiCristina*, 726 F.3d at 96.

veys, 'by operation of law,' the relevant rights in the causes of action to the FDIC."[202] Indeed, the Succession Clause plainly states that it assigns to the FDIC "*all* rights . . . of any stockholder."

*Second*, the FDIC did not refuse to recognize these claims. Although the FDIC does not by law accept administrative class claims and instead requires each claimant to submit its own administrative claim, it has not refused to accept any individual administrative claim arising from the failure of Signature. And to the extent there is money remaining from the FDIC's resolution of Signature after all other creditors have been paid, the FDIC will distribute that money to shareholders. Thus, "[a]s a policy matter, vesting [these] claims in the FDIC is not absurd, it is sensible . . . [because it is] 'consistent with the requirement that shareholders not circumvent the interests of creditors and the FDIC.'"[203]

### G.    Other Arguments AP7 Makes Also Lack Merit.

1. AP7 argues that this Court's pre-FIRREA decision in *Adato v. Kagan*[204] supports application of the direct-derivative or "source of

---

[202] *Zucker*, 919 F.3d at 659.

[203] *Id.* at n.14 (quoting *Barnes*, 783 F.3d at 1195).

[204] 599 F.2d 1111 (2d Cir. 1979).

49

harm" test here.[205] Specifically, AP7 contends that this Court held securities-fraud claims and banking-law claims were improperly dismissed for lack of standing because the district court wrongly concluded they were derivative claims.[206] AP7 also contends that, as a result, this Court concluded "the FDIC . . .was 'hardly the proper party to represent [the specific plaintiffs] in th[at] proceeding."[207] AP7 misreads *Adato*.

The plaintiffs in *Adato* were depositors who alleged that time deposits they made in a bank were improperly converted into investments.[208] The critical issue in the case was whether the plaintiffs should be treated as depositors or investors who had been sold unregistered securities.[209] The securities claims were dismissed not because the district court ruled the plaintiffs' claims were derivative claims, but because it ruled the plaintiffs were not investors.[210] And this Court concluded the FDIC was "hardly the party to represent [the plaintiffs]" on the banking law claims

---

[205] AP7 Br. 32-35.

[206] *Id.* at 34.

[207] *Id.*

[208] *Adato*, 599 F.2d at 1114.

[209] *Id.* at 1114-1115.

[210] *Id.* at 1115.

not because the plaintiffs' claims were direct claims, but because the FDIC's position was that the plaintiffs were not depositors.[211] Importantly, this Court did not resolve the issues of whether the plaintiffs were investors or whether, if they were, the FDIC would have succeeded to their claims under the Succession Clause. This Court did state, however, that "[a]s a general rule, wrongdoing by bank officers that adversely affects all depositors creates a liability which is an asset of the bank, and only the bank or its receiver may sue for its recovery."[212]

2. AP7 argues that because it and other shareholders in the putative class do not owe any duty to depositors and depositors have no interest in the claims at issue, damages recovered by the FDIC based on the claims at issue could not be used to pay depositors' claims.[213] And AP7 further argues that any distribution of putative class members' damages recovered by the FDIC to pay depositors would be an improper windfall because the FDIC has publicly stated that depositors have been made whole.[214] AP7 is wrong on both counts.

---

[211] *Id.* at 1117.

[212] *Id.*

[213] AP7 Br. 8.

[214] *Id.*

51

*First*, whether AP7 and other shareholders in the putative class owe a duty to depositors and whether depositors have any interest in putative class members' claims have nothing to do with whether amounts realized by the FDIC from resolution of a failed bank can be paid to depositors. Rather, under the congressionally mandated priority scheme, depositors are paid before shareholders regardless of the source of the funds recovered by the FDIC. Depositors are also paid before general unsecured creditors even though those creditors do not owe any duty to depositors and depositors have no interest in those creditors' claims.

*Second*, the fact that depositors have been made whole does not mean that the deposit liability of a failed bank has been satisfied. Rather, the FDIC is subrogated to depositor claims that have been paid out of the Deposit Insurance Fund.[215] And in any event, the FDIC cannot reap a windfall when it resolves a failed bank because any amount remaining in a receivership after all higher-priority claims have been satisfied generally must be distributed to shareholders.[216]

3. AP7 contends that *Zucker* "explicitly carved out securities fraud

---

[215] *See* 12 U.S.C. § 1821(g).

