25-720
*Sjunde AP-Fonden v. FDIC*

# In the
# United States Court of Appeals
## for the Second Circuit

August Term 2025
Argued: October 21, 2025
Decided: August 19, 2026

Docket No. 25-720

SJUNDE AP-FONDEN,

*Lead Plaintiff-Appellant*,

MATTHEW SCHAEFFER,

*Plaintiff*,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as Receiver for Signature Bank,

*Intervenor-Appellee*,

JOSEPH DEPAOLO, ERIC HOWELL, FRANK SANTORA, JOSEPH SEIBERT, SCOTT A. SHAY, VITO SUSCA, STEPHEN D. WYREMSKI, and KPMG LLP,

*Defendants-Appellees*.[*]

[*] The Clerk of the Court is respectfully directed to amend the caption as set forth above.

---

Before: LOHIER, *Chief Judge*, and WESLEY and MERRIAM, *Circuit Judges*.

Lead Plaintiff-Appellant Sjunde AP-Fonden ("AP7") appeals from the judgment of the United States District Court for the Eastern District of New York (Block, *J.*). AP7 filed a consolidated class complaint for securities fraud under § 10(b) of the Securities Exchange Act of 1934 and Securities Exchange Commission ("SEC") Rule 10b-5 against the third-party auditor and several former directors and officers of Signature Bank ("Signature"), a (now-defunct) federally insured and publicly traded commercial bank. The Federal Deposit Insurance Corporation ("FDIC"), as receiver for Signature, intervened in the action and moved to dismiss for lack of prudential standing and failure to exhaust administrative remedies. According to the FDIC, it "owns" AP7's securities fraud claims because the Succession Clause of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") transferred ownership of the claims to the FDIC, when the latter became Signature's receiver. The district court agreed and dismissed AP7's complaint. We disagree. The Succession Clause does not apply to AP7's securities fraud claims. We also conclude that AP7 was not required to administratively exhaust its securities fraud claims against the third-party auditor and the former directors and officers, because those claims are not against Signature or the FDIC as receiver. We **VACATE** the judgment of the district court and **REMAND**.

---

SHARAN NIRMUL, Kessler Topaz Meltzer & Check, LLP, Radnor, PA (Richard A. Russo, Joshua A. Materese, Nathaniel C. Simon, Kessler Topaz Meltzer & Check, LLP, Radnor, PA; John J. Rizio-Hamilton, Jeremy Robinson, Alexander McRae Noble, John J. Esmay, Jonathan D'Errico, Bernstein Litowitz Berger & Grossmann LLP, New York, NY, *on the brief*), *for Plaintiff-Appellant*.

JOSEPH BROOKS (Dominic A. Arni, J. Scott Watson, *on the brief*), Federal Deposit Insurance Corporation, Arlington, VA, *for Intervenor-Appellee*.

Michael S. Doluisio, Dechert LLP, Philadelphia, PA, *for Defendant-Appellee Joseph DePaolo*.

Peter L. Simmons, Fried, Frank, Harris, Shriver & Jacobson LLP, New York, NY, *for Defendant-Appellee Eric Howell*.

David B. Massey, Perkins Coie LLP, New York, NY, *for Defendant-Appellee Frank Santora*.

Jonathan A. Harris, Harris St. Laurent & Wechsler LLP, New York, NY, *for Defendant-Appellee Joseph Seibert*.

Jonathan M. Sperling, Covington & Burling LLP, New York, NY, *for Defendant-Appellee Scott A. Shay*.

Michael D. Longyear, Charles T. Spada, Lankler Siffert & Wohl LLP, New York, NY, *for Defendant-Appellee Vito Susca*.

Anand Sithian, Crowell & Moring LLP, New York, NY, *for Defendant-Appellee Stephen D. Wyremski*.

Richard Marooney, King & Spalding LLP, New York, NY, *for Defendant-Appellee KPMG LLP*.

---

WESLEY, *Circuit Judge*:

When a federally insured bank fails, the Federal Deposit Insurance Corporation ("FDIC") may be appointed receiver for the failed bank and tasked with winding down its affairs. Under the "Succession Clause" of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), the

FDIC, upon its appointment as receiver, "shall . . . succeed to . . . all rights . . . of any stockholder . . . of such institution with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A)(i). The question presented is whether the FDIC, as receiver, succeeds to an individual's right to bring a claim for securities fraud under § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5.

In this case, the FDIC was appointed receiver for Signature Bank ("Signature"), a federally insured and publicly traded commercial bank that New York banking authorities closed in 2023. Sjunde AP-Fonden ("AP7") then filed a consolidated class complaint for securities fraud under § 10(b) and Rule 10b-5 against Signature's third-party auditor KPMG LLP and seven former Signature officers and directors. The FDIC intervened and moved to dismiss for lack of prudential standing and failure to exhaust administrative remedies. The district court (Block, *J.*, E.D.N.Y.) dismissed the complaint for lack of prudential standing, because, in its view, the Succession Clause transferred these securities fraud claims from AP7 to the FDIC as receiver for Signature. In this case, we disagree that the Succession Clause is so sweeping. We therefore vacate the judgment of the district court and remand for further proceedings below.

# I. BACKGROUND

## A. Facts and Procedural History

Lead Plaintiff-Appellant Sjunde AP-Fonden (AP7)[1] is a Swedish government agency that operates Sweden's public pension investment fund. It filed the instant consolidated class complaint for securities fraud under § 10(b) and Rule 10b-5 against Defendants-Appellees KPMG LLP ("KPMG"), an American professional services firm that audited Signature's financial statements from 2001 to 2023,[2] and seven former Signature officers and directors ("the Officers"). The Officers include several former C-suite executives of Signature, including the chairman of its board and the managing director of its digital assets banking group.[3] We take the following facts from AP7's amended consolidated complaint as true, as we must upon review of the grant of a motion to dismiss.

---

[1] "Sjunde" means "Seventh" in Swedish. "Fonden" means "Fund" in Swedish.

[2] KPMG is a Delaware limited liability partnership headquartered in New York, NY. App'x at 118.

[3] The individuals and their respective former positions at Signature during the class period are as follows: Joseph DePaolo, co-founder, president, and chief executive officer; Scott A. Shay, co-founder and chairman of the bank's board; Eric Howell, chief operating officer; Stephen Wyremski, chief financial officer; Vito Susca, chief administrative officer; Frank Santora, chief payments officer; and Joseph Seibert, managing group director and senior vice president of the digital assets banking group.