[216] *See* 12 U.S.C. § 1821(d)(11)(A).

claims from its holding."[217] It did not. Although *Zucker* does note that "th[at] action [wa]s not one alleging fraud or one to enforce the securities laws[,]"[218] that part of the decision was not addressing the court's holding regarding the scope of the Succession Clause. Rather, it was merely providing an additional reason why legislative history addressing securities-fraud claims was not relevant to the claims at issue in *Zucker*.

\* \* \*

In sum, because the FDIC succeeded to the claims at issue under the Succession Clause, AP7 lacks prudential standing to litigate them.[219] Accordingly, the district court correctly dismissed AP7's Complaint and this Court should affirm the district court's judgment.

## III. Alternatively, The District Court Lacked Subject-Matter Jurisdiction Because The Administrative Claims Process Was Not Exhausted Before This Action Was Commenced.

Although the parties fully briefed below the issue of whether the district court lacked subject-matter jurisdiction because the FIRREA ad-

---

[217] AP7 Br. 20.

[218] *Zucker*, 919 F.3d at 660.

[219] *See, e.g., Rajamin*, 757 F.3d at 86 ("The prudential standing rule . . . normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves.") (quotation marks omitted) (ellipsis in original).

ministrative claims process was not exhausted before this action was commenced,[220] the court did not address this issue. Nevertheless, it provides an alternative ground for affirmance because this Court "may affirm a district court's dismissal of a complaint on any basis supported by the record."[221] And in any event, this Court has an "independent obligation to consider the presence or absence of subject-matter jurisdiction *sua sponte*."[222] As we demonstrate *infra*, the district court lacked subject-matter jurisdiction over AP7's claims because the administrative claims process was not exhausted before this action was commenced.

## A. FIRREA Strips Courts Of Jurisdiction Over Claims That Are Filed When The Administrative Claims Process Has Not Been Exhausted.

In the aftermath of the savings and loan crisis of the 1980s, Congress enacted FIRREA "to give the FDIC power to take all actions necessary to resolve the problems posed by a financial institution in default."[223] To enable the government to effectively deal with the threat to the national

---

[220] *See* A-277-79, 280-82, 286-93, 374-75, 386-97, 418-23.

[221] *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010).

[222] *In re Tronox Inc.*, 855 F.3d 84, 95 (2d Cir. 2017).

[223] *Sahni v. American Diversified Partners*, 83 F.3d 1054, 1058 (9th Cir. 1996) (quoting H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 2 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 126).

54

economy posed by bank failures, FIRREA established a comprehensive and mandatory administrative claims process that "allows the FDIC to ensure that the assets of a failed institution are distributed fairly and promptly among those with valid claims against the institution, *and* to expeditiously wind up the affairs of failed banks, without unduly burdening the [d]istrict [c]ourts."[224] What is more—to ensure that claimants do not proceed with court actions without first exhausting this claims process—Congress included a jurisdictional bar in the statute,[225] which is codified at 12 U.S.C. § 1821(d)(13)(D):

> Except as otherwise provided in this subsection, no court shall have jurisdiction over—
>
> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the [FDIC] has been appointed receiver . . .; *or*
>
> (ii) any claim relating to any act or omission of such institution or the [FDIC] as receiver.

---

[224] *Rundgren v. Washington Mut. Bank, FA*, 760 F.3d 1056, 1060 (9th Cir. 2014) (emphasis added) (internal citations and quotation marks omitted).

[225] *See Carlyle Towers Condominium Ass'n, Inc., v. FDIC* 170 F.3d 301, 307 (2d Cir. 1999) ("FIRREA makes exhaustion a jurisdictional requirement").