Signature was a New York State-chartered and federally insured commercial bank whose stock publicly traded on the NASDAQ.[4] Its collapse in 2023 was one of the largest bank failures in United States history. From its founding in 2001 until 2017, the bank employed a New York-centric business strategy primarily focused on serving clients in the commercial real estate sector, as well as law firms and taxi medallion owners. The strategy depended largely on earning interest on loans funded through its clients' cash deposits. The bank's clients "primarily consisted of mid-sized companies and wealthy families" involved in commercial real estate, which held significant deposits at the bank. App'x at 119.

For years, the bank's strategy worked. From 2009 until 2016, its revenue significantly increased and its deposits grew from approximately $7 billion to $32 billion. App'x at 120. From February 2010 until February 2017, the bank's stock

[4] "[C]ommercial banking" includes a variety "of services and credit devices," including "the creation of additional money and credit, the management of the checking-account system, and the furnishing of short-term business loans." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 326–27 (1963).

price also increased, and its market capitalization[5] expanded from approximately $1.53 billion to $8.46 billion. *Id.*

In 2017, however, Signature faced stagnating deposits and declining revenue, *id.*; it then made "a major pivot into the nascent cryptocurrency and blockchain industries," *id.* at 123. It launched a digital assets banking group and a digital payment platform that allowed customers to "instantly settle" cryptocurrency transactions using cash deposits. *Id.* at 123–24. In 2019, Signature began providing banking services, such as cash management, and financing services, such as loans, to venture capital firms and private equity firms.

Following the change in strategy, the bank's total deposits again grew dramatically, by approximately 57% to $63.32 billion in 2020, and 68% to $106.13 billion in 2021. App'x at 125–26. The bank's total assets reached $118.45 billion in 2021. *Id.* at 130. Most of the new deposits belonged to a small number of clients,

---

[5] Market capitalization refers to the value of a bank's outstanding shares (shares currently held by shareholders), which is calculated by multiplying the total number of such shares by the stock price. *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 69 (2d Cir. 2012) (per curiam).

and because they exceeded the FDIC's insurable limit of $250,000 per depositor, were uninsured.[6]

As Signature rapidly grew, the FDIC and New York banking regulators became increasingly concerned about the bank's liquidity risk profile and warned the bank about deficiencies in its risk management practices.[7] Because the owners of uninsured deposits may be more likely to withdraw their deposits in a period of uncertainty regarding a bank's stability, the high percentage of Signature's total deposits that were uninsured raised the specter of a bank run—which occurs when a large number of clients, fearful about the bank's stability, withdraw their deposits in a short period of time.

As more of Signature's total deposits became concentrated in the accounts of a small number of cryptocurrency clients, it also became increasingly exposed to the risk that a downturn in the volatile cryptocurrency industry would eliminate

[6] In 2020, 88% of the bank's total deposits were uninsured, and 55% of its total deposits belonged to 196 clients. App'x at 127. In 2021, 92% of the bank's total deposits were uninsured, 40% of its total deposits belonged to sixty clients, and 14% of its total assets belonged to four clients. *Id.*

[7] A bank's liquidity is its ability to meet its financial obligations, including by making payments to clients and funding its operations, in a timely manner. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 249 (2d Cir. 2016). "The banks' use of [clients'] funds is conditioned by the fact that their working capital consists very largely of demand deposits, which makes liquidity the guiding principle of bank lending and investing policies . . . ." *Phila. Nat'l Bank*, 374 U.S. at 326.

a significant portion of its total deposits. AP7 alleges that alongside the bank's growth from 2021 to 2023 (the class period), the Officers and KPMG each made several false public statements misrepresenting the bank's liquidity risk profile and its risk management practices. AP7 contends that those statements artificially inflated Signature's stock price and deceived investors who relied on these statements when deciding to purchase stock.

In 2022, the "Crypto Winter" came; the digital assets industry faltered. App'x at 112. As clients like FTX went bankrupt, Signature's financial health also began to suffer. Eventually, on March 10, 2023, coinciding with the failure of the similarly crypto-focused Silicon Valley Bank, Signature faced a run on its deposits; more than 20% of its total deposits were withdrawn in a single day. On March 12, 2023, New York banking authorities concluded that Signature lacked adequate liquidity to satisfy expected withdrawals and could no longer safely operate. The same day, they closed the bank and appointed the FDIC as its receiver. By March 28, 2023, the price of Signature stock had plummeted to $0.13 per share, after reaching a high price of $365.71 per share in 2022.

On March 14, 2023, Plaintiff Matthew Schaeffer initiated a putative class action for securities fraud in the United States District Court for the Eastern

District of New York. App'x at 22. A few weeks later, Pirthi Pal Singh filed a second, substantially identical putative class action in the same district. *See* Complaint, *Singh v. Signature Bank*, No. 1:23-cv-02501-FB-JRC (E.D.N.Y. Mar. 31, 2023). Both complaints initially named Signature as a defendant but the plaintiffs in each action voluntarily dismissed the claims against the bank, leaving only their claims against several of the Officers.

Not long after the two actions began, AP7 moved in the first-filed *Schaeffer* action, as a member of the putative class, to consolidate the actions, pursuant to Federal Rule of Civil Procedure 42, and to be appointed lead plaintiff, pursuant to the Private Securities Litigation Reform Act of 1995. 15 U.S.C. § 78u-4(a)(3)(B)(i). The district court granted the motion, consolidated the *Schaeffer* and *Singh* actions, and appointed AP7 lead plaintiff, forming the instant consolidated action. Dist. Ct. Dkt. No. 51. The amended consolidated complaint is the operative complaint and was the subject of the motion practice below.

In its amended consolidated complaint, AP7 raises three distinct claims for securities fraud under § 10(b) and Rule 10b-5: (1) a fraudulent misrepresentation

claim against the Officers under Rule 10b-5(b);[8] (2) a scheme-to-defraud and fraudulent course-of-conduct claim against the Officers under Rules 10b-5(a) and 10b-5(c);[9] and (3) a fraudulent misrepresentation claim against KPMG under Rule 10b-5(b).[10] The proposed class includes persons and entities who "purchased" Signature common stock between January 21, 2021 and March 12, 2023 (the class period), and were damaged as a result. App'x at 106, 258.