Construing this statutory text, this Court concluded "[t]he crux of the matter . . . is what the subsection 'otherwise provides.'"[226] It then held "the reference to 'subsection' refers to the entirety of § 1821(d)[,]"[227] and "that section 1821(d)(13)(D), when read in conjunction with the rest of section 1821(d), creates a requirement that all claims must be presented to the FDIC before a claimant may seek judicial review."[228]

Under section 1821(d)(3), the FDIC was required to publish notice that Signature's creditors must file claims with the receiver by a claims bar date not less than 90 days after publication of the notice.[229] The FDIC was also required to mail a similar notice to creditors appearing on Signature's books.[230] After a claim is filed, the FDIC has 180 days to determine whether to allow or disallow the claim.[231] The FDIC is required to allow any claim received on or before the claims bar date that is proved to its satisfaction.[232] If the claim is disallowed by the FDIC, or

---

[226] *Id.*

[227] *Id.*

[228] *Id.*

[229] 12 U.S.C. § 1821(d)(3)(B)(i).

[230] *Id.* at § 1821(d)(3)(C)(i).

[231] *Id.* at § 1821(d)(5)(A)(i).

[232] *Id.* at § 1821(d)(5)(B).

if the 180-day period expires without action by the FDIC, the claimant then has 60 days to file suit on that claim in the appropriate federal district court.[233]

After being appointed as receiver for Signature, the FDIC established July 17, 2023, as the "Claims Bar Date," *i.e.*, the deadline for filing any administrative claims.[234] The FDIC also prepared a Publication Notice to Creditors and Depositors of Signature advising that administrative claims must be submitted to the FDIC by the Claims Bar Date.[235] And it sent a "Notice to Discovered Claimant to Present Proof of Claim"—which advised recipients of the requirement to file any claims by the Claims Bar Date—to every plaintiff that has appeared in this action, including on June 1, 2023, to AP7.[236] Each of the Notices included the following statement: "By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver."[237]

---

[233] *Id.* at § 1821(d)(6)(A).

[234] A-304 (¶ 5).

[235] *Id.* at ¶ 6.

[236] *Id.* at ¶¶ 7-8.

[237] A-327.

**B.    The District Court Never Had Jurisdiction Because This Action Was Commenced Before The Administrative Claims Process Was Exhausted.**

It is undisputed that this action was filed before any plaintiff exhausted the administrative Claims Process. As AP7 conceded in its opposition to the FDIC's motion to dismiss, "[AP7] did not commence this action or the action with which it was consolidated—they were commenced by others[.]"[238] And it is undisputed that neither the plaintiff who filed this action on March 14, 2023,[239] nor the plaintiff who filed the *Singh* action on March 31, 2023,[240] ever filed an administrative claim with the FDIC.[241] Thus, "[b]ecause federal courts 'assess[ ] jurisdiction . . . as of the moment the complaint was filed,' that is the end of the [administrative-exhaustion] inquiry."[242]

Subject-matter jurisdiction "depends upon the *state of things* at the time of the action brought[.]"[243]  Moreover, "an amended complaint re-

---

[238] A-392.

[239] A-22-36.

[240] A-37-71.

[241] A-305 (¶ 9).

[242] *Hunter v. McMahon*, 75 F.4th 62, 71 (2d Cir. 2023).

[243] *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824) (emphasis added).

58

vises the prior pleading only to reflect a more accurate understanding of *the state of things when the action was filed*—not to update the pleading with later occurring facts."[244] Because it is undisputed that no administrative claim had been filed "at the time the case came before the district court,"[245] and also because no subsequent development could alter the state of things at that time, the district court never had jurisdiction over this action.[246]

### C. AP7's Arguments That The Exhaustion Requirement Either Does Not Apply Or Was Satisfied Lack Merit.

While opposing the FDIC's motion to dismiss in the district court, AP7 made several arguments in support of its contentions that FIRREA's exhaustion requirement either (1) does not apply to the claims at issue or (2) was satisfied by events that occurred *after* the two original complaints were filed. Neither of those arguments is valid.

---

[244] *Lutter v. JNESO*, 86 F.4th 111, 125 (3d Cir. 2023) (emphasis added).

[245] *Rosa v. RTC*, 938 F.2d 383, 392 and n.12 (3d Cir. 1991) (applying "rule that subject matter jurisdiction is tested as of the time of the filing of the complaint" to analysis of claim exhaustion under section 1821(d)(13)(D)).