The FDIC moved to dismiss the amended consolidated complaint for lack of prudential standing under Rule 12(b)(6) and for lack of subject matter jurisdiction due to AP7's failure to exhaust administrative remedies under Rule 12(b)(1). The district court granted the motion to dismiss for lack of prudential

[8] In support of the fraudulent misrepresentation claim against the Officers, AP7 alleges that the Officers disseminated or approved false statements, while knowing or recklessly disregarding that the statements were misleading.

[9] In support of the scheme-to-defraud and fraudulent course of conduct claim against the Officers, AP7 alleges that the Officers "employed devices, schemes, and artifices to defraud and carried out a plan, scheme, and course of conduct which operated as a fraud and deceit" on the purchasers of Signature stock. *See Lorenzo v. SEC*, 587 U.S. 71, 77–82 (2019) (discussing "scheme liability" claims under Rule 10b-5(a) & (c)); *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021).

[10] In support of the fraudulent misrepresentation claim against KPMG, AP7 alleges that KPMG disseminated false statements—specifically, audit opinions included in Signature's 2020, 2021, and 2022 Form 10-Ks, which opined that the bank's internal controls over financial reporting were effective and that its financial statements fairly presented the financial position, cash flow, and operations of the bank—while knowing or recklessly disregarding that the statements were misleading.

standing; it concluded that FIRREA's Succession Clause transferred AP7's securities fraud claims to the FDIC, and that, as a result, AP7 was barred from asserting the claims of a third party, the FDIC. This appeal followed.

### B. The Financial Institutions Reform, Recovery, and Enforcement Act

In 1989, Congress enacted FIRREA "in the wake of the savings and loan crisis, with the purpose of 'stem[ming] the financial hemorrhaging resulting from the large number of failures in the thrift industry.'" *Nat'l Credit Union Admin. Bd. v. Goldman, Sachs & Co.*, 775 F.3d 145, 148 (2d Cir. 2014) (alteration in original) (quoting *Resol. Tr. Corp. v. Diamond*, 45 F.3d 665, 674 (2d Cir. 1995)). FIRREA is "comprehensive legislation," *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994), that aims to put the FDIC "on a sound financial footing," provide it "funds from public and private sources to deal expeditiously with failed depository institutions," and better equip it to "contain, manage, and resolve failed savings associations." Pub. L. No. 101–73, § 101, 103 Stat. 183, 187 (1989). Among its reforms were new provisions outlining the administrative claims process and priority scheme, as well as the FDIC's receivership powers. *See* 12 U.S.C. § 1821.

One provision—§ 1821(d)(2)—outlines the "[p]owers and duties of [the FDIC] as . . . receiver." 12 U.S.C. § 1821(d). They include the ability to "take over the assets of [the failed institution]," "operate the . . . institution with all the powers

of the members or shareholders, the directors, and the officers of the institution," "conduct all business of the institution," "collect all obligations and money due the institution," "perform all functions of the institution in the name of the institution," and "preserve and conserve the assets and property of such institution." *Id.* § 1821(d)(2)(B)(i)–(iv). Other provisions describe the FDIC's powers to "place the insured depository institution in liquidation and proceed to realize upon the assets of the institution," organize new depository institutions, merge the institution with another institution, transfer assets without approval, and pay the institution's obligations. *Id.* § 1821(d)(2)(E)–(H).

Another provision of § 1821—the Succession Clause—provides for the transfer of certain rights and powers from the failed bank and its institutional stakeholders to the FDIC:

> The Corporation shall, as conservator or receiver, and by operation of law, succeed to—
>
> (i) *all rights*, titles, powers, and privileges of the insured depository institution, and *of any stockholder*, member, accountholder, depositor, officer, or director *of such institution with respect to the institution and the assets of the institution*; and
>
> (ii) title to the books, records, and assets of any previous conservator or other legal custodian of such institution.

12 U.S.C. § 1821(d)(2)(A)(i)–(ii) (emphasis added).

In essence, these powers allow the FDIC, upon its appointment as receiver, to "step[] into the shoes of the failed bank" and fulfill its "responsibility to marshal the assets of the bank and to distribute them to the bank's creditors and shareholders." *Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir. 2004) (citation omitted).

### C. The Securities Exchange Act

The federal securities laws, including the Securities Exchange Act of 1934 ("the '34 Act"), "emerged as part of the aftermath of the market crash in 1929." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194–95 (1976); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 98 (2d Cir. 2017). These laws "seek to maintain public confidence in the marketplace," "by deterring fraud, in part, through the availability of private securities fraud actions." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). In particular, the '34 Act "was intended principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges . . . and to impose regular reporting requirements on companies whose stock is listed on national securities exchanges." *Ernst & Ernst*, 425 U.S. at 195.

Under § 10(b) of the '34 Act[11] and SEC Rule 10b-5,[12] "[a]ny person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser . . . of securities relies may be liable as a primary violator." *Cent. Bank of Denv., N.A. v. First Interstate Bank of Denv., N.A.*, 511 U.S. 164, 191 (1994). We have explained that a Rule 10b-5 claim remedies "'the evil . . . of being induced to buy' without the disclosure required by the . . . Act." *Clark v. John Lamula Invs., Inc.*, 583 F.2d 594,

---

[11] Section 10(b) makes it "unlawful for any person . . . by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

[12] Promulgated pursuant to the SEC's rulemaking authority under § 10(b), *Romano v. Kazacos*, 609 F.3d 512, 517 (2d Cir. 2010), Rule 10b-5 makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange":

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

603 (2d Cir. 1978) (quoting *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1173 (2d Cir. 1970)).

To state a Rule 10b-5 claim for fraudulent misrepresentation, a plaintiff must plausibly allege six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 140 n.3 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

## II. DISCUSSION

We review a district court's grant of a motion to dismiss *de novo*, accepting the factual allegations in the complaint as true. *Bellin v. Zucker*, 6 F.4th 463, 472–73 (2d Cir. 2021); *Crupar-Weinmann v. Paris Baguette Am., Inc.*, 861 F.3d 76, 79 (2d Cir. 2017).[13] We review issues of statutory interpretation *de novo*. *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 170 (2d Cir. 2020).