[246] *See Kusen v. Herbert*, 2025 WL 1635863, at *5 (N.D. Cal. June 9, 2025) (district court lacked jurisdiction where original plaintiff failed to exhaust FIRREA claims process before filing suit even though lead plaintiff subsequently filed an administrative claim before filing the operative amended complaint).

### 1. AP7's claims are subject to FIRREA's exhaustion requirement.

AP7 first argued that "FIRREA's exhaustion requirements are only intended to apply to claims brought against the bank itself, not individuals and entities related to the bank."[247] This argument fails for two reasons.

*First*, as discussed in the preceding section, subject-matter jurisdiction is assessed based on the state of things at the time the case came before the district court. And critically, both original complaints filed in this consolidated action included Signature as a defendant.[248] Consequently, even if FIRREA's exhaustion requirement applied only to claims against the Bank itself, the district court still never had jurisdiction over this case.

*Second*, FIRREA's exhaustion requirement clearly applies to claims other than those against the bank itself. Under the unambiguous language of section 1821(d)(13)(D)(ii), the requirement applies to "any claim relating to any act or omission of [the failed bank] or the [FDIC] as

---

[247] A-386-87.

[248] A-22-36, 37-71.

receiver." Nothing in this language limits the requirement's applicability to the Bank itself. And it is beyond dispute that AP7's claims "relat[e] to *any* act or omission" of Signature. Indeed, AP7's Complaint is laden with allegations of misstatements by, and misconduct of, the individual Defendants and Signature's auditor acting on Signature's behalf.[249] These are all acts or omissions of Signature.[250] And "[s]ection 1821(d)(13)(D)(ii) refers to '*any claim* relating to any act or omission' of a failed institution and does not make its application contingent upon whom the claim is against."[251] What is more, it is well-settled that "[l]itigants cannot avoid FIRREA's administrative requirements through strategic pleading."[252]

---

[249] *See supra* at 10-13.

[250] *See, e.g., In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 705 (9th Cir. 2021) (holding that the *defendant corporation* made allegedly false statements in the corporation's securities filings); *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) ("a corporation 'can only act through its employees and agents'").

[251] *Aber-Shukofsky v. JPMorgan Chase & Co.*, 755 F. Supp. 2d 441, 447 (E.D.N.Y. 2010); *see also Verdi v. FDIC*, 2023 WL 6388225, at *6 (C.D. Cal. Sept. 28, 2023) ("Where the claims relate to an act or omission of an institution under the receivership of the FDIC, the court lacks jurisdiction prior to administrative exhaustion—no matter the defendant.").

[252] *Seaway Bank & Trust Co. v. J&A Series I, LLC*, 962 F.3d 926, 932 (7th Cir. 2020) (quoting *Benson v. JPMorgan Chase Bank, N.A.*, 673 F.3d 1207, 1209 (9th Cir. 2012)).

AP7 also argues that its claims cannot be subject to FIRREA's exhaustion requirement because, by refusing to accept a claim on behalf of putative class members, the FDIC refused to administratively consider their claims.[253] But that is no argument at all. The FDIC's position on administrative consideration of putative class members' securities-fraud claims was plainly stated in the Notices it provided to AP7 and other potential claimants: "EACH individual or entity must file a separate claim with the Receiver."[254] That plainly was not a refusal to consider putative class members' securities-fraud claims.

### 2. AP7's belated administrative claims did not exhaust FIRREA's administrative claims process.

AP7 also argued below that its filing of an individual administrative claim and a second administrative claim purportedly on behalf of the putative class members on July 17, 2023—four months *after* the original complaint was filed—exhausted the administrative claims process.[255] Specifically, AP7 argued that "on January 12, 2024, the FDIC disallowed [AP7's individual] claim," and that on "January 16, 2024, the

---

[253] A-389-91.

[254] A-327.

[255] A-392-93.

FDIC's time to allow or disallow the Class's administrative claim expired, giving th[e] [c]ourt jurisdiction[.]"[256] AP7 is twice wrong.