---

[13] While we also review decisions based on undisputed facts in the record *de novo* and any findings regarding disputed facts as to a party's standing to sue for clear error, only the allegations in the complaint are relevant to our decision here, as we explain further below. *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 81, 84–85 (2d Cir. 2014) ("We review *de novo* a decision as to a plaintiff's standing to sue based on the allegations

The district court concluded that the Succession Clause transferred AP7's securities fraud claims to the FDIC and granted the FDIC's motion to dismiss for lack of prudential standing. On appeal, AP7 argues, first, that it has prudential standing, because FIRREA's Succession Clause does not apply to its securities fraud claims. Second, AP7 argues that it was not required to administratively exhaust its claims.

The FDIC's motion to dismiss presented the district court with two discrete, yet interrelated issues: whether AP7 lacks prudential standing because FIRREA's Succession Clause transferred ownership of AP7's securities fraud claims to the FDIC;[14] and if AP7 owns the claims, whether the district court lacked subject matter jurisdiction over the claims due to AP7's purported failure to satisfy FIRREA's administrative exhaustion requirement.[15] The district court decided the

---

of the complaint and the undisputed facts evidenced in the record. '[I]f the court also resolved disputed facts' in ruling on standing, 'we will accept the court's findings unless they are 'clearly erroneous.''" (alteration original) (citations omitted)); *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016).

[14] Prudential standing is a "judicially self-imposed" limitation on courts' *exercise* of their jurisdiction. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)); *see Deutsche Bank*, 757 F.3d at 84.

[15] FIRREA deprives federal courts of subject matter jurisdiction over unexhausted claims against a failed bank or the FDIC as its receiver. *See Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 920–21 (2d Cir. 2010); *Carlyle Towers Condo. Ass'n, Inc. v. FDIC*, 170 F.3d

prudential standing issue and the underlying question of the Succession Clause's application, and dismissed the complaint for lack of prudential standing.

While the district court was obligated to decide, as a threshold matter, whether FIRREA's administrative exhaustion scheme deprived it of subject-matter jurisdiction,[16] on the circumstances of this case, it could not do so without resolving prudential standing. Both the prudential standing and administrative exhaustion issues require an answer to the same initial question: who owns the claims?

If, by operation of the Succession Clause, the FDIC owns the claims, that ends the inquiry for both issues—AP7 lacks prudential standing to bring the claims and the administrative exhaustion requirement is irrelevant.[17] But if AP7 owns the claims, AP7 has prudential standing to bring them, and the question then is whether AP7 was required to administratively exhaust them (and if so, whether

---

301, 307 (2d Cir. 1999) (explaining that FIRREA's administrative exhaustion requirement is jurisdictional).

[16] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

[17] If the FDIC owns the claims, it would simply be left to manage their resolution independently of the administrative process applicable to claims against the failed bank and the FDIC as its receiver. *See First Millennium, Inc.*, 607 F.3d at 920–21.

it exhausted them). If AP7 failed to do so as required, the district court would have been without jurisdiction to entertain the claims.

Because the Succession Clause question underlying the prudential standing issue is inextricably "intertwined" with the jurisdictional issue of administrative exhaustion in this way, the district court's conclusion that the Succession Clause transferred AP7's securities fraud claims to the FDIC necessarily meant that the administrative exhaustion requirement did not apply to those claims. *See Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 178 (2017). Deciding the Succession Clause question—and determining whether AP7 has the right to bring the securities fraud claims in the first instance—was therefore logically prior to, and necessary for, answering the jurisdictional question of administrative exhaustion. *See id.* at 178–79 (explaining that particular statutory question of "whether the rights asserted are rights of a certain kind . . . is a jurisdictional matter that the court must typically decide at the outset of the case" even when it involves merits issues); *see also United States v. Ruiz*, 536 U.S. 622, 628 (2002).

Like the district court, we thus begin by deciding the prudential standing issue and the underlying question of whether the Succession Clause applies to AP7's securities fraud claims.

## A. Prudential Standing

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance." *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, 747 F.3d 44, 48 (2d Cir. 2014) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004)).[18] The third-party standing rule is a prudential limitation on the federal courts' exercise of their jurisdiction. *June Med. Servs. LLC v. Russo*, 591 U.S. 299, 317 (2020) (plurality opinion) (citing *Kowalski*, 543 U.S. at 128–29); *Warth v. Seldin*, 422 U.S. 490, 498 (1975).[19] It dictates that "[o]rdinarily, a party 'must assert his own legal rights' and 'cannot rest his claim to relief on the legal rights . . . of third

[18] The doctrine "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

[19] While in *Lexmark International, Inc. v. Static Control Components, Inc.*, the Supreme Court expressed some doubt about the proper classification of the third-party standing rule, it explained that "most" of its cases frame the third-party standing inquiry as an element of prudential standing and left "consideration of that doctrine's proper place in the standing firmament" to "another day." 572 U.S. 118, 125–26, 127 n.3 (2014). Our own cases have also placed the rule under the banner of prudential standing. *See, e.g.*, *Deutsche Bank*, 757 F.3d at 86.

parties.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017) (second alteration in original) (quoting *Warth*, 422 U.S. at 499); *Kowalski*, 543 U.S. at 129.

The FDIC argues that the prudential third-party standing rule bars AP7's securities fraud claims, because, by operation of the Succession Clause, the FDIC "owns" the claims. App'x at 277; *see* Appellee's Br. at 2. The district court agreed and dismissed the complaint for lack of prudential standing. We disagree that the Succession Clause applies to AP7's securities fraud claims.[20]

[20] The district court analyzed prudential standing as a ground for dismissal under Rule 12(b)(1), reasoning that it "implicate[s] federal jurisdiction." Spec. App'x at 6 (first citing *Wight v. BankAmerica Corp.*, 219 F.3d 79, 90 (2d Cir. 2000); and then citing *In re Sofer*, 613 F. App'x 92, 92 (2d Cir. 2015) (summary order) (stating that "[p]rudential standing remains a jurisdictional requirement in our Circuit")). Our cases are not perfectly clear on whether Rule 12(b)(1) or 12(b)(6) should govern a motion to dismiss for lack of prudential standing. Some of our cases suggest that a motion to dismiss for lack of prudential standing may be brought under either Rule 12(b)(1) or Rule 12(b)(6). *E.g., Paris Baguette Am., Inc.*, 861 F.3d at 79. Moreover, several of our cases treat prudential standing as a "jurisdictional" issue in a more general sense, beyond the constitutional and statutory limitations on subject matter jurisdiction. *See, e.g., Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 127–30 (2d Cir. 2003) (Sotomayor, J.) (explaining that "standing, whether in its constitutional or prudential form, [is] a jurisdictional limitation and as such [cannot] be waived," and that "prudential considerations of standing are . . . generally treated as jurisdictional in nature" (citing *Thompson v. County of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994)), *abrogated on other grounds as recognized in Am. Psych. Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352 (2d Cir. 2016); *Hillside Metro Assocs., LLC*, 747 F.3d at 50–51 (remanding with instructions to dismiss the complaint for lack of subject matter jurisdiction where plaintiff lacked prudential standing under the third-party standing rule); *see also In re Sofer*, 613 F. App'x at 92.