*First*, as discussed above, jurisdiction is assessed at the time an action is filed. Therefore, as both original complaints were filed in March of 2023, it matters not that AP7 filed administrative claims in July of 2023.

*Second*, even if this Court were to look to AP7's December 1, 2023 Complaint to assess jurisdiction, the result would not change. As AP7 admits, *supra* at 62-63, the claims process was not exhausted until January 2024. And as this Court's precedent makes clear, a court lacks jurisdiction unless a claimant files suit *after* exhaustion of the FIRREA claims process. This Court explained in *Carlyle Towers* that, under FIRREA, "[a] claimant may obtain judicial review of the FDIC's claim determination if the claimant files a claim with the FDIC, receives a 'disallowance' of the claim, *and then* files suit in a district court within 60 days of the FDIC's disallowance."[257] And as this Court held there, "the statute means just what it says, and, accordingly . . . a claimant must

---

[256] A-393.

[257] *Carlyle Towers*, 170 F.3d at 305 (citing 12 U.S.C. §§ 1821(d)(5)(A), 6(A).) (emphasis added).

*first present its case to the [FDIC]* under the administrative procedure erected by FIRREA *before seeking relief in the federal courts*."²⁵⁸

### 3. AP7 could not exhaust the FIRREA claims process on behalf of putative class members.

AP7 also argued in the district court that it is able to exhaust claims of putative class members.²⁵⁹ But AP7 simply ignored the facts that (1) it did not file its purported administrative class claim with the FDIC until four months *after* the original complaint was filed in this action and (2) it filed the operative Complaint *before* that claim was disallowed.

What is more, AP7 did not cite a single case that permitted a named plaintiff to exhaust the FIRREA claims process on behalf of a class. To the FDIC's knowledge, there is no such case. On the other hand, there is an unbroken line of six district-court decisions from across the country that have concluded the FIRREA claims process cannot be exhausted on behalf of a class.²⁶⁰ For example, the Eastern District of New York held

---

²⁵⁸ *Id.* at 307 (quoting *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 627 (2d Cir. 1991)).

²⁵⁹ A-393-95.

²⁶⁰ *See Kusen v. Herbert*, 2025 WL 1635863, at *6 (N.D. Cal. June 9, 2025); *Cassese v. Washington Mut., Inc.*, 711 F. Supp. 2d 261, 270 (E.D.N.Y. 2010), *appeal dismissed sub nom. Bloom v. FDIC*, 738 F.3d 58 (2d Cir. 2013); *Holman v. Downey Sav. & Loan Ass'n*, 2010 WL

that nothing "provide[s] a certified class plaintiff with the power to file [a FIRREA] administrative claim on behalf of other class members."[261]

AP7 also argued that the PSLRA grants it authority as a lead plaintiff to exhaust class claims.[262] But nothing in the PSLRA suggests that Congress intended to allow a lead plaintiff to file an administrative claim on behalf of a putative class. Indeed, AP7 admitted below that "the PSLRA does not contain an express provision governing this situation."[263] To the contrary, the governing statute explicitly provides that the PSLRA's procedures relating to a lead plaintiff apply only to private securities claims brought as a class action pursuant to the Federal Rules of Civil Procedure in a federal district court.[264]

Finally, we note that the Northern District of California recently dismissed a putative securities class action due to the plaintiffs' failure to

---

11597286, at *8 (C.D. Cal. Apr. 21, 2010); *Taylor v. ANB Bancshares, Inc.*, 682 F. Supp. 2d 970, 975-76 (W.D. Ark. 2009); *Brandow v. FDIC*, 2008 WL 5378348, at *2 (N.D. Ohio Dec. 22, 2008); *Michels v. RTC*, 1994 WL 242162, at *1-*2 (D. Minn. Apr. 13, 1994).

[261] *Cassese*, 711 F. Supp. 2d at 270.

[262] A-393-95.

[263] A-394.

[264] *See* 15 U.S.C. § 78u-4(a)(1).

exhaust FIRREA's administrative claims process in a case that is indistinguishable from this one. While deciding that case, moreover, the court rejected the same arguments AP7 raised in the district court here.