In any event, we save further discussion of this question for another day. The district court's decision did not turn on the application of Rule 12(b)(1), and our own

### 1. FIRREA's Succession Clause

As we have noted, under FIRREA's Succession Clause, the FDIC, upon its appointment as receiver for a failed bank, "succeed[s] to . . . all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A). The FDIC argues that, as the district court concluded, the third-party standing rule bars AP7's securities fraud claims, because the Clause "assigned" the claims to the FDIC as receiver. Appellee's Br. at 2. The FDIC specifically contends that because AP7's securities fraud claims assert rights of Signature's stockholders "with respect to the institution and the assets of the institution," 12 U.S.C. § 1821(d)(2)(A), AP7's claims became the FDIC's claims upon its appointment as Signature's receiver. Appellee's Br. at 28–29. Because, by

---

analysis of the underlying Succession Clause question would be the same under either rule. In other words, even if the district court erred by assessing a non-jurisdictional issue under Rule 12(b)(1), remand for reconsideration under Rule 12(b)(6) is "unnecessary," because "nothing in the analysis of the court[] below turned on the mistake" and "remand would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010); *see M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013) (declining to decide whether Rule 12(b)(6) or Rule 12(b)(1) applies, where materials outside the pleading are not relevant to the dispositive legal issue and the outcome is the same under either rule).

virtue of the Clause, the FDIC "owns" AP7's claims, the argument goes, AP7 cannot press the securities fraud claims, which raise the rights of a third party, the FDIC. Spec. App'x at 8.

The meaning of the Succession Clause is a matter of first impression for this court. It is common ground that for the Clause to apply to AP7's claims, two things must be true: (1) the claims must assert a right "*of* a[] stockholder" that is (2) "*with respect to* the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A) (emphasis added). Focusing on the Clause's second requirement, the district court interpreted rights "with respect to" the institution and its assets as simply rights "regarding" the bank and its assets. In doing so, it relied on the reasoning of another district court in *Verdi v. FDIC*, No. 1:24-cv-00791(DEH), 2024 WL 4252038, at *4, 6 (S.D.N.Y. Sept. 20, 2024). Spec. App'x at 10–11 (expressly adopting *Verdi*'s holding regarding the Clause's scope). The district court reasoned that AP7's securities fraud claims fall within the Clause's scope, because the content of the Officers' and KPMG's alleged misrepresentations "relate to Signature and its assets." Spec. App'x at 15.[21]

[21] The district court alternatively reasoned that the claims against the Officers relate to the bank and its assets because damages recovered from the Officers would be paid, at least in part, from funds available under the directors and officers insurance

We begin and end our analysis with the Clause's first requirement that the claims assert a right "*of* a[] stockholder." 12 U.S.C. § 1821(d)(2)(A) (emphasis added).[22] AP7 argues that this requirement means that the right at issue must be one that a stockholder possesses as a stockholder—that is, "by virtue of . . . share ownership." Appellant's Br. at 22–23; Appellant's Reply Br. at 13. We agree. A stockholder right, within the meaning of the Clause, is one that is distinctive to stockholders and therefore derives from the ownership of stock or the corresponding legal relationship between stockholders and the corporation. This interpretation follows from the Supreme Court's decision in *Collins v. Yellen*, 594 U.S. 220 (2021), the Succession Clause's neighboring provisions, and the well-established understanding of stockholder rights under state and federal law.

In *Collins*, the Supreme Court interpreted the Succession Clause of the Housing and Economic Recovery Act of 2008 ("HERA")—a provision that is

---

policies, which it considered "assets of the bank." Spec. App'x at 14–15, 15 n.6. In this regard, the district court's reasoning was based on its interpretation of those policies, which were outside the pleadings. *See id.* at 14–15 & nn. 5–6. Because of the conclusion we reach here about the meaning of the Succession Clause, we need not consider either the policies or the district court's interpretation of them.

[22] We save for another day the interpretation of the Clause's second requirement that the stockholder right at issue be one that is "with respect to" the institution and its assets. As the district court noted, this question has divided the other circuits. *Contrast Zucker v. Rodriguez*, 919 F.3d 649, 656–57 (1st Cir. 2019), *with Levin v. Miller*, 763 F.3d 667, 672 (7th Cir. 2014).

substantially identical to FIRREA's Succession Clause. 594 U.S. at 244–45. HERA's Succession Clause similarly provides that the Federal Housing Finance Agency ("FHFA") "shall, as conservator or receiver . . . succeed to . . . all rights . . . of the regulated entity, and of any stockholder . . . of such regulated entity with respect to the regulated entity and the assets of the regulated entity." 12 U.S.C. § 4617(b)(2)(A)(i). During the 2008 financial crisis, the FHFA was appointed conservator of Fannie Mae and Freddie Mac, two mortgage financing corporations that "operate under congressional charters as for-profit corporations owned by private shareholders." *Collins*, 594 U.S. at 226–28. The corporations' shareholders subsequently brought suit against the FHFA, asserting that HERA's restriction on the President's power to remove the agency director was unconstitutional. *Id.* at 235–36.

The Supreme Court rejected the argument that HERA's Succession Clause transferred the stockholders' constitutional claim to the FHFA. *Id.* at 244–45. In doing so, the Court explained that HERA's Succession Clause "effects only a limited transfer of stockholders' rights, namely, the rights they hold *as stockholders* '*with respect to the regulated entity' and its assets*," rather than rights shared in common with non-shareholders. *Id.* at 245 (emphasis in original). The Court

ultimately held that the Succession Clause "d[id] not transfer to the FHFA the constitutional right at issue," because the right asserted by the shareholders "is not one that is distinctive to shareholders." *Id.* at 245–46.