In *Kusen v. Herbert*, the original complaint filed by Kusen alleged violations of federal securities laws on behalf of a putative class of stockholders against former directors and officers of a failed bank in FDIC receivership, First Republic Bank (FRB), and its outside auditor, KPMG.[265] Like the original plaintiffs here, Kusen never filed an administrative claim with the FDIC.[266] Subsequently, a Swedish pension fund (Alecta) was named lead plaintiff. And like AP7 here, Alecta filed two administrative claims *after* the original lawsuit was filed—one individual administrative claim on behalf of itself and one purported administrative class claim. And also like AP7 here, Alecta filed an amended complaint on behalf of itself and a putative class of the bank's stockholders asserting federal securities-fraud claims in the district court *before* the administrative claims it filed with the FDIC were exhausted.[267]

---

[265] *Kusen,* 2025 WL 1635863, at *1.

[266] *Id.* at *5.

[267] *Id.* at *3.

As the *Kusen* court explained, "[t]hough [the] [p]laintiffs [in *Kusen*] did not name either the [b]ank or the FDIC-R as defendants, . . . [the] [p]laintiffs' claims [we]re based upon alleged false or misleading statements or omissions by the [b]ank, acting through the individual defendants, in the [b]ank's public securities filings, the [b]ank's earnings calls, and in the [b]ank's press releases" that "concern[ed] the [b]ank, the [b]ank's assets, and the [b]ank's financial condition."[268] And the "[p]laintiffs' claim against KPMG [wa]s likewise premised upon statements made in the [b]ank's public securities filings that concerned the [b]ank's allegedly false or misleading statements about its financial condition and its assets."[269]

The *Kusen* court held that, "[b]ecause none of the [p]laintiffs administratively exhausted their claims prior to filing th[at] lawsuit, th[e] [c]ourt lack[ed] jurisdiction over the claims[.]"[270] In support of that holding, the court ruled: (1) the plaintiffs' claims were subject to FIRREA's exhaustion requirement because "FIRREA does not make any distinc-

---

[268] *Id.*

[269] *Id.*

[270] *Id.* at *5.

67

tion based on the identity of the party from whom relief is sought[;]" (2) the original plaintiff did not file an administrative claim and "[s]ubject matter jurisdiction must exist as of the time the action is commenced[;]" (3) "[e]ven if the [c]ourt were to look to the Alecta [amended complaint] to assess subject matter jurisdiction, the result would not change because the administrative process had not been exhausted[;]" (4) "no member of a purported class may exhaust the FIRREA claims process on behalf of another member of that purported class[.]" and (5) the PSLRA did not authorize the lead plaintiff to exhaust the FIRREA administrative claims process on behalf of the putative class members.[271]

As an alternative ground for affirming the judgment, this Court should similarly hold that the district court lacked jurisdiction here.

## CONCLUSION

The district court's judgment should be affirmed.

---

[271] *Id.* at *5-*6.

Dated: June 27, 2025    Respectfully submitted,


        Dominic A. Arni
        Acting Asst. General Counsel
        J. Scott Watson
        Senior Counsel

        <u>s/Joseph Brooks</u>
        Joseph Brooks
        Counsel
        FEDERAL DEPOSIT
        INSURANCE CORPORATION
        3501 Fairfax Drive, Room D-7010
        Arlington, VA 22226
        Tel: (703) 562-2054
        E-mail: jobrooks@fdic.gov

        *Counsel for Intervenor-Appellee*
        *Federal Deposit Insurance*
        *Corporation, as Receiver for*
        *Signature Bank*

## FED. R. APP. P. 32(g) CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32.1(a)(4)(A) because it contains 13,074 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

Undersigned counsel further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced 14-point Century Schoolbook typeface.

s/ Joseph Brooks
Joseph Brooks

*Counsel for Intervenor-Appellee*
*Federal Deposit Insurance*
*Corporation, as Receiver for*
*Signature Bank*

Dated:  June 27, 2025

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Answering Brief for Intervenor-Appellee Federal Deposit Insurance Corporation, as Receiver for Signature Bank has been filed by electronic case filing and served on counsel of record through this Court's Notice of Docket Activity on this 27th day of June, 2025.

s/ Joseph Brooks
Joseph Brooks