Consistent with *Collins*'s interpretation of the phrase "rights . . . of any stockholder," *id.*, we read stockholder rights, within the meaning of the substantially identical language in FIRREA's Succession Clause, as rights that are distinctive to stockholders and held by stockholders in their capacity as stockholders.[23] We further hold that such rights are those that derive from the ownership of stock or the corresponding legal relationship between stockholders and the corporation. On this interpretation, the Succession Clause does not reach those rights a stockholder holds personally and separately from their ownership of a particular stock or their status as a stockholder. Our interpretation also follows from the Clause's neighboring provisions and the well-established understanding of stockholder and shareholder rights under state and federal corporate law.

---

[23] "[W]hen Congress uses the same language in two statutes having similar purposes, . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005).

Most notably, the provision that immediately follows the Succession Clause—§ 1821(d)(2)(B)—describes the FDIC's power to "[o]perate the institution." 12 U.S.C. § 1821(d)(2)(B). Extrapolating from the Clause's transfer of stockholder rights and powers to the FDIC, it provides that the FDIC may, as receiver, "take over the assets of and operate the insured depository institution with all the powers of the . . . shareholders . . . of the institution and conduct all business of the institution." 12 U.S.C. § 1821(d)(2)(B)(i).[24] Section 1821(d)(2)(B)'s explication of the FDIC's power, as receiver, to control the institution's assets and operate the institution with the stockholders' powers reinforces our view of the Succession Clause. Because § 1821(d)(2)(B) empowers the FDIC to manage the institution's assets and operations with all the stockholders' powers, it makes sense that its neighboring provision, the Succession Clause, applies, at step one, to rights and powers that derive from the ownership of stock or the corresponding legal relationship between stockholders and the corporation. After all, stock

[24] Section 1821(d)(2)(A) explains that the FDIC succeeds to all rights of, inter alia, "any stockholder" of the institution. Section 1821(d)(2)(B) authorizes the FDIC to exercise all powers of the institution's "shareholders." We understand these terms to mean the same thing, and we use them interchangeably herein. *See* 11 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 5085 (Sept. 2025 update).

ownership is the source of the stockholders' interest in and control over the corporation's assets and operations.

Our view stems from the long-standing principle that, generally speaking, the stockholders' interest in and "power of legal control" over the corporation—including their ability to "govern[] and control[]" it "through the officers whom they elect"—"is in exact proportion to the amount of [their] stock." *Sawyer v. Hoag*, 84 U.S. (17 Wall.) 610, 623 (1873). Indeed, what makes stockholder rights distinctive, under both state and federal law, is that they derive from the ownership of stock or the corresponding legal relationship between stockholders and the corporation. *See, e.g.*, *Crane Co. v. Anaconda Co.*, 39 N.Y.2d 14, 18 (1976) (explaining that the "conceptual basis for [a shareholder's] right [to inspect corporate records] is derived from the shareholder's beneficial ownership of corporate assets and the concomitant right to protect [that] investment"); *In re Facebook, Inc., Initial Pub. Offering Derivative Litig.*, 797 F.3d 148, 157 (2d Cir. 2015) (discussing a shareholder's right to bring a derivative action on behalf of the company, and explaining that "[t]he contemporaneous stock ownership rule . . . denies a putative derivative plaintiff standing to challenge wrongdoing that predated the time the plaintiff became a shareholder"); *Brookfield Asset Mgmt., Inc.*

*v. Rosson*, 261 A.3d 1251, 1263 (Del. 2021) (discussing a stockholder's right to bring a direct action, and explaining that "a stockholder who is directly injured retains the right to bring an individual action for injuries affecting his or her legal rights *as a stockholder*" (emphasis added)); *Saba Cap. CEF Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 115–16 (2d Cir. 2023) (discussing a shareholder's voting rights arising from stock ownership).[25]

The well-established understanding of stockholder rights under state corporate law holds particular purchase here. As the Supreme Court has explained, FIRREA regulates against the backdrop of state corporate law. *O'Melveny & Myers*, 512 U.S. at 85, 87 (explaining that FIRREA's Succession Clause "places the FDIC in the shoes of the insolvent [savings and loan], to work out its claims under state law, except where some provision in the extensive framework

[25] *See also In re Starbuck*, 251 N.Y. 439, 445 (1929) ("The right to the dividends is an incident of the ownership of the stock."); *Campbell v. Am. Zylonite Co.*, 122 N.Y. 455, 459 (1890) (discussing "[t]he rights and powers arising out of the ownership of corporate shares," including the rights to sell shares, vote in corporate elections, approve or disapprove changes to the relative value of shares, and approve or disapprove mortgaging of corporate property); *Cont'l Sec. Co. v. Belmont*, 206 N.Y. 7, 17–18 (1912) (discussing "the authority of stockholders in the management of business corporations"); *Gollust v. Mendell*, 501 U.S. 115, 122–24 (1991) (discussing the stock ownership requirement for the stockholder right of action for disgorgement of short-swing profits from insider trading under § 16(b) of the '34 Act); *Zetlin v. Hanson Holdings, Inc.*, 48 N.Y.2d 684, 685 (1979) (noting "that those who invest the capital necessary to acquire a dominant position in the ownership of a corporation have the right of controlling that corporation").

of FIRREA provides otherwise," and that "matters left unaddressed" in FIRREA's "comprehensive and detailed" "scheme are presumably left subject to . . . state law"); *Atherton v. FDIC*, 519 U.S. 213, 226 (1997) (holding that uniform federal common law does not supply a "general standard of care applicable to" federally insured institutions).[26]

Moreover, in *Resolution Trust Corp. v. Diamond*, we specifically explained that under FIRREA, the Resolution Trust Corporation, a predecessor receiver for federally insured savings institutions, "like the FDIC in *O'Melveny*, steps into the shoes of another entity having claims, rights, powers and causes of action defined and limited by state law." 45 F.3d 665, 670 (2d Cir. 1995). In this sense, when it used the phrase "all rights . . . of any stockholder," 12 U.S.C. § 1821(d)(2)(A)(i),

[26] *Accord Langley v. FDIC*, 484 U.S. 86, 90–91 (1987) (interpreting word "agreement" in a provision of the Federal Deposit Insurance Act that governed the enforcement of certain agreements against the FDIC in its capacity as receiver, based on its common meaning under commercial and contract law); *Burks v. Lasker*, 441 U.S. 471, 478 (1979) (explaining that "in [the] field [of corporate law] congressional legislation is generally enacted against the background of existing state law," and that "Congress has never indicated that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute"); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98, 109 (1991) (stating that courts should rarely "endeavor to fill the interstices of federal remedial schemes with uniform federal rules," and explaining that "[t]he presumption that state law should be incorporated into federal common law is particularly strong in areas," like corporate law, "in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards").

Congress "borrow[ed] [a] term[] of art in which are accumulated the legal tradition and meaning of centuries of practice." *United States v. Hansen*, 599 U.S. 762, 774 (2023) (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952)). We therefore presume Congress "kn[ew] and adopt[ed] the cluster of ideas that were attached to" the term stockholder rights when it enacted FIRREA's Succession Clause. *Id.*

The rights that stockholders "*hold as stockholders*," *Collins*, 594 U.S. at 245 (emphasis in original), are therefore those they hold as "persons who are interested in the operation of the corporate property and franchises" by virtue of their "undivided interests in the corporate enterprise," *In re Bronson*, 150 N.Y. 1, 8 (1896). The next question, then, is whether AP7's securities fraud claims assert rights that are stockholder rights within the meaning of the Clause.

**2. AP7's 10b-5 Claims**

AP7's securities fraud claims do not assert the right of a stockholder but the right of a *stock purchaser* under Rule 10b-5. The *Birnbaum* rule[27] limits the availability of the § 10(b) and Rule 10b-5 private right of action to purchasers and sellers of securities who suffered economic loss due to misrepresentations in connection with their purchase or sale. *Blue Chip Stamps v. Manor Drug Stores*, 421

---

[27] *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 464 (2d Cir. 1952).

U.S. 723, 731–35, 737–38 (1975). In doing so, it precludes claims by "actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material." *Id.* at 737–38. The rule also precludes claims by "shareholders [ and] creditors . . . who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b-5," when the purchase or sale of securities was not made *by the shareholders and creditors themselves*. *Id.* at 738. The *Birnbaum* rule makes clear that the Rule 10b-5 right of action arises in connection with the purchase or sale of securities, not mere ownership of the stock in question. In other words, the Rule 10b-5 right of action "is not a property right carried by the shares, nor does it arise out of the relationship between the stockholder and the corporation." *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2015).[28]

The district court considered AP7's right of action under Rule 10b-5 to be a right "in its capacity as a stockholder," because its "theory of damages for its

[28] "A Rule 10b-5 claim under the federal securities laws is a personal claim akin to a tort claim for fraud. The right to bring a Rule 10b-5 claim is not a property right associated with shares, nor can it be invoked by those who simply hold shares of stock. . . . As such, the Rule 10b-5 claim is personal to the purchaser or seller and remains with that person; it does not travel with the shares." *Activision Blizzard*, 124 A.3d at 1056 (citations omitted).

investments both before and after the alleged misrepresentations depend[s] on the drop in value of its shares." Spec. App'x at 14 (quoting *Verdi*, 2024 WL 4252038, at *6 (cleaned up)). But the fact that a plaintiff's theory of *damages* involves the plaintiff's stock ownership does not mean that the underlying right asserted by the plaintiff's claim attaches to stock ownership and is distinctive to stockholders.

To the extent AP7 or other members of the putative class are stockholders, their status as such was not the source of the Rule 10b-5 rights at issue and reflects only their decision to hold the stocks. If AP7 or other members of the putative class sold their stocks at a loss, such that they were no longer stockholders, they would still have the same rights of action under Rule 10b-5 as purchasers of securities. *See Clark*, 583 F.2d at 603 (holding that the difference between purchase price and subsequent resale price is a proper theory of damages for Rule 10b-5 claims brought by defrauded stock purchasers who subsequently sold the stock); *Dura Pharms.*, 544 U.S. at 342 ("If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price might mean a later loss." (emphasis omitted)). Or, if AP7 or other members of the putative class happened to have purchased a different form of security than stock, such as a type

of debt security like a note or bond,[29] they, again, would have the same rights of action under Rule 10b-5 as purchasers of securities. What matters is the nature of the underlying right.

That is quite different from, for example, a shareholder's right to bring a derivative action on behalf of the company, which derives from and requires contemporaneous ownership of stock. *See In re Facebook*, 797 F.3d at 157 ("The contemporaneous stock ownership rule . . . denies a putative derivative plaintiff standing to challenge wrongdoing that predated the time plaintiff became a shareholder.").

Because AP7's Rule 10b-5 right of action is not a stockholder right within the meaning of the Succession Clause, the district court erred in concluding that the Clause transfers AP7's securities fraud claims to the FDIC. And for that reason, the district court erred in dismissing AP7's complaint for lack of prudential standing.

---

[29] *See* 15 U.S.C. § 78c(a)(10) (defining the term "security" under the '34 Act to include, among other things, "any note, stock, treasury stock, security future, security-based swap, bond, debenture, [or] certificate of interest or participation in any profit-sharing agreement"); *Reves v. Ernst & Young*, 494 U.S. 56, 60–61 (1990) (discussing the definition of "security" under § 3(a)(10) of the '34 Act).

## B. Administrative Exhaustion

Because AP7 has prudential standing to bring the securities fraud claims, one question remains. Was AP7 required to administratively exhaust its securities fraud claims against KPMG and the Officers? It was not.

FIRREA grants the FDIC, as receiver, the authority to administratively "determine claims," 12 U.S.C. § 1821(d)(3)(A), "against a depository institution," *id.* § 1821(d)(5)(A)(i), including those by "the depository institution's creditors," *id.* § 1821(d)(3)(B)(i); *see id.* § 1821(d)(3)–(11), (d)(13)(D) (outlining procedures for administrative determination of claims against bank and the FDIC and for judicial review of administrative determinations). The FDIC must then distribute "amounts realized from the liquidation . . . of any insured depository institution" to pay claims according to the prescribed order of priority. *Id.* § 1821(d)(11). When the FDIC disallows a claim, the claimant has the option to request additional administrative review or file suit on the claim in federal district court. *Id.* § 1821(d)(5)(A)(i), 1821(d)(6).

Section 1821(d)(13)(D), the provision that makes administrative exhaustion a jurisdictional requirement, defines the claims subject to the administrative claim scheme with particularity:

> Except as otherwise provided in this subsection, no court shall have jurisdiction over—
>
> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
>
> (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

12 U.S.C. § 1821(d)(13)(D)(i)–(ii).

The FDIC argues that AP7 needed to administratively exhaust its claims against KPMG and the Officers because although the claims are not brought against the bank or the FDIC as receiver, they nonetheless relate to acts of Signature. Appellee's Br. at 60–61. This argument is squarely foreclosed by our decision in *Bank of New York v. First Millennium, Inc.*, a case the FDIC fails to cite, in which we interpreted § 1821(d)'s scope and held that the procedural requirements of FIRREA's administrative claim scheme apply only to claims against the failed institution, or against the FDIC as receiver. 607 F.3d 905, 920–21

(2d Cir. 2010) (explaining that § 1821(d) "establishes administrative procedures for bringing claims *against institutions* for which the FDIC is receiver" (emphasis added)); *see also Resol. Tr. Corp. v. Elman*, 949 F.2d 624, 627 (2d Cir. 1991) (explaining that FIRREA "provides an administrative scheme for adjudicating claims . . . *against the institution* for which the [FDIC's predecessor] has become receiver" (emphasis added)). In doing so, we rejected an overly broad, "out of context" interpretation of § 1821(d)(13)(D)(ii) that would "deprive courts of jurisdiction over any claim involving the FDIC's 'act or omission,' even a claim not directly against the FDIC." *First Millennium*, 607 F.3d at 920–21. We instead explained that § 1821(d)(13)(D)(ii) bars "only claims that could be brought under the administrative procedures of § 1821(d), not any claim at all involving the FDIC." *Id.* at 921.

*First Millennium* is instructive. There, the Bank of New York, as trustee for the NextCard Credit Card Master Note Trust, brought an interpleader action against the FDIC as receiver for the failed bank that created the trust "to generate money to lend to credit card holders," and against owners of notes issued by the trust. *First Millennium*, 607 F.3d at 908–09. Both the FDIC and the noteholders asserted claims to the funds held by the trust. We concluded that the noteholders'

claim against the trust was "not an administrative claim, nor could it have been one," because, "[t]hey h[e]ld notes issued by . . . an independent and still solvent entity," they were "not creditors of [the failed bank]," and "they assert[ed] no claims against either that failed institution or against the FDIC." *Id.* at 920.

Here, AP7 did not need to exhaust its securities fraud claims against the Officers or KPMG because they are not claims against Signature. AP7's claims do not name Signature as a defendant, do not seek to impose liability on Signature, and seek recovery only from the individual Officers and KPMG. *See First Millennium*, 607 F.3d at 920–21; *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1144–45 (D.C. Cir. 2011) (concluding that administrative exhaustion is not required where plaintiff "allege[s] that [defendant], not the FDIC-as-receiver or [the failed bank], itself committed the tortious acts for which they claim relief").[30] AP7 was therefore not required to administratively exhaust its claims against the Officers or KPMG.

---

[30] Our analysis here concerns only the claims before us. We take no position on whether the administrative exhaustion requirement would apply to third-party claims for contribution or indemnification that former directors and officers may bring against a failed bank, or claims based on imputed liability, under legal theories such as respondeat superior or agency principles, that a plaintiff may bring against a failed bank, in addition to claims against third parties. *See* Fed. R. Civ. P. 14(a)(1) ("A defending party may, as third-party plaintiff, serve a . . . complaint on a nonparty who is or may be liable to it for all or part of the claim against it.").

We are also unpersuaded by the FDIC's argument that the constituent *Schaeffer* and *Singh* complaints' inclusion of claims against Signature at the time of their filing means that the district court lacked subject matter jurisdiction over the *Schaeffer* and *Singh* actions at the outset and thereafter over the consolidated action. Appellee's Br. at 60. Even assuming the district court's subject matter jurisdiction over the consolidated action depends on the complaints in the constituent actions in this way,[31] the *Schaeffer* and *Singh* complaints nonetheless also included claims against individual former officers at the time of their filing. As relevant here, § 1821(d)(13) strips jurisdiction over any unexhausted "*claim* relating to any act or omission" of Signature or the FDIC and any unexhausted "*claim or action* for payment from . . . the assets of" Signature, but it does not necessarily strip

[31] We take no position on this issue and note only that it is not entirely clear under our caselaw. Additionally, the consolidation order and the record do not specify the precise extent of the consolidation and, in particular, the extent to which the consolidated complaint was intended to supersede the prior individual pleadings. *See Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 n.3 (2015) ("Parties may elect to file a 'master complaint' and a corresponding 'consolidated answer,' which supersede prior individual pleadings."); *Hall v. Hall*, 584 U.S. 59, 77 (2018) ("District courts enjoy substantial discretion in deciding whether and to what extent to consolidate cases. . . . [C]onstituent cases retain their separate identities at least to the extent that a final decision in one is immediately appealable by the losing party." (citation omitted)). *But see Cole v. Schenley Indus., Inc.*, 563 F.2d 35, 38 (2d Cir. 1977) (stating that notwithstanding the filing of a consolidated complaint, "[w]e must . . . consider the jurisdictional basis of each complaint separately").

jurisdiction over an entire *action* where a complaint presents some claims that did not need to be administratively exhausted and others that did. *Contrast* 12 U.S.C. § 1821(d)(13)(D)(i) (stripping jurisdiction over any unexhausted "*claim or action* for payment from . . . the assets of" Signature of the FDIC) (emphasis added)), *with id.* § 1821(d)(13)(D)(ii) (stripping jurisdiction over any unexhausted "*claim* relating to any act omission" of Signature or the FDIC (emphasis added)). Otherwise, the "claim or action" language would be superfluous. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 554 (2005) (discussing how some "statutory prerequisites for federal jurisdiction . . . can be analyzed claim by claim").

In any event, even if the *Schaeffer* and *Singh* complaints' initial inclusion of the claims against Signature created a jurisdictional defect with respect to those actions that implicated the district court's jurisdiction over the consolidated action, the subsequent dismissal of those claims in the constituent actions and the filing of the amended consolidated complaint cured it. *See Hain Celestial Grp., Inc. v. Palmquist*, 607 U.S. 421, 428 (2026) ("If a district court 'cures' a jurisdictional defect prior to final judgment, then the court of appeals is not required to vacate that judgment even if, at some earlier point in the case, the district court lacked jurisdiction."); *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35–36 (2025)

("The amended complaint becomes the operative one; and in taking the place of what has come before, it can either create or destroy jurisdiction."). We therefore conclude that AP7 did not run afoul of FIRREA's administrative exhaustion requirement, and the district court's subject matter jurisdiction over the consolidated action was sound.

## CONCLUSION

For the reasons above, we **VACATE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